**LOEB & LOEB LLP**
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Tel: 310-282-2000
Fax: 310-282-2200
Email: bgiven@loeb.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

**FORSHEY & PROSTOK, LLP**
Jeff Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
        llankford@forsheyprostok.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 20-40349-elm11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Adv. Proc. No. 20-_____ |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BIG PICTURE LOANS, LLC, ASCENSION | § | |
| TECHNOLOGIES, LLC, and TRIBAL | § | |
| ECONOMIC DEVELOPMENT HOLDINGS, LLC, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT FOR TURNOVER, TEMPORARY
## RESTRAINING ORDER AND INJUNCTIVE RELIEF, AND FORECLOSURE

COMES NOW Plaintiff Eventide Credit Acquisitions, LLC (the "**Debtor**" or "**Plaintiff**"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, and as plaintiff in the above-captioned adversary proceeding, and hereby alleges for its *Complaint for Turnover, Temporary Restraining Order and Injunctive Relief, and Foreclosure* (the "**Complaint**"),[1] upon knowledge of its own acts and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.    The Debtor is facing a liquidity crisis caused by Tribal Economic Development Holdings, LLC ("**TED**"), Big Picture Loans, LLC ("**Big Picture**"), and Ascension Technologies, LLC ("**Ascension**"), Defendants in this Adversary Proceeding.  The Debtor and the Defendants entered into a prepetition seller-financed transaction whereby the Debtor sold its business to the Defendants in exchange for a secured promissory note, with payments under the promissory note being calculated based on an agreed waterfall.  However, instead of making the agreed upon payments under the waterfall, Defendants have, at every turn, devised new ways to reduce the payments owed to the Debtor so as to divert profitability after the note sunsets.  These decisions by the Defendants were boldly in breach of several obligations to maximize the note payments.  As a result, the Debtor has not received any payments under the promissory note since November 2018.

2.    Even worse, with knowledge of the Debtor's bankruptcy filing and after receiving a demand to make the contractually required payment under the promissory note, Defendants refused to comply and, instead, purported to effectuate an offset against amounts allegedly owed by the Debtor under a separate agreement.  Defendants have further taken the position that their

---

[1] The claims asserted in this Complaint are subject in all respects to the Debtor's forthcoming motions to transfer venue of the Pending Actions to this Court where they can be efficiently litigated in one forum.

actions are permissible as a result of their sovereign immunity and that the automatic stay of section 362 of the Bankruptcy Code does not apply to them.

3.  The payments owed to the Debtor under the waterfall belong to the Debtor and are subject to turnover under section 542 of the Bankruptcy Code.  In addition, Defendants' conduct gives rise to certain damage claims in favor of the Debtor, including for violation of the automatic stay.  The Debtor is entitled to relief on an immediate and permanent basis for turnover of cash belonging to and withheld from the Debtor, and for damages, among other relief requested herein. Substantially contemporaneously with filing this Complaint, the Debtor is filing pleadings in this Adversary Proceeding to obtain temporary and preliminary relief for the immediate turnover of the withheld waterfall payments that Defendants are wrongfully retaining in violation of the automatic stay.  At minimum, the withheld funds should be paid into the registry of the Court so that they are not dissipated while the Court reaches a final determination on these issues as Defendants have shown that they will use every effort available to resist having to make contractually required payments to the Debtor.

4.  Separately, Defendants have committed blatant breaches of the promissory note and other transaction documents between the Debtor and the Defendants, including by entering into a settlement agreement for additional indebtedness, not consented to by the Debtor, designed to displace more than $20 million dollars in Debtor note payments, over the next two years, for the benefit of the plaintiffs in class action litigations against both the Defendants and the Debtor. However, the Debtor itself will receive no benefit under the settlement agreement.  As a result, the Debtor is permitted to foreclose on its collateral, which must now be turned over to the Debtor's estate so that it may be sold for the benefit of the Debtor and its legitimate creditors.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b).

6. Venue in this district is proper under 28 U.S.C. § 1409.

7. The statutory predicates for the relief requested herein are sections 362(a)(3), 362(a)(6), 362(a)(7), 542(a), 542(b), 542(e) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") as well as rules 7001(1), 7001(7), and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

8. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A), (E) and (O). To the extent this matter is determined to be non-core, Plaintiff consents to the entry of final orders and judgments by this Court in this adversary proceeding.

## THE PARTIES

9. Plaintiff Eventide Credit Acquisitions, LLC is a Delaware limited liability company with its principal place of business in Texas.

10. Defendant TED is a limited liability company organized under the laws of The Lac Vieux Desert Bank of Lake Superior Chippewa Indians ("**LVD**") with its principal place of business on LVD's reservation in the Upper Peninsula of Michigan.

11. Defendant Big Picture is a limited liability company organized under the laws of the LVD with its principal place of business on LVD's reservation in the Upper Peninsula of Michigan. Big Picture is a subsidiary of TED.

12. Defendant Ascension is a limited liability company organized under the laws of the LVD with its principal place of business on LVD's reservation in the Upper Peninsula of Michigan. Ascension is a subsidiary of TED.

## FACTUAL BACKGROUND

**A.      The Transaction Between the Debtor and the Defendants.**

13.      Since 2011, in an effort to relieve the burdens of its sovereignty amplified by a downturn in its casino, LVD enacted legislation and regulatory and other infrastructure to begin online lending from its reservation.  LVD's purpose was to further its attainment toward self-sufficiency through self-determination and economic development.  With a minimal tax base and resources and all the obligations of a sovereign, federal law and policy suggested (as tribes so typically do) LVD seek "outside expertise" and capital to help build its brand, its intellectual property and to consult and mentor.   LVD began first in online title lending, before it met the President of the Debtor, Matt Martorello, through agents LVD paid to seek the specialized fintech expertise so commonly available to banks and non-bank lenders in modern digital lending.

14.      LVD has operated online lending businesses to consumers nationwide.  Each lending entity was wholly-owned, operated and controlled by LVD, regulated by LVD's agency in accord with both tribal and federal laws, and was headquartered and operated from LVD's reservation.  All loans were originated on LVD's reservation located in the Upper Peninsula of Michigan, where state law is not applicable.  The loans were also serviced and collected from actions on the reservation and payment then applied to the loan transactions there as well.  Indeed, at all times, LVD had complete control over the lending entities.

15.      In 2012, LVD began offering loans to consumers through a tribal lending entity called Red Rock Tribal Lending, LLC ("**Red Rock**").  LVD also offered consumer loans through a second tribal lending entity, Duck Creek Financial, LLC ("**Duck Creek**").  To assist in the growth of LVD's lending portfolios and to provide necessary services to those portfolios, Red Rock and Duck Creek entered into a servicing agreement with Bellicose VI, Inc. ("**Bellicose**") to obtain vendor services.  Without a restriction to sovereignty as there is in gaming through the

Indian Gaming Regulatory Act providing a template by which to engage, Martorello engaged over a dozen of the nation's most esteemed tribal lawyers who worked with the LVD's lawyers to ensure the business would be entirely lawful. The parties landed upon a congressionally blessed NIGC management contract as their template. In 2012, Bellicose assigned its rights under its servicing contracts with Red Rock and Duck Creek to its affiliate, SourcePoint VI, LLC ("**SourcePoint**"). The services Red Rock and Duck Creek obtained from Bellicose and SourcePoint included, *inter alia*, compliance management assistance, marketing material development, and the development of risk modeling and data analytics. While these services were vital to LVD's economic development, the termination rights and all decisions, or revocation of, were always in the sole and absolute discretion of LVD whose council appointed council members as the Defendants' managers and chief executive officers.

16.     After a few years, LVD sought to mature its lending operations by moving in house several vendor services in an effort to reduce costs as well as to further enhance economic development opportunities for LVD and members of LVD. Towards that end, LVD sought to acquire its then service provider, SourcePoint, along with its affiliates and parent company, Bellicose Capital, LLC ("**Bellicose Capital**"). LVD determined that such an acquisition would create significant value for LVD because of the valuable processes, good will, existing contractual relationships, and other assets owned by Bellicose Capital and its subsidiaries. After more than three years of discussion, LVD's lawyers provided Bellicose Capital a compelling framework and revenue multiple for a seller financed transaction that would result in substantial tax benefits to Bellicose Capital's members whereby LVD acquired Bellicose Capital, including SourcePoint.

17.     As an overview, the acquisition was generally structured as follows:

(a)     LVD formed Big Picture, its new lending entity.

(b)     LVD formed Ascension, its new servicing company.

(c)     LVD formed TED, as the parent company, to wholly own both Big Picture and Ascension.

(d)     LVD transferred all assets and liabilities from Duck Creek and Red Rock to Ascension and Big Picture.  Red Rock and Duck Creek dissolved.

(e)     The Debtor was formed as an entity to sell Bellicose Capital to LVD through TED.

(f)     SourcePoint and all of its subsidiary companies merged and consolidated their assets into Bellicose Capital.

(g)     Bellicose Capital was acquired by LVD Tribal Acquisition Company, LLC ("**TAC**") and its assets were transferred to Ascension and its liabilities to Big Picture.  TAC was then dissolved.  This left TED as the holding company for its subsidiaries, Big Picture and Ascension.

(h)     The transaction was evidenced by (1) a secured promissory note to the Debtor (the "**Promissory Note**"), attached as **Exhibit 1**, (2) a Loan and Security Agreement (the "**LSA**"), attached as **Exhibit 2**, (3) Parental Guarantee and Sovereign Immunity Waiver ("**Guarantee**"), attached as **Exhibit 3**, and (4) Agreement and Plan of Merger (the "**Merger Plan**" and together with the Promissory Note, LSA and Guarantee, the "**Transaction Documents**"), attached as **Exhibit 4**.

18.     In sum, remaining today are the Debtor, a secured creditor in a seller-financed transaction, LVD, and TED, the buyer and parent of Big Picture and Ascension.  The Promissory Note from TED to the Debtor was secured by certain Collateral as defined in section 2.2(b) of the

LSA and section 1.5 of the Promissory Note, which includes substantially all of the assets of TED, Big Picture and Ascension.

19. The term-sheet was signed August 22, 2014, the acquisition finally closed on January 26, 2016, and was completed by February 15, 2016.

20. After the acquisition by LVD of the business previously operated by Bellicose Capital and SourcePoint, LVD continued to operate its short term consumer lending business through TED, Big Picture and, the brain bank that supports the lender, Ascension.

21. Because of the seller-financed nature of the transaction, LVD (through TED) committed to make contractually required payments to the Debtor for a seven-year period, pursuant to the Promissory Note, after which the remaining debt on the note would be retired and LVD, through TED, would own the consulting business free and clear of any obligations to its creditor, the Debtor. The term of the Promissory Note is set to expire on January 26, 2023.

22. To ensure a fair price would be paid and that TED would not risk default from ordinary course fluctuations to the business such as seasonality, the payments required to be made to the Debtor are variable and determined based upon a contractual waterfall set forth in section 1.2 of the Promissory Note (the "**Waterfall**") that was advantageous to LVD's and the Defendants' interests. Because these Waterfall payments to the Debtor are not uncommon in Indian country efforts of economic development, and they naturally varied based upon TED's overall profitability, TED agreed that it owes a fiduciary duty to the Debtor to maximize note payments, as set forth in section 4.4 of the LSA and that it would limit its other indebtedness without the consent of the Debtor as set forth in section 5.1 of the LSA.

**B.      Defendants Blatantly Breached the Transaction Documents in Numerous Ways.**

23.      However, Defendants breached their fiduciary duty to maximize note payments and otherwise breached the LSA and Promissory Note, resulting in the Debtor receiving no payments under the Promissory Note since November 2018.

24.      Defendants breached the LSA and Promissory Note by:

a.      Improperly deducting moneys from Waterfall calculations pursuant to the Promissory Note as "bad debt reservations";

b.      Maintaining undisclosed reserves against payments to the Debtor under the Promissory Note;

c.      Making wholesale changes to product and business policy to the detriment of TED's obligations to the Debtor under the LSA and Promissory Note so as to increase instead the payments after the note sunsets;

d.      Cementing the changes to their product and business policy by changing Tribal law in violation of section 5.16 of the LSA and section 2 of the Guarantee;

e.      Making gross misrepresentations to the Debtor about the financial forecasts of its business concealing the changes and the attempts to move note payment dollars past the sunset;

f.      Incurring $15,000,000 of senior debt ahead of the Debtor, without the Debtor's written consent and in violation of section 5.1 of the LSA;

g.      Incurring legal expenses outside the ordinary course of business and including such payments in the calculation of the Waterfall; and

h.      Paying subordinated insider debt ahead of payments to the Debtor, without the Debtor's written consent in violation of section 5.1 of the LSA.

25.     In addition, Big Picture and Ascension are defendants in class-action litigation pending in the United States District Courts of Oregon, Massachusetts, and the Eastern District of Virginia.  They have sought to resolve those litigations, as against them, by way of a settlement with the putative consumer classes that brought suit against them in those districts (the "**Settlement Agreement**").  Plaintiffs in those putative class actions sought court approval of the Settlement Agreement by filing a Motion for Preliminary Approval of the Class Action Settlement on November 26, 2019, which is attached as **Exhibit 5**.  The Settlement Agreement was preliminarily approved on December 20, 2019.

26.     Contrary to their obligations in the LSA, Big Picture Loans and Ascension have agreed to pay $8,700,000 in the Settlement Agreement over the next two years.

27.     In the Settlement Agreement, Big Picture and Ascension also agreed to collect no more than 2.5 times the original principal amount of the loan in payments over the life of the loan for individuals who executed loan agreements on or after June 22, 2013, resulting in an estimated impact of greater than eleven million dollars.

28.     On December 12, 2019, Eventide's counsel sent a Notice of Default to Big Picture and Ascension.

29.     These breaches and Events of Default are currently the subject of an arbitration commenced by the Debtor against LVD and the Defendants before the American Arbitration Association on December 16, 2019 (the "**Arbitration**").  Such Arbitration is expressly permitted by section 8.5 of the LSA and section 10(e) of the Guarantee.

30.     Under section 6.2 of the LSA, after an Event of Default has occurred, the Debtor is authorized

> without any further demand or notice except to such extent as may
> be required by applicable law, to take possession and/or sell or

otherwise dispose of all or any of the Collateral at public or private sale and the exercise of any rights under agreements held in escrow; and [the Debtor] may also exercise any and all other rights and remedies of a secured party under the UCC . . . *Upon demand by [the Debtor], [Defendants] shall assemble the Collateral and make it available to [the Debtor] at a place designated by [the Debtor] which is reasonably convenient to [the Debtor] and [TED].* [Defendants] hereby acknowledge[] that [the Debtor] has extended credit and other financial accommodations to [TED] upon reliance of [Defendants'] granting [the Debtor] the rights and remedies contained in this Agreement including without limitation *the right to take immediate possession of the Collateral upon the occurrence of an Event of Default* which has not been waived by [the Debtor] and [Defendants] hereby acknowledge that [the Debtor] is entitled to such equitable and injunctive relief to enforce any of its rights and remedies hereunder and [Defendants] hereby waive[] any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to [the Debtor].

LSA at § 6.2 (emphasis added).

31.     Accordingly, as result of the Events of Default under the Transaction Documents, and the Debtor's right to take immediate possession of the Collateral upon an Event of Default, the Collateral is now property of the Debtor's estate and is subject to turn over.

**C.     The Side Letter.**

32.     On May 6, 2019, TED and the Debtor entered into that certain letter agreement for $5,000,000 in advance payments on the Promissory Note (the "**Side Letter**").  A copy of the Side Letter is attached hereto as **Exhibit 6**.  Pursuant to the Side Letter, Defendants agreed to make certain payments to the Debtor beginning in May 2019 with the final payment being made on July 31, 2019.

33.     Thereafter, TED and the Debtor agreed that TED could offset amounts it would otherwise be required to pay under the Promissory Note until all amounts advanced to the Debtor under the Side Letter had been offset.

34.     In negotiations relating to the Side Letter, Defendants stated that they anticipated all payments relating to the Side Letter would be offset within three months.

35.     However, TED conveniently did not purport to offset any payments due by the Debtor under the Side Letter until after the Arbitration was commenced.  TED allegedly applied $425,695.44 to amounts owed on the Side Letter in January 2020 based on revenues generated by Big Picture in December 2019.

    **D.**    **The Bankruptcy Filing and Demand Letter.**

36.     On January 28, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed.

37.     On February 14, 2020, TED was obligated to pay the Debtor not less than $988,931.35 on the Promissory Note (the "**February Payment**") as dictated by TED's own application of the Waterfall.

38.     Instead of making the February Payment, TED purported to effect a setoff of such amount against a sum allegedly owed by the Debtor to TED pursuant to the Side Letter.

39.     On February 20, 2020, the Debtor issued a demand letter directing TED to make the February Payment by February 25, 2020 and advising it that failure to make the payment would result in a violation of the automatic stay.

40.     On February 25, 2020, Big Picture and Ascension responded to the Debtor's demand letter and denied any obligation on their part or the part of TED to make the February Payment.

41.     Big Picture and Ascension further asserted that, as a result of their sovereign immunity, the automatic stay of section 362 of the Bankruptcy Code does not apply to any of the Defendants.

42.     Defendants' course of action and own assertion demonstrates their belief that they should be permitted to purchase a business from the Debtor worth not less than $100 million and not pay for it, all to the detriment of the Debtor and its legitimate creditors, and that this Court is unable to do anything to stop them.

**FIRST CLAIM FOR RELIEF**
**(11 U.S.C. § 542(b) – Turnover of Payments Owed under the Waterfall)**

43.     The Debtor repeats and re-alleges Paragraphs 1-42 of this Complaint as if fully set forth herein.

44.     Bankruptcy Code section 542(b) expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of the trustee, except to the extent that such debt may be offset under [11 U.S.C. § 553]."  11 U.S.C. § 542(b).

45.     Bankruptcy Code section 541(a) provides, in pertinent part, that the bankruptcy estate is comprised, among other things, of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

46.     The February Payment became payable on February 14, 2020 as set forth in section 1.2 of the Promissory Note.

47.     The February Payment constitutes a debt that is mature, payable on demand and/or payable on order.

48.     The February Payment is property of the estate pursuant to section 541(a) of the Bankruptcy Code.

49.     No part of the February Payment may be offset under section 553 of the Bankruptcy Code.

50.     TED has not paid the February Payment to the Debtor.

51.     As set forth in the Response Letter, Big Picture and Ascension have indicated that TED intends to continue to withhold payments due under the Waterfall as repayment of the amount advanced pursuant to the Side Letter.

52.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, the Debtor requests that the Court enter an order compelling TED to turn over the February Payment to the Debtor and to make all subsequent payments owed on the Promissory Note as provided for in the Waterfall.

**SECOND CLAIM FOR RELIEF**
**(11 U.S.C. § 542(e) – Turnover of Information)**

53.     The Debtor repeats and re-alleges Paragraphs 1-52 of this Complaint as if fully set forth herein.

54.     Section 542(e) of the Bankruptcy Code provides that "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e).

55.     Defendants have prohibited the Debtor from accessing information regarding the Collateral that the Debtor is entitled to receive pursuant to section 4.3 of the LSA.  Information regarding the Debtor's Collateral constitutes information relating to the Debtor's property and financial affairs.

56.     Debtor is entitled to entry of an order compelling Defendants to turn over information in Defendants' possession relating to the Debtor's Collateral, including the information required under section 4.3 of the LSA.

### THIRD CLAIM FOR RELIEF
**(Demand for Accounting)**

57.      The Debtor repeats and re-alleges Paragraph 1–56 of this Complaint as if fully set forth herein.

58.     Defendants have breached section 4.3 of the LSA by failing to provide all necessary information to calculate payments owed under the Waterfall.

59.     The Debtor is entitled to an accounting and affirmative injunctive relief against Defendants, requiring Defendants to promptly produce all relevant data and documentation to enable the Debtor to determine the amount owed under the Waterfall and to audit and review any claim which Defendants may assert as their basis for refusing to make the Waterfall payments.

### FOURTH CLAIM FOR RELIEF
**(11 U.S.C. § 362(a) – Damages for Violation of Automatic Stay)**

60.      The Debtors repeats and re-alleges Paragraph 1–59 of this Complaint as if fully set forth herein.

61.     Defendants had actual notice of the bankruptcy filing by the Debtor and the imposition of the automatic stay.

62.     Defendants have stated that the automatic stay does not apply to them.

63.     Notwithstanding their knowledge of the bankruptcy filing, Defendants improperly withheld the February Payment, and instead attempted to effect an offset of that payment against amounts alleged to be owed to Defendants under the Side Letter in violation of the automatic stay.

64.     The Debtor requests entry of an order finding that Defendants have violated the automatic stay and awarding the Debtor damages for such violation.

**FIFTH CLAIM FOR RELIEF**
**(11 U.S.C. § 105 – Injunctive Relief)**

65.     The Debtor repeats and re-allege paragraphs 1–64 of this Complaint as if fully set forth herein.

66.     The Debtor is entitled to an order pursuant to sections 105(a) and 362 of the Bankruptcy Code enjoining Defendants from engaging in any further setoffs of payments owed under the Promissory Note to the Debtor against any claims purportedly held by Defendants under the Side Letter or on any other basis as well as an order enjoining Defendants from otherwise continuing to withhold payments owed to the Debtor under the Promissory Note.

67.     The Debtor has no adequate remedy at law.

68.     The likelihood of the irreparable harm to the Debtor's estate outweighs any harm to Defendants.  Once Defendants have expended the February Payment and any other payments owed under the Waterfall in the future, the Debtor is unlikely to be able to recover the funds. Conversely, the Debtor is dependent on payments under the Promissory Note to succeed in its reorganization.

69.     Accordingly, the Debtor requests that the Court enter orders in favor of the Debtor temporarily, preliminarily and permanently (a) enjoining Defendants from withholding payments due under the Waterfall of the Promissory Note, (b) compelling Defendants to turn over the February Payment, and (c) enjoining Defendants from utilizing the Debtor's Collateral to make any payments not permitted by the Waterfall.

70.     To the extent Defendants continue to setoff sums alleged to be due to them under the terms of the Side Letter or otherwise, the Debtor reserves the right to amend this Complaint to seek punitive damages for intentional violation of the automatic stay.

**SIXTH CLAIM FOR RELIEF**
**(11 U.S.C. § 542(a) - Foreclosure and Turnover of Collateral)**

71.     The Debtor repeats and re-allege paragraphs 1–70 of this Complaint as if fully set forth herein.

72.     Bankruptcy Code section 542(a) provides, in pertinent part, that "an entity, . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

73.     Bankruptcy Code section 541(a) provides, in pertinent part, that the bankruptcy estate is comprised, among other things, of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a).

74.     The Debtor and Defendants are parties to the LSA.  Entry into the Settlement Agreement is facially an Event of Default under the LSA, among other Events of Default that have occurred under the Transaction Documents.

75.     Because an Event of Default has occurred under the LSA, the Debtor is automatically has the right "to take immediate possession of the Collateral" and to otherwise exercise its rights under section 6.2 of the LSA to effectuate a windup and to foreclose on the Collateral.

76.     The Collateral is now property of the Debtor's estate and the Debtor is entitled to possession of it.

77.     The Debtor could use the Collateral, pursuant to 11 U.S.C. § 363, to pay the ongoing expenses of the Debtor's estate.

78.     The Collateral is not of inconsequential value.

79.     Debtor requests entry of an order of foreclosure on the Collateral and directing defendants to turn over the Collateral to the Debtor.

## PRAYER FOR RELIEF

WHEREFORE, the Debtor respectfully demands judgment against the Defendants in this adversary proceeding, and requests relief as follows:

i.   For Count I of this Complaint, entry of an order compelling Defendants to turn over the February Payment and all other payments due under the Waterfall;

ii.  For Count II of this Complaint, entry of an order compelling Defendants to turn over all information relating to the Collateral to the Debtor as required by section 4.3 of the LSA;

iii. For Count III of this Complaint, entry of an order directing Defendants to promptly produce all relevant data and documentation to enable the Debtor to determine the amount owed under the Waterfall and to audit and review any claim which Defendants may assert as their basis for refusing to make the Waterfall payments;

iv.  For Count IV of this Complaint, entry of an order awarding damages, including punitive damages, for Defendants' violation of the automatic stay;

v.   For Count V of this Complaint, orders in favor of the Debtor temporarily, preliminarily and permanently (a) enjoining Defendants from withholding payments due under the Waterfall of the Promissory Note, (b) compelling Defendants to turn over the February Payment, or, alternatively, to pay it into the registry of the Court pending final resolution of this matter; and (c) enjoining Defendants from utilizing the Debtor's Collateral to make any payments not permitted by the Waterfall;

vi. For entry of an order directing that the Collateral be foreclosed upon and that it be turned over to the Debtor for the benefit of the Debtor and its legitimate creditors; and

vii. all such other relief as the Court may find just and proper.

Dated: March 5, 2020

**LOEB & LOEB LLP**

*/s/ Bernard R. Given II*
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Tel.: 310-282-2000
Fax: 310-282-2200
Email: bgiven@loeb.com

-and-

**FORSHEY & PROSTOK, LLP**
Jeff Prostok
State Bar No. 16352500
Lynda Lankford
State Bar No. 11935020
777 Main Street, Suite 1290
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
llankford@forsheyprostok.com

*Proposed Counsel to the Debtor and Debtor
in Possession*

# EXHIBIT 1

January 26, 2016

## SECURED PROMISSORY NOTE

FOR VALUE RECEIVED, Tribal Economic Development Holdings, LLC (hereinafter "Borrower") an entity wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe ("Tribe") and formed pursuant to the laws of the Tribe, unconditionally promises to pay, in the aggregate, to Eventide Credit Acquisitions, LLC, a Delaware limited liability company (hereinafter "Lender"), without any counterclaim, setoff, or deduction whatsoever, Borrower's Obligation (as defined below), provided Borrower shall pay at such other place as Lender may designate to Borrower in writing from time to time, the principal sum equal to the Acquisition Amount ("Note Amount"), together with as is from time to time outstanding and unpaid, from the date of the advance of the principal evidenced hereby, at an interest rate of 1.8% per annum or such other minimum interest rate required under United States tax regulations (the total of which is the "Borrower's Obligation"). All principal and interest shall be paid in lawful money of the United States of America which shall at the time of payment be legal tender in payment of all debts and dues, public and private.

This Secured Promissory Note is made and delivered by Borrower in connection with the acquisition through merger of Bellicose Capital, LLC, a Delaware limited liability company (the "Company") by Borrower's subsidiary, LVD Tribal Acquisition Company, LLC, pursuant to that certain Agreement and Plan of Merger, executed on October 7, 2015 and effective as of even date herewith among, Borrower, Bellicose Capital, LLC, Eventide Credit Acquisitions, LLC ("ECA") (the "Merger Agreement") and effective as set forth therein. Borrower and Lender may each be referred to as "Party" and collectively as "Parties."

## ARTICLE I - TERMS AND CONDITIONS

1.1     Definitions.  The following terms shall have the meanings as follows and any other capitalized terms used but not defined herein shall have the respective meanings set forth in the Loan and Security Agreement, or if not defined therein, other applicable Transaction Document.

a.      "Bad Debt" shall mean Consumer Loans more than sixty (60) days past due.

b.      "Gross Revenues" shall mean all revenues of any nature derived directly or indirectly from the operation of Borrower and the Subsidiaries plus any bad debt recovery of Borrower or Subsidiaries minus the sum of charge backs and bad debt charge offs.

c.      "Loan and Security Agreement" shall mean that certain Loan and Security Agreement executed by Borrower for the benefit of Lender in the amount of Borrower's Obligations, dated as of the date hereof.

d.     "Merger Agreement" shall mean that meaning set forth in the second introductory paragraph of this Agreement.

e.     "Net Cash Available" shall mean as calculated in Section 1.2.

f.     "Prudent Operator" means the standard of care equal to that degree of diligence, skill, prudence and foresight, which is reasonably and ordinarily exercised by experienced market participants engaged in the same line of business under the same or similar circumstances, and the actions resulting from such standard of care being in compliance with the applicable laws and the Transaction Documents.

g.     "Transaction Documents" shall mean this Note, the Loan and Security Agreement, the Parental Guarantee and Sovereign Immunity Waiver and such other agreements, documents, and instruments, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions and modifications thereof.   All of the terms and provisions of the Transaction Documents are incorporated herein by reference.

1.2     Payment of Principal and Interest. Interest shall be computed hereunder based on a three hundred sixty (360) day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated. Principal and accrued and unpaid interest on this Note shall be payable monthly on the 15th day of the calendar month (each a "Payment Date"), with the amount of each payment equal to the amount of Net Cash Available (as hereinafter defined), if any, beginning on the last day of each calendar month preceding the Payment Date (each a "Calculation Date"). On each Payment Date, Borrower shall pay to Lender an amount equal to the Net Cash Available which payment shall be first applied to Lender's costs associated with an Event of Default (if any) permitted under the terms of the Transaction Documents, then to a reduction of the principal balance of this Note, and then to unpaid interest.  If any Payment Date is not a Business Day, such payment shall be due and payable on the Business Day immediately prior to such Payment Date.  As used herein, "Net Cash Available" shall be an amount calculated as follows:

(a)     Gross Revenues deposited in Borrower's and Subsidiaries' accounts.

(b)     Minus the following:

1.     A monthly distribution to the Tribe equal to two percent (2%) of the Gross Revenues until such time as fifty percent (50%) of the Note Amount has been repaid at which time the percentage shall increase from two percent (2%) to four (4%) ("Monthly Distribution"), except that in an Event of Default, the distribution under this provision shall be reduced to zero.

2.     In addition to the Monthly Distribution, a one-time reinvestment amount equal to 1.3 million dollars ($1,300,000), and a monthly reinvestment amount thereafter of two percent (2%) of Gross Revenues shall be paid to the Tribe which shall be reinvested by the Tribe in growing the loan portfolio which shall stay in equity within

Borrower or a Subsidiary conducting lending until the termination of this Agreement except that in an Event of Default, the reinvestment amount under this provision shall be reduced to zero.

3.      All interest accrued and scheduled principal payments on any Senior Debt per the terms of the respective debt instrument, and any debt balancing requirements.

4.      Expenses:
        (a)     Ordinary and necessary business expenses that would be reasonably accrued by a Prudent Operator incurred by Borrower or a Subsidiary relative to the operation of the Business incurred from vendors with no affiliation to the Tribe or any Tribal member provided that all work output provided by non-affiliated entities shall not exceed the market price and market service level under which a Prudent Operator would acquire such services.

        (b)     Ordinary and necessary business expenses that would be reasonably accrued by a Prudent Operator relative to operation of the Business incurred by Borrower or a Subsidiary or charged by a vendor affiliated with the Tribe, any Tribal entity or any Tribal member capped by the historical labor costs charged to Borrower or a Subsidiary by previous service providers (calculated by examining the labor costs for the same calendar month in the previous year) plus an annual escalator of five percent (5%), or if a further increase is required for expansion activities, then pursuant to a budget approved by Lender.  Borrower agrees that any transaction between it or any Subsidiary and an affiliated entity of the Tribe or Tribal member shall not exceed reasonable market rates.  Borrower agrees that it and each Subsidiary shall have a fiduciary duty to the Lender to ensure that neither Borrower nor any Subsidiary or affiliates shall undermine the Parties' intent to maximize the cash flows directed to retire the Note as soon as possible .  Notwithstanding the forgoing, nothing in this provision shall limit the reasonable expansion of the Business of the Borrower or any Subsidiary (which the Parties agree does not cause a Material Adverse Effect on the Business) and is a natural evolution of the Business based on industry climate and norms.  To ensure that any such expansion does not affect payments under this Note, such expansion shall follow a budget approved by the Lender.

5.      Non-deductible expenses (to be deducted from the Tribal distribution or reinvestment portion at Borrower's choice) include:

        (a)     any tax, fine or other fee including licensing charged by the Tribe except as reasonably required for licensure or regulatory oversight by the Tribal Financial Services Regulatory Authority (the "Authority") or fines or fees assessed against Borrower or a Subsidiary by the Authority except for fines levied against a Subsidiary for the actions of a non-affiliated vendor capped at twenty-five thousand dollars ($25,000) per year;

(b)     any award of attorneys fees under the Dispute Resolution provisions of any Transaction Document; and

(c)     any ordinary and necessary expenses not agreed to in Section 4 above and in excess of an aggregate of twenty-five thousand dollars ($25,000)per year , unless otherwise agreed by the Parties, shall be a non-deductible expense.

It shall be considered an Event of Default under the Transaction Documents, if the non-deductible expenses exceed the Tribal distribution or accumulated reinvestment portion.

6.     Reserves allowed to maintain portfolio size as set for in Section 4.4 of the Loan Agreement and Security Agreement, except that in an Event of Default, the amount reserved under this provision shall be reduced to zero.

(c)     Each payment above shall be accompanied by a schedule showing how such payment was calculated. The Lender shall have the right to inspect Borrower's and any Subsidiary's books and records to determine and/or verify the payments due under this Note during regular business hours and upon reasonable notice to Borrower or the respective Subsidiary.

(d)     There shall be a true-up payment to Lender on the first 15th following the date of Close, reflecting the payment that would have been due to any Lender's subsidiary under the Servicing Agreement with Lender's affiliate acquired by Borrower for services provided up to and including the date of Close.

1.3     Term. The term of this Note is seven (7) years from execution.  At the expiration of the term, the remaining balance is forgiven.

1.4     Prepayment. This Note may be prepaid at any time in whole or in part with no prepayment penalty.

1.5     Security. This indebtedness evidenced by this Note, the Transaction Documents, and the obligations created thereby are secured by the Collateral.

1.6     Event of Default. An "Event of Default" shall be deemed to exist upon the occurrences of any item listed in Section 6.1 of the Loan and Security Agreement. Upon the occurrence of an Event of Default, the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Transaction Document, and all unpaid interest accrued thereon shall, at the option of Lender, at once become due and payable and may be collected forthwith. The remedies of Lender in this Note or in the other Transaction Documents shall be cumulative and concurrent, and may be pursued singly, successively, or together, at Lender's discretion as limited by Section 2.3. In the event this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees.

## ARTICLE II - GENERAL CONDITIONS

2.1    No Waiver; Amendment. No failure to accelerate the debt evidenced hereby after an Event of Default, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder.  No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change, or affect the original liability of Borrower and its Subsidiaries under this Note, either in whole or in part, unless Lender agrees otherwise in writing except as provided in Section 1.3. This Note may only be amended by an agreement in writing signed by the Party against whom enforcement of any waiver, change, modification, or discharge is sought.

2.2    Waivers. Presentment for payment, demand, protest and notice of demand, protest, and nonpayment, notice of intent to accelerate maturity, notice of acceleration of maturity, and all other notices are hereby waived by Borrower.

2.3 Limited Waiver Of Sovereign Immunity. Section 8 of the Loan and Security Agreement is incorporated by reference herein *mutatis mutandis*.

2.4    Unconditional Payment. Subject to and as limited by Section 1.2 and 1.3, Borrower is and shall be obligated to pay principal, interest, and any and all other amounts which become payable hereunder or under the other Transaction Documents absolutely and unconditionally and without any abatement, postponement, diminution, or deduction and without any reduction for counterclaim or setoff.

2.5    Further Assurances. Borrower and any Subsidiary shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all reasonable documents and take all reasonable actions, reasonably required by Lender from time to time to confirm the rights created under this Note and the other Transaction Documents, to protect its rights in the Collateral.  Provided, however, that no such further actions, assurances, and confirmations shall increase, modify, or change Borrower's or any Subsidiary's obligations under this Note or under the other Transaction Documents.

2.6    Miscellaneous. The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower, its Subsidiaries and Lender and their respective permitted successors and assigns. Assignment of any rights and obligations of this Note may only be assigned with the prior written consent of the Parties, not to be unreasonably withheld. As used herein, the terms "Borrower," "Subsidiary" and "Lender" shall be deemed to include their respective permitted successors and assigns. All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Titles of articles and sections are for convenience only and in no way define, limit, amplify, or describe the scope or intent of any provisions hereof. Time is of the essence with respect to all provisions of this Note and the other Transaction Documents. This

Note and the other Transaction Documents contain the entire agreement between the Parties hereto relating to the subject matter hereof and thereof, and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated. If any provision under this Note or the application thereof to any entity, person, or circumstance shall be invalid, illegal, or unenforceable to any extent, the remainder of this Note and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

2.7    NO ORAL AGREEMENTS. THIS WRITTEN AGREEMENT IS THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN BORROWER AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OR ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER. BORROWER AND LENDER HEREBY AFFIRM THAT THERE IS NO UNWRITTEN ORAL CREDIT AGREEMENT BETWEEN BORROWER AND LENDER WITH RESPECT TO THE SUBJECT MATTER OF THIS WRITTEN AGREEMENT.

2.8    Payments & Notice. Payments will be made through mutually agreeable electronic arrangements. Any written Notices shall be sent to the Parties at the address set forth in Section 7.12 of the Loan and Security Agreement.

2.9    Counterparts. This Note may be executed in multiple counterparts. Delivery by any party of an executed counterpart of a signature page to this Note by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

[signature page follows]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Note to be effective as of the day and year first written above.

**TRIBAL ECONOMIC DEVELOPMENT HOLDINGS, LLC**

By: _Michelle Hazen_
Name: Michelle Hazen
Title: Co-Manager

**BIG PICTURE LOANS, LLC**

By: _Michelle Hazen_
Name: Michelle Hazen
Title: Co-Manager, Board of Directors

**ASCENSION TECHNOLOGIES, LLC**

By: _Brian McFadden_
Name: Brian McFadden
Title: President

# EXHIBIT 2

**LOAN AND SECURITY AGREEMENT**

This LOAN AND SECURITY AGREEMENT (this "Agreement"), executed on October 7, 2015 to become effective as of Close as defined in the Merger Agreement  the Effective Date, by and between Tribal Economic Development Holdings, LLC, (together with its Subsidiaries as defined herein, successors and assigns, the "Borrower"), a wholly-owned holding company of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), and Eventide Credit Acquisitions, LLC, a Delaware limited liability company (together with its successors or assigns, the "Lender").   All capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Transaction Documents (as hereinafter defined).

This Agreement is made and delivered by Borrower in connection with the acquisition through merger of Bellicose Capital, LLC, a Delaware limited liability company (the "Company") by Borrower's subsidiary, LVD Tribal Acquisition Company, LLC, pursuant to that certain Agreement and Plan of Merger, executed on October 7, 2015 but effective as of the Effective Date of the Merger Agreement among, Borrower, Bellicose Capital, LLC, and Eventide Credit Acquisitions, LLC (the "Merger Agreement"). Borrower and Lender may each be referred to as "Party" and collectively as "Parties."

## 1.    THE LOAN

1.1    Loan.  Subject to the terms and conditions of this Agreement, Lender hereby agrees to loan to or for the benefit of Borrower a principal amount equal to the Acquisition Amount as defined in the Merger Agreement to fund the purchase price for Company (the "Loan").  Should the Merger Agreement be canceled due to the failure to meet the conditions precedent in the Merger Agreement, this Agreement and the Note shall terminate.  The Loan shall be evidenced by that certain Promissory Note, dated as of the date hereof (the "Note") given by Borrower to the order of Lender, in the face amount of the Acquisition Amount.  This Agreement, the Note, the Merger Agreement, the Servicing Agreement, lockbox agreements, any deposit account control agreements, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered and/or held in escrow in connection with any of the foregoing, including any guaranties of any obligation of Borrower are collectively hereinafter referred to as the "Transaction Documents."

1.2    Interest.  Interest respecting the outstanding principal balance of the Loan will be charged to Borrower from time to time outstanding at the rate specified in the Note in accordance with the terms of the Note or as otherwise set forth in this Agreement.  Interest on the Loan will be based on the actual number of days elapsed in a given calendar month and an assumed 360-day year.

1.3    Payments.  Payments shall be set forth in the Note.

1.4    Conduct of Business.  Borrower, through Borrower's Subsidiaries, is (and throughout the term of the Loan shall be) engaged  in the business related to consumer lending for the Tribe (the "Business"), and Borrower's Subsidiaries shall not conduct any business activities unrelated to the Business while any Obligations (as hereinafter defined) are outstanding.

## 2.    GRANT OF SECURITY INTEREST

2.1    <u>Grant of Security Interest</u>.  In consideration of Lender's extending credit and other financial accommodations to or for the benefit of Borrower, Borrower and its Subsidiaries hereby grant to Lender a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined), including, without limitation, all claims against third parties arising out of or related to the Collateral.  The security interest granted by this Agreement is given to and shall be held by Lender as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Note.  Borrower and Subsidiaries hereby authorized the filing of by Lender of any financing statement in any applicable jurisdiction, and such financing statement may describe the collateral as "all assets" or a similar description.

2.2    <u>Definitions</u>.  As used herein, the following definitions shall have the following meanings:

(a)    "<u>Business Day</u>"" shall mean any day other than a Saturday, Sunday or day that is or shall be a federal holiday or a day on which banking institutions are required or authorized to close.

(b)    "<u>Collateral</u>" shall mean all of Borrower's and any Subsidiary's present and future right, title and interest in, to and under the following described property whether (unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the UCC) whether directly owned by Borrower or owned by a Subsidiary:

(i)    all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Financial Assets, Deposit Accounts (including, without limitation, the Collateral Account), Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, Letters of Credit, Letter-of-Credit Rights, Commercial Tort Claims, money, Equipment, Inventory, Fixtures, and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including without limitation all insurance policies and proceeds thereof), and those agreements held in escrow for benefit of Lender in an Event of Default providing for the potential merger of Ascension Technologies, LLC; the control of certain intellectual property interests (specifically including website domain names); and certain vendor agreements;

(ii)    to the extent, if any, not included in clause (i) above, each and every other item of personal property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all software use licenses, contracts and agreements, and all collateral for the payment or performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) of any accessions to any of the foregoing; and

(iii)    all present and future business records and information relating to any of the foregoing, including computer tapes and other storage media containing the same and computer programs and software (including without limitation, source code, object code and related manuals and documentation and all licenses to use such

software) for accessing and manipulating such information, provided Borrower and its Subsidiaries may retain copies of the same business records and information as required by applicable law.

All such information shall be subject to Section 5.17 of this Agreement.

(c)  "Collateral Account" shall mean any account(s) of Borrower or a Subsidiary (including banking, ACH processing, reserve or other accounts in which Borrower or a Subsidiary may have an economic interest) through which Borrower or the Subsidiary conducts its Business and maintains a deposit account control agreements and lockbox agreements to protect the interests of Lender unless otherwise waived by Lender.

(d)  "Consumer" shall have the meaning given under the Code.

(e)  "Consumer Loan" shall mean a "Small Loan Transaction" as defined in the Tribal Consumer Financial Services Regulatory Code.

(f)  "Financial Assets" shall mean any security for an obligation of a person or a share participation or other interest in a person or in property or an enterprise of a person which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area which it is issued or dealt in as a medium for investment, or any property that is held by a securities intermediary for another person in Investment Property if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset.

(g)  "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, contract, or commodity account.

(h)  "Material Adverse Effect" shall mean, with respect to Borrower, any event, occurrence, development, fact, condition or change that individually or in the aggregate is or would be reasonably likely to be materially adverse to the operations or financial performance of Borrower or any of Borrower's Subsidiaries.

(i)  "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by Borrower to Lender at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by Borrower to Lender; or are due indirectly by Borrower to Lender as endorser, guarantor or other surety, or as borrower of obligations due third persons which have been endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Transaction Documents.  Said term shall also include all interest and other charges chargeable to Borrower or due from Borrower to Lender from time to time and all fees, costs and expenses referred to in this Agreement.

(j)  "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

(k) "Senior Debt" shall mean (1) the debt owed to Alpha Credit Resources, LLC, a Delaware limited liability company by Borrower or a Subsidiary; (2) those notes owed and acquired through the merger of Bellicose Capital, LLC into LVD Tribal Acquisition Company, LLC ("TAC"), and subsequently assigned by TAC to Borrower as set forth in Exhibit A of the Merger Agreement; (3) the successor in interest to the line of credit provided by Source Point VI, LLC originally held by Red Rock Lending, LLC and transferred to Big Picture Loans, LLC and reaffirmed; (4) the successor in interest to the line of credit provided by Source Point VI, LLC and Big Picture Loans, LLC as reaffirmed; and (5) such other debt as agreed to in writing by Lender pursuant to the Transaction documents.

(l) "Senior Lender" shall mean any party providing Senior Debt, and collectively, "Senior Lenders."

(m) "Subsidiary" shall mean Big Picture Loans, LLC, Ascension Technologies, LLC, LVD Tribal Acquisition Company, LLC and any other entity created as allowed under the Transaction Documents (collectively referred to as the "Subsidiaries")

(n) "UCC" shall mean the Uniform Commercial Code in effect in the State of Delaware from time to time.

(o) "Tribal" shall mean of or relating to the Tribe.

All other capitalized terms used in this Agreement shall have the meanings accorded to them in the UCC, and if not defined therein, the Merger Agreement or other applicable Transaction Document, or otherwise they shall have the word's or term's normal and customary use within the industry. Definitions referenced or used herein are for interpretation of this Agreement and the Transaction Documents only.

2.3 Ordinary Course of Business. Lender hereby authorizes and permits Borrower through the lockbox(es) established by mutual agreement and under the deposit account control agreements (unless other waived by Lender) to receive from its Subsidiaries the proceeds of the Collateral at Borrower's own cost and expense, and also liability, if any, subject to Borrower's and the Subsidiaries' obligations under this Agreement and the Note; provided however, that following an Event of Default or at maturity, the Lender may terminate all or any part of the authority and permission granted to Borrower and/or any Subsidiary with reference to the Collateral. Subject to the Senior Debt requirements, all proceeds of and collections of Collateral shall be retained by the lockbox agent and used for purposes of satisfying Section 1.2 of the Note and making disbursements thereunder. Borrower and its Subsidiaries acknowledge and agree that the lockbox agent must direct all funds available from each Subsidiary and the Borrower to follow the cash waterfall established by Section 1.2 of the Note. From and after an Event of Default which has not been waived by Lender, all proceeds of and collections of the Collateral shall be held in trust by Borrower and/or any Subsidiary for the benefit of Lender and shall not be commingled with any other funds or deposited in any bank account of Borrower or a Subsidiary other than a Collateral Account; and, from and after an Event of Default which has not been waived by Lender, Borrower and each Subsidiary agrees to deliver to Lender on the dates of receipt thereof by Borrower and/or its Subsidiaries, duly endorsed to Lender or to bearer, or assigned to Lender, as

may be appropriate, all proceeds of the Collateral in the identical form received by Borrower and/or any Subsidiary.

2.4 Records. Borrower and/or each Subsidiary shall deliver to Lender from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of the rendering of services of Borrower, or Subsidiary; and Borrower and/ or each Subsidiary will deliver to Lender promptly at Lender's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of accounts and such other writings as Lender may in its sole discretion deem to be necessary or effectual to evidence any loan or Consumer Loan hereunder or Lender's security interest in the Collateral.

2.5 Legends. Borrower or Subsidiary shall promptly make, stamp or record such entries or legends on Borrower's or that Subsidiary's books and records or on any of the Collateral (including, without limitation, chattel paper or electronic chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral. Such books and records may be maintained in electronic form (provided that any Consumer Loan shall be evidenced by electronic records which at all times comply with the requirements of all applicable federal and Tribal laws) and the entries or legends indicating or disclosing Lender's security interest shall be made electronically on any such electronic records.

## 3. REPRESENTATIONS AND WARRANTIES

Borrower and each Subsidiary represent and warrant to Lender that the following are, and after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents will be, true, correct and complete:

3.1 Organization and Qualification. Borrower and Borrower's Subsidiaries are each duly formed and existing limited liability companies under Tribal law and are wholly-owned subsidiaries of Borrower, and therefore the Tribe. Borrower and Borrower's Subsidiaries are in good standing under Tribal law and each has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted.

3.2 Subsidiaries. Borrower shall not during the term of this Agreement create additional subsidiaries without the written consent of Lender, but may terminate and dissolve at will any subsidiary that has terminated operations provided that such termination may not create a Material Adverse Effect.

3.3 Corporate Records. Borrower's and Borrower's Subsidiaries' articles of organization have been duly filed and their articles of organization and operating agreement are in proper order. All outstanding equity issued by Borrower and Borrower's Subsidiaries was and is properly issued and all books and records of Borrower and each Subsidiary, including but not limited to its minute books, operating agreement, and books of account, are accurate and up to date and will be so maintained.

3.4 Title to Properties; Absence of Liens. Borrower and each Subsidiary has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets,

including the Collateral (as defined herein) to the extent owned by Borrower or a Subsidiary, are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the Senior Debt and other security interests outstanding as of the Effective Date ("Permitted Liens").

3.5     Places of Business.  Borrower's principal place of business and chief executive office are located within Tribal jurisdiction at N5384 U.S. Hwy. 45, P. O. Box 704, Watersmeet, Michigan, 49969, and Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each of its and its Subsidiaries other places of business, and shall not change the location of any such principal place of business or open or close, move or change any existing or new place of business without giving Lender at least thirty (30) days prior written notice thereof unless otherwise waived by the Lender.

3.6     Valid Obligations.  The execution, delivery and performance of the Transaction Documents have been duly authorized by all necessary action and the Transaction Documents represent the legal, valid and binding obligation of Borrower and its Subsidiaries and are fully enforceable according to their terms, except as limited by (a) bankruptcy, insolvency, reorganization, receivership, moratorium and other laws affecting creditors' rights and (b) the exercise of judicial discretion and the application of principles of equity, good faith, fair dealing, reasonableness, conscionability and materiality (regardless of whether the applicable agreements are considered in a proceeding in equity or at law).

3.7     Conflicts.  There is no provision in Borrower's or any Subsidiary's organizational documents, if any, or in any indenture, contract or agreement to which Borrower or a Subsidiary is a party which prohibits, limits or restricts the execution, delivery or performance of Borrower's or a Subsidiaries obligations under the Transaction Documents other than those associated with the Senior Debt and 5.2 (c) of the Operating Agreement of the Borrower, as it exists on the Effective Date.

3.8     Approvals.  The execution, delivery and performance of the Transaction Documents have been duly authorized and approved by the Tribe, as member of the Borrower, do not and will not require any additional approval of or filing with any Tribal or governmental agency or authority or any other Person.

3.9     Litigation.  At the time of execution of this document, there are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against Borrower or the Subsidiaries which would be reasonably expected to cause a Material Adverse Effect.

3.10    Title to Collateral.  As of the Effective Date and subject to Section 6.4, Borrower is the lawful owner of its assets constituting the Collateral, and the Collateral and each item thereof is free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby and the Permitted Liens.  Borrower has full power and authority to grant to Lender a security interest in the Collateral, and neither Borrower nor any of Borrower's Subsidiaries have transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's or its Subsidiaries' right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral is valid and genuine

in all respects. Except as to claims by a Senior Lender, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.11    Third Parties. Lender shall not be deemed to have assumed any liability or responsibility to Borrower, a Subsidiary or any third person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower or a Subsidiary by Lender (which shall automatically be deemed to be without recourse to Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Lender, by accepting such security interest in the Collateral owned by Borrower or a Subsidiary, or by releasing any Collateral to Borrower or Subsidiary, shall not be deemed to have assumed any obligation or liability to any Consumer or to any other third party, and Borrower and each Subsidiary agree to indemnify and defend Lender and hold Lender harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.12    Taxes. Borrower and each Subsidiary has filed, or will file, all applicable and required Federal, Tribal, state and other tax returns (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Borrower or a Subsidiary have been fully paid. Borrower and each Subsidiary have established on their books reserves adequate for the payment of all applicable and required Federal, Tribal, state and other tax liabilities (if any).

3.13    Use of Proceeds. Funds received under this Agreement may only be used for the acquisition of Bellicose Capital, LLC by TAC, and Borrower and/or its Subsidiaries shall receive good and valuable consideration in connection with such acquisition.

3.14    Compliance with Law. As of the Effective Date, Borrower and each Subsidiary are in compliance with all applicable laws.

3.15    Disclosure. This Agreement (together with all exhibits and schedules hereto), the other Transaction Documents and the other agreements, certificates and other documents furnished to Lender by or on behalf of Borrower and each Subsidiary related to effectuating the Transaction Documents do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading. There is no fact known to Borrower or a Subsidiary which has not been disclosed to Lender in writing which could reasonably be expected to have a Material Adverse Effect.

## 4.    AFFIRMATIVE COVENANTS

4.1    Payments and Performance. Borrower and each Subsidiary will duly and punctually pay and perform all Obligations on its part to be done or performed under this Agreement.

4.2    Books and Records; Inspection. Borrower and each Subsidiary will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with its standard practices, consistently applied. Borrower and each Subsidiary will at all reasonable times, and on reasonable advance notice, make its books, records, and accounting

practices and procedures available in its offices for a field inspection and examination by Lender and/or Lender's representatives and will permit inspection of the Collateral and all of its properties by Lender and/or Lender's representatives (a "Field Inspection"). Lender may, at its option and expense, require a Field Inspection not more than one (1) time in any calendar quarter, unless an Event of Default shall occur which has not been waived by Lender, in which case Lender shall be permitted to require a Field Inspection as frequently as Lender deems reasonably necessary. In the event that an infraction is found, all reasonable costs and expenses incurred by Lender in connection with any Field Inspection shall be borne by Borrower, otherwise such costs shall be borne by Lender. Borrower and/ or any Subsidiary will from time to time furnish Lender with such information and statements as Lender may request in its sole discretion with respect to the Obligations or Lender's security interest in the Collateral, and Borrower shall have a commercially reasonable time period to produce such information and statements. Borrower shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's or a Subsidiary's records relating to its accounts and contract rights are kept, and shall not remove such records to another jurisdiction without giving Lender at least thirty (30) days prior written notice thereof.

4.3    Financial Information. Borrower and each Subsidiary will furnish to Lender:

(a)    real-time, read-only, online access to information concerning sums on deposit (including credits and debits) to any Collateral Account or other pertinent accounts and other information contained in technology used to monitor the Collateral;

(b)    as soon as available to Borrower and each Subsidiary, but in any event within thirty (30) days after the close of each calendar month, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such month, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such month and shall be prepared by Borrower and each Subsidiary and certified by a senior officer of Borrower or each Subsidiary as appropriate having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments;

(c)    as soon as available to Borrower or a Subsidiary, but in any event within thirty (30) days after the close of each calendar quarter, a full and complete signed copy of financial statements, which shall include a balance sheet of Borrower and each Subsidiary, as at the end of such quarter, and statement of profit and loss of Borrower and each Subsidiary reflecting the results of its operations during such quarter and shall be prepared by Borrower or the respective Subsidiary and certified by a senior officer of Borrower or the respective Subsidiary having primary responsibility for the preparation of such financial statements as to correctness in accordance with Borrower's standard practices, consistently applied, subject to year-end adjustments ; and

(d)    promptly, from time to time, such other financial data and information about Borrower or a Subsidiary, including a Subsidiary's Consumer Loans, if applicable, and the performance thereof, as Lender may reasonably request.

All information submitted pursuant to this Section 4.3 shall be certified as true, accurate, and complete in all material respects by Borrower or the respective Subsidiary.

4.4    Financial & Operational Performance.  Borrower and its Subsidiaries shall only use the Collateral for the benefit of TED and its Subsidiaries and to meet their fiduciary obligations to Lender under this Agreement.  Borrower and/or its Subsidiaries shall maintain a range of the cumulative loan portfolio (all Consumer Loans on Borrower's or a Subsidiary's balance sheet current up to sixty (60) days past due) of a minimum portfolio size of fifteen million dollars ($15,000,000) to a maximum portfolio size in any given month equal to 1.1 times the previous month's portfolio size.  All funds in excess of those required for (a) balancing requirements of Senior Lenders and (b) the monthly maximum portfolio size, shall be applied to Note payments. As long as Borrower and Subsidiaries meet their fiduciary obligations to maximize Note payments during the term of the Note, Lender agrees that Subsidiaries may do Business such that Note payments may be affected while portfolio size is within the above mentioned range.  Regardless of portfolio size, any additional debt may only be entered into as allowed under this Agreement.

4.5    Conduct of Business.  Borrower and each Subsidiary will maintain its articles of organization and existence in good standing and materially comply with all laws and regulations of the Tribe and of any other governmental authority which may be applicable to it or to the Business.  Each lending Subsidiary will maintain servicing agreements with the servicing Subsidiary in a form substantially the same as that in place at the execution of this agreement and not make any changes that would cause a Material Adverse Effect under this Agreement.

4.6    Contact with Accountant.  Borrower and each Subsidiary hereby authorizes Lender to directly contact and communicate with any accountant employed by Borrower or the respective Subsidiary in connection with the review and/or maintenance of Borrower's or the respective Subsidiary's books and records or preparation of any financial reports delivered by or at the request of Borrower or a Subsidiary to Lender.  To the extent any accountant is so employed, Borrower or the respective Subsidiary shall provide Lender with full contact information for such accountant or any other accountant which may be employed by Borrower or the respective Subsidiary to replace such accountant.

4.7    Taxes.  Borrower and each Subsidiary will promptly pay all applicable real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith or any outstanding tax liability of Lender or its subsidiaries incurred prior to the Effective Date.  Lender may, at its option, from time to time, discharge any taxes resulting in a lien or encumbrance on the Collateral, or other charges resulting in liens or encumbrances on any of the Collateral, and Borrower will pay to Lender on demand or Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.8    Indemnity.  Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, shareholders, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys, successors and permitted assigns (collectively, the

"Indemnitees") from and against all liabilities (including sums paid in settlement of claims), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine), penalties or damages arising as a direct or indirect result of any of the following with respect to Borrower's, any Subsidiary's: (a) fraud, (b) intentional material misrepresentation, (c) failure to pay applicable taxes, (d) misapplication of funds (including any sums on deposit from time to time in the Collateral Account), (e) failure to apply funds to pay the Obligations following an Event of Default pursuant to Section 6, (f) additional financing incurred or guaranteed by Borrower or any Subsidiary in violation of the terms of the Transaction Documents, (g) transfer of substantially all of Borrower's or Subsidiary's assets without consent of Lender, (h) gross negligence, (i) willful misconduct, and (j) court costs and attorneys' fees. In addition, Borrower and each Subsidiary shall indemnify and hold harmless the Indemnitees from and against any liabilities or costs incurred by any Indemnitee under the deposit account control agreement between the Parties.

4.9     Insurance. Borrower and each Subsidiary will maintain (or cause to be maintained) in force insurance on its properties against risks customarily insured against by companies engaged in businesses similar to that of Borrower or the respective Subsidiary containing such terms and written by such companies reasonably standard in the industry, with Lender to be named as the loss payee.

4.10     Notification of Default. Within five (5) days of becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower and/ or a Subsidiary shall give Lender written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.11     Notification of Litigation. Borrower will promptly notify Lender in writing of any litigation or of any investigative or enforcement actions initiated by a governmental agency or authority against it or any Subsidiary which would or is reasonably be expected to have a Material Adverse Effect, and which would cause the potential liability of Borrower and/ or a Subsidiary under such litigation, when aggregated with all other active litigation against Borrower or any Subsidiary, to exceed twenty-five thousand dollars (US$25,000.00), unless the potential liability of Borrower under such litigation is covered by a policy of insurance acceptable to Lender, Lender has been named as an additional insured or additional loss payee and has received reasonably acceptable endorsements from such insurer(s) to such effect, and Lender has been provided evidence satisfactory to Lender that such insurance coverage is in full force and effect. The Parties agree this Section does not apply to correspondence or inquiries received in the ordinary course of business from various state agencies or departments. Without limiting the foregoing, within two (2) days of Borrower or any Subsidiary obtaining knowledge of the existence thereof, Borrower or Subsidiary shall notify Lender of any applicable investigative or enforcement action, and shall immediately forward to Lender, on receipt thereof by Borrower or any Subsidiary, a copy of any written communication or correspondence concerning the foregoing.

4.12     Compliance. Borrower and each Subsidiary shall comply with all applicable requirements of governmental authorities having jurisdiction over Borrower and each Subsidiary, including, without limitation, those relating to money laundering and terrorism, in each case as amended from time to time, and the rules and regulations promulgated thereunder.

4.13   Organizational Documents.   Borrower and each Subsidiary shall comply in all respects with Borrower's or the respective Subsidiary's articles of organization and Borrower's or the respective Subsidiary's operating agreement.

4.14   Location of Collateral.   Borrower and each Subsidiary shall, during the term of this Agreement, keep Lender currently and accurately informed in writing of each location where Borrower's and each Subsidiary's records relating to its accounts and contract rights, including Consumer Loans, respectively, are kept, and shall not remove such records or any of them to another location without giving Lender at least thirty (30) days prior written notice thereof. The Borrower and Subsidiaries have agreed to pre-signed assignments of all vendor agreements and associated obligations in favor of the Lender and held in escrow for Lender, and for any future vendor agreements shall provide pre-signed assignments to be held in escrow upon the execution of any new vendor agreements. Further, the Borrower and certain Subsidiaries, have agreed to pre-signed merger agreements to be held in escrow by the Lender.

4.15   Notification of Material Adverse Effect.   Borrower and/or a Subsidiary will immediately notify Lender of any Material Adverse Effect.

4.16   Deposit Account Control Agreements/Lockbox.

(a)      Unless waived in writing by Lender or as otherwise limited pursuant to Section 6.4, the Borrower and each Subsidiary will enter into (1) a deposit account control agreement (or maintain existing deposit account control agreements) for any bank account(s) in which the Subsidiary conducts its business in a form mutually agreeable with Lender and agrees to enter into other banking arrangements only if a mutual agreeable deposit account control agreement is in place and (2) enter into a lockbox agreement in a form mutually agreeable with Lender and third-party provider for the lending Subsidiaries.

(b)      In the event the lockbox agreement is terminated or fails for any reason, the Collateral Account(s) shall be governed by the existing deposit account control agreement(s) to ensure the continued operation of the Business and satisfaction of obligations under the Transaction Documents. Unless mutually agreed by the Parties, upon the termination or failure of the lockbox agreement required by (a)(ii), a new lockbox agreement will be entered into by Borrower and each Subsidiary in a form mutually agreeable with the Lender and third-party provider for the Subsidiaries

4.17   Costs & Expenses.   The Borrower and each Subsidiary will maintain a fiduciary duty to the Lender to keep costs and expenses (including any capital expenses or other investments) associated with operations within industry standards and that all transactions with affiliates shall occur at no more than arms-length, market rates, and Borrower will not allow any movement of assets or liabilities between affiliates (such movement shall not include payment of affiliates for services rendered under contracts for services) unless approved by Lender. Any excessive salary or bonus payments must be accounted for the Tribe's distribution under the cash waterfall in the Note or other Tribal equity. For the term of the Note, neither Borrower nor any Subsidiary shall make any charitable donations or any investments in excess of an aggregate of $5,000 per year for all entities unless approved by Lender.

4.18   Title to Acquired Collateral.  As to Collateral that Borrower (directly or through its Subsidiaries) acquires, Borrower or Subsidiary shall be the lawful owner of its assets constituting the Collateral.  The Collateral and each item thereof will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests, credits, defenses, recoupments, set-offs or counterclaims whatsoever, other than the security interest granted to Lender hereby and the Permitted Liens.  Borrower and Subsidiaries have full power and authority to grant to Lender a security interest in the Collateral as it is acquired, and neither Borrower nor any of Borrower's Subsidiaries will transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's or its Subsidiaries' right, title or interest therein), to any person other than Lender or the holder of a Permitted Lien.  The Collateral will be valid and genuine in all respects.  Except for claims by Senior Debt, Borrower and each Subsidiary will warrant and defend Lender's right to and interest in the Collateral acquired against all claims and demands of all persons whatsoever.

4.19   Licensing and Tribal Law.  Borrower and each Subsidiary shall maintain all licenses and other authorizations required for Borrower or the respective Subsidiary to operate its business.  No Tribal law, regulatory code or other Tribal action exists that could potentially prohibit or interfere with the perfection of the security interest granted under this and the other Transaction Documents except for Section 8.7 of the Code which could potentially interfere with the perfection of the security interest by allowing the seizure of the property owned by a Person or other entity with a license issued by the Tribal Financial Services Regulatory Authority if such property was used in violation of the Code, and Appendix 1 of the Code, which governs secured transactions within the Tribe's jurisdiction.  In the event of any such seizure on behalf of the Tribe or other adverse action, the Borrower and, if applicable, Subsidiary shall use all good faith efforts to ensure that all obligations to Lender are met and all Lender's rights may be fully exercised (including the right to perfect Lender's security interest during the due process required under the Code) under the Transaction Documents.

## 5.   NEGATIVE COVENANTS

5.1   Limitations on Indebtedness.  Other than the Senior Debt, Borrower and each Subsidiary shall not, without the prior written consent of Lender in each instance, issue any evidence of indebtedness or create, assume, guarantee, become contingently liable for, or suffer to exist indebtedness in addition to Permitted Liens.  Neither Borrower nor any Subsidiary will incur additional indebtedness nor take any action that could negatively affect payment under the Note or dilute or burden the equity of Borrower without the express written approval of Lender.

5.2   Sale of Interest.  There shall not be any sale or transfer of ownership of any interest, whether direct or indirect, in Borrower or in any Subsidiary without Lender's prior written consent, unless Lender is paid in full for all Obligations under the Transaction Documents in accordance with the provisions of this Agreement.

5.3   Loans or Advances.  Borrow and each Subsidiary shall not make any loans or advances to any individual, firm or corporation, including without limitation it officers and employees; provided that Borrower or the respective Subsidiary may make advances to its employees in the ordinary course of business which expenses are reimbursable by Borrower or the respective Subsidiary.

5.4     Investments.  Borrower and each Subsidiary shall not make investments in any individual, trust, entity or Tribal or governmental body.  Borrower and each Subsidiary will not purchase or otherwise invest in or hold securities, real estate or other non-operating assets or purchase all or substantially all the assets of any entity other than in connection with an acquisition approved by Lender in writing.

5.5     Merger and Restructuring.  Borrower and each Subsidiary will not dissolve, merge or consolidate or be merged or consolidated with or into any other entity, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Transaction Documents except as set forth in Section 3.2 of the Merger Agreement.

5.6     Capital Expenditures.  Borrower and each Subsidiary shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary course of business for the purpose of replacing machinery, equipment or other personal property necessary for operating the Business unless pursuant to Section 1.2(b)(4)(b) of the Note.

5.7     Sale of Assets.  Borrower and each Subsidiary shall not sell, lease or otherwise dispose of any of its assets including the Collateral, except the sale of bad debt  in the ordinary course of business, unless prior to or concurrently therewith Lender is paid in full for all Obligations under the Transaction Documents pursuant to any internal restructuring of Borrower's operations and Subsidiaries' but only to the extent that all of the total assets and any liabilities owed to the Lender remain within the new structure and do not create a Material Adverse Effect, and Borrower provides Lender with prior written notice of such restructuring.

5.8     Restriction on Liens.  Borrower and each Subsidiary shall not grant any security interest in, or mortgage of, its respective properties or assets including the Collateral, other than Permitted Liens or such liens as are in favor of Lender.  Any granted in breach of this provision shall be considered void.  Reserve accounts required by non-affiliated, third party vendors do not constitute a "lien" under this Agreement.

5.9     Other Business.  Borrower and each Subsidiary shall not engage in any business other than the Business.

5.10    Change of Name.  Borrower and each Subsidiary shall not change its legal name or the jurisdiction of its organization, without giving Lender at least thirty (30) days' prior written notice thereof.

5.11    Payment Processors.  No Subsidiary shall enter into or modify or permit the modification of any payment processor agreements (such as ACH, RCC or debit card), and all such agreements must require that all transactions must settle to the Collateral Account(s).  In the event of a termination of a payment processor agreement the respective Subsidiary shall replace the terminated payment processor agreement with a new payment processor agreement as soon as reasonably practicable after such termination in a form substantially similar to the prior processor's agreement.  Provided, however, the Subsidiary's failure to replace the terminated payment processor agreement shall not be deemed an Event of Default so long as adequate payment processing relationships exist that allows for the Business to operate in a commercially reasonable manner.  Borrower shall provide Lender a prompt update in the event of any ACH provider

changes or additions by Borrower or a Subsidiary. The payment processor agreements shall contain a provision irrevocably instructing that the payment processor to direct all payments to a lockbox established pursuant to Section 4.16.

5.12 <u>Servicing Agreement</u>. Neither Borrower nor any Subsidiary shall amend, modify, or terminate the Servicing Agreement between that Subsidiary and Ascension Technologies, LLC during the term of the Loan without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed. To insure quality servicing of the loan portfolio included in the Collateral, neither Borrower nor any of its Subsidiaries will offer services to any other lender without prior written consent from Lender.

5.13 <u>Business Policies</u>. Neither the Borrower nor any Subsidiary shall make any internal policy decisions which could dilute the value of the Collateral unless such changes are made to mitigate a Material Adverse Effect.

5.14 <u>Management</u>. Neither the Borrower nor any Subsidiary shall terminate or replace any manager, director or officer of Borrower or the respective Subsidiary or modify delegations of authority without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed.

5.15 <u>Organizational Documents</u>. Borrower and each Subsidiary shall not dissolve or modify, alter, amend, or restate in any way its articles of organization or operating agreement without the prior written consent of Lender in each instance, which consent shall not be unreasonably withheld, conditioned, or delayed, unless such modification, alteration, amendment or restatement is clerical, administrative, ministerial, or *de minimis* in nature, including any change in permitted management thereunder.

5.16 <u>Tribal Law</u>. There will be no changes to Tribal law or regulations that would materially adversely impact Borrower's or a Subsidiary's performance under the Transaction Documents, unless such changes are caused by applicable requirements outside the Tribe's sovereign authority.

5.17 <u>Confidentiality</u>. The provisions of Section 9 of the Parental Guarantee and Sovereign Immunity Waiver shall apply *mutatis mutandis* to this Agreement.

## 6. DEFAULT

6.1 <u>Default</u>. An "<u>Event of Default</u>" shall mean the occurrence of one or more of any of the following events:

(a) (1) failure to make any payment of principal or interest within three (3) days of the due date, whether at maturity, by acceleration or otherwise under the Note, or, (2) any material breach or default by Borrower or a Subsidiary of an affirmative covenant hereof not substantially cured within ten (10) days, (3) any material breach or default by Borrower or a Subsidiary of a negative covenant hereof, or (4) any breach or default under any agreements regarding the Senior Debt not substantially cured within the time frame allowed under the applicable agreement, provided, however, no Event of Default shall have occurred under (1) and (4) if the failure to make payment is a result of the termination or

failure of the lockbox agreement or responsibility of the Lender under any deposit account control agreement; or

(b) default of any other liability, obligation or undertaking of Tribe, Borrower or a Subsidiary, including under the Transaction Documents or any material breach of the Transaction Documents or any documents evidencing Borrower's and any Subsidiary's guarantee of indebtedness, or of the Tribe as guarantor under the Parental Guarantee or later-added guarantors or other surety for the Loan, which failure continues after ten (10) days' written notice thereof (provided that if such default is not reasonably susceptible of cure within said ten (10) days, and Borrower or the respective Subsidiary commences a cure of such default within said ten (10) day period, and thereafter diligently pursues such cure, then Borrower or the respective Subsidiary shall have an additional period of ten (10) days in which to effect such cure prior to an Event of Default arising hereunder); or

(c) if any statement, representation or warranty heretofore, now or hereafter made by Borrower or any Subsidiary in connection with this Agreement or in any supporting financial statement of Borrower or any Subsidiary shall be determined to have been intentionally false in any material respect when made; or

(d) the liquidation, termination or dissolution of Borrower or a Subsidiary, or the merger or consolidation of Borrower or a Subsidiary into another entity that is not otherwise permitted hereby, or stops processing loans or servicing loans for ninety (90) days of any one hundred twenty (120) day period or the appointment of a receiver for its property; or

(e) the institution by or against the Borrower or any Subsidiary of any insolvency proceedings, whether under the United States Bankruptcy Code 11 USC §101 *et seq.* or any other law, in which Borrower or any Subsidiary is alleged to be insolvent or unable to pay its debts as they mature, or the making by Borrower or any Subsidiary of an assignment for the benefit of creditors or the granting by Borrower or any Subsidiary of a trust mortgage for the benefit of creditors and, if such proceeding is instituted against Borrower or any Subsidiary, such proceeding shall not have been dismissed in sixty (60) days; or

(f) the service upon Lender of a writ in which Lender is named as trustee of Borrower or of any Subsidiary; or

(g) the decision of the Tribal Financial Services Regulatory Authority to seize control of any of the Collateral; or

(h) the imposition of any non-appealable fee, fine or order of restitution or reparations by any regulatory authority having requisite jurisdiction upon Borrower or any Subsidiary which exceeds a cumulative amount of one hundred thousand dollars ($100,000) during the term of the Note; or

(i) a final, non-appealable judgment or judgments for the payment of money enforceable against Borrower or any Subsidiary shall be rendered in excess of twenty-five thousand dollars (US$25,000.00) against Borrower or any Subsidiary, and any such judgment shall remain unsatisfied and in effect for any period of thirty (30) consecutive days without a

stay of execution unless such non-payment would have no Material Adverse Effect on the Business as mutually agreed by the Parties; or

(j)    the occurrence of any Material Adverse Effect; or

(k)    any levy, lien (including mechanics lien) other the Permitted Liens, seizure, attachment, execution or similar process shall be issued or levied on any material portion of the property of Borrower or any Subsidiary, and such lien or levy shall not be removed within sixty (60) days.

6.2    <u>Windup.</u>

(a)    If an Event of Default under Section 6.1(e) shall have occurred, all Obligations shall become immediately due and payable without notice or demand. If any other Event of Default shall have occurred which, to the extent capable, has not been waived by Lender, at the election of Lender, all Obligations shall become immediately due and payable without notice or demand.

(b)    Lender is hereby authorized, at its election, after an Event of Default shall have occurred which has not been waived by Lender, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at a public or private sale and the exercise of any rights under agreements held in escrow; and Lender may also exercise any and all other rights and remedies of a secured party under the UCC or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by Lender is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Borrower agrees that ten (10) days' written notice to Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which Borrower and all Subsidiaries shall waive and release after default upon Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide. No purchaser at any sale (public or private) shall be responsible for the application of the purchase money. The net proceeds of sale shall belong to Lender. Upon demand by Lender, Borrower and all Subsidiaries shall assemble the Collateral and make it available to Lender at a place designated by Lender which is reasonably convenient to Lender and Borrower. Borrower and each Subsidiary hereby acknowledges that Lender has extended credit and other financial accommodations to Borrower upon reliance of Borrower's and its Subsidiaries' granting Lender the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default which has not been waived by Lender and Borrower

-16-

and each Subsidiary hereby acknowledges that Lender is entitled to such equitable and injunctive relief to enforce any of its rights and remedies hereunder and Borrower and each Subsidiary hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to Lender.

(c)    No Lender shall be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guarantees shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Borrower and each Subsidiary hereby agrees that it will not invoke any law relating to the marshalling of Collateral which might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed, and to the extent that it lawfully may do so, Borrower and each Subsidiary hereby irrevocably waives the benefits of all such laws. Except as otherwise provided in subsection (e), Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

(d)    Borrower and its Subsidiaries will accelerate all payments pursuant to Section 6.2(a), or other mutually agreeable methodology, and in good faith pursue winding up the business of the Borrower and its Subsidiaries in a manner that maximizes the value to Lender. In the event of windup, the payment methodology shall follow that of Section 1.2 of the Note provided that outstanding Consumer Loan principal returned shall at that point be included in Gross Revenues.

(e)    The Borrower and Subsidiaries will effectuate assignments of all vendor and other agreements and associated obligations, whether held in escrow or otherwise, as directed by the Lender within three (3) Business Days of the occurrence of any event described in subsections 6.2 (a)-(d).

    (i)    Borrower and Subsidiaries will prepare assignments of vendor agreements as described in Section 4.14 or will effectuate any pre-signed assignments held in escrow.

    (ii)    In the event of assignment under (e)(i), Lender agrees to assume the obligations of said vendor agreements and satisfy the remaining unassigned obligations to other vendors related to the Business through the date of the Event of Default unless otherwise agreed by the Lender.

(f)    In the event of assignment of Consumer Loans after an Event of Default, so long as it is commercially feasible, Lender, its successors or assigns agrees to:

    (i)    Provide Borrower with information related to Consumer Loans that were entered into prior to the Event of Default within five (5) Business Days of a request by

Borrower or Borrower's designee related to a consumer initiated complaint or an inquiry from a regulatory agency. Such information shall include executed loan agreement(s), payment history and account notes;

(ii)    Provide, as soon as is reasonably practicable, Borrower with a database including information related Consumer Loans that were entered into prior to the Event of Default such as: full name, date of birth, state of residency, origination date(s), and customer ID;

(iii)   Provide, as soon as is reasonable practicable, Borrower with access to or a copy of any database maintained for the purpose of tracking Consumer complaints or inquiries that occurred prior to the Event of Default; and

(iv)    notify the Tribal Financial Services Regulatory Authority of the assignment of Collateral and provide contact information for the holder of the Collateral; and

(v)     notify Consumers of the assignment of the Consumer Loan.

(g)    Access to Consumer Loan information provided for in subsection (i)-(iii) shall survive the termination of this Agreement for a period not to exceed twelve (12) months after dissolution of the Subsidiary that formerly held the Consumer Loans or the transfer of the Collateral.

6.3    Power of Attorney.  Subject to 6.4, Borrower and each Subsidiary hereby irrevocably constitutes and appoints Lender as Borrower's and/ or each Subsidiary's true and lawful attorney, with full power of substitution, at the sole cost and expense of Borrower but for the sole benefit of Lender, upon the occurrence of an Event of Default which has not been waived by Lender, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the Collateral (subject to the notice and other terms provided in Section 6.2, above); to solely enforce collection of the Collateral either in its own name or in the name of Borrower or any Subsidiary beyond 90 days after the transfer of collateral, including, without limitation, executing releases or waivers, compromising or settling with any Consumers and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to Borrower or any Subsidiary and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest; to notify applicable postal authorities to change the address for delivery of mail addressed to Borrower or any Subsidiary to such address as Lender shall designate; to endorse the name of Borrower or any Subsidiary in favor of Lender upon any and all checks, drafts, money orders, notes, acceptances or other instruments of the same or different nature; to sign and endorse the name of Borrower or any Subsidiary on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to act on behalf of Borrower or any Subsidiary under any vendor or servicing contract beyond 90 days after the transfer of collateral to sign the name of Borrower or any Subsidiary on verification of the Collateral beyond 90 days after the transfer of collateral; and to sign, if necessary, and file or record on behalf of Borrower or any Subsidiary any financing or other statement in order to perfect or protect Lender's security interest. Unless otherwise provided

in this Agreement, Lender shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be entitled to collect more than an amount equal to the then outstanding Obligations, and any sums received in excess of the then-outstanding Obligations shall be returned to Borrower unless otherwise provided in this Agreement, and it shall not be responsible to Borrower or to any other party except in the event that Lender has been determined, with finality, by an Arbitration Decision (as hereafter defined), that Lender has committed gross negligence or willful misconduct. All powers conferred upon Lender by this Agreement, being coupled with an interest, shall be, once triggered, irrevocable so long as any Obligation of Borrower or any surety to Lender shall remain unpaid or Lender is obligated under this Agreement to extend any credit to Borrower. The Lender shall retain the power of attorney during the pendency of any dispute resolution process. This power of attorney shall not grant Lender with the right or ability to waive the sovereign immunity of the Tribe, Borrower or any Subsidiary.

6.4    Subordination.    The repayment of the Loan and Lender's rights hereunder shall be subordinate to the rights of the Senior Lender.

6.5    Nonexclusive Remedies.    All of Lender's rights and remedies not only under the provisions of this Agreement but also any other Transaction Document shall be cumulative and not alternative or exclusive, and may be exercised by Lender at such time or times and in such order of preference as Lender in its sole discretion may determine.

6.6    Force Majeure.    In the event of an act of God or other natural disaster which makes the carrying out of this Agreement impossible, or if a Party's performance hereunder is rendered illegal or materially adversely affected by reason of changes in applicable federal law  applicable to Borrower's Business or to either Party, or if a Party is advised in writing by a federal governmental authority having or asserting jurisdiction over such Party, in an enforcement action or otherwise, that the performance of its obligations under this Agreement is or may be unlawful, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a federal governmental authority, may terminate this Agreement by giving written notice at least ninety (90) calendar days in advance of termination to the other Party, unless such changes in federal law or communication from a federal governmental authority require earlier termination, in which case termination shall be effective upon such earlier required date.

## 7.    MISCELLANEOUS

7.1    Waivers.    Borrower and each Subsidiary waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

7.2    Severability.    If any provision of this Agreement or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid of this Agreement (or the remainder of such provision) and the application thereof to other persons or circumstance shall not be affected thereby.

7.3     Set-Off.   Subject to Lender's limitations pursuant to Section 6.4, Borrower and each Subsidiary hereby grants to Lender a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from Lender to Borrower and any cash, securities, instruments or other property of Borrower or any Subsidiary in the possession of Lender or subject to the lockbox agreement as required Section 4.16 whether for safekeeping or otherwise, or in transit to or from Lender as security for the full and punctual payment and performance of all of the liabilities and obligations of Borrower to Lender such deposits and other sums may be applied or set off against such liabilities and obligations of Borrower to Lender as are then due and unpaid, whether or not demand has been made and whether or not other collateral is then available to Lender.

7.4     Indemnification.   Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, shareholders, employees, attorneys, successors and permitted assigns (collectively, the "Indemnitees") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty or damages) arising as a direct or indirect result of (a) Borrower's or a Subsidiary's Event of Default arising under Section 6.1 of this Agreement, (b) as a result of any investigation or enforcement action initiated by any governmental entity into Borrower's and/ or a Subsidiary's business.   The indemnification provided by this Section 7.4 shall survive payment of the Obligations, any termination of this Agreement, and/or release or discharge executed by Lender in favor of Borrower for a period of four (4) years or twelve (12) months beyond the resolution of any case initiated within the four (4) year period or in the Event of Default for a period not to exceed twelve (12) months after the transfer of Collateral.

7.5     Costs and Expenses.   Borrower and/ or Subsidiary shall pay to Lender any and all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, and disbursements, court costs, litigation and other expenses) incurred or paid by Lender in establishing, maintaining, protecting or enforcing any of Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by Lender in defending Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

7.6     Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.   Delivery by any Party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.7     Complete Agreement.   This Agreement and the other Transaction Documents constitute the entire agreement and understanding between and among the Parties hereto relating to the subject matter hereof, and supersedes, all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

7.8    Binding Effect of Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and permitted assigns of the parties hereto, and shall remain in full force and effect (and Lender shall be entitled to rely thereon) until all commitments of Lender hereunder are terminated and all Obligations hereunder are fully paid. Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights and liabilities of Lender; and such assigning Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement, and the Collateral. Lender shall provide at least sixty (60) days advance written notice to the Borrower of such an intent to assign. Borrower and each Subsidiary may not assign or transfer any of its rights or obligations under this Agreement. Except as expressly provided herein or in the other Transaction Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Transaction Documents.

7.9    Further Assurances. During the pendency of the merger and after the merger is complete, the Borrower and each Subsidiary will from time to time execute and deliver to Lender, and take or cause to be taken, all such other or further action as Lender may reasonably request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Transaction Documents or to vest more fully in or assure to Lender the security interest in the Collateral granted to Lender by this Agreement or to comply with applicable Delaware or federal law and to facilitate the collection of the Collateral (including, without limitation, the endorsement of promissory notes and instruments and notifications to obligors on the Collateral). To the extent permitted by applicable Delaware, Tribal, or federal law, Borrower and each Subsidiary authorizes Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be signed by Lender on behalf of Borrower, if necessary, and may be filed at any time in any jurisdiction. Lender may at any time and from time to time file financing statements, continuation statements, debentures, mortgage, and any other documents allowed under the laws of the Tribe or any other applicable jurisdiction, and amendments thereto which contain any information required by the laws of the Tribe or any other applicable jurisdiction for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower or the respective Subsidiary is an organization, the type of organization and any organization identification number issued to Borrower or Subsidiary. Borrower and each Subsidiary agree to furnish any such information to Lender promptly upon request. In addition, Borrower and each Subsidiary shall at any time and from time to time take such steps as Lender may reasonably request for Lender (a) to obtain an acknowledgement, in form and substance reasonably satisfactory to Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Lender, (b) to obtain possession and control of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Lender, and (c) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and the preservation of its rights therein. As limited by Section 6.3 herein, Borrower and each Subsidiary hereby constitutes Lender its attorney-in-fact to execute, if necessary, and will file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are paid in full and

the Collateral is released. Lender shall deliver to Borrower a copy, on receipt by Lender from the applicable filing jurisdiction, of any such financing statements.

7.10    Amendments and Waivers. This Agreement may not be amended, or the obligations of the parties hereto modified, except in a writing executed by all of the parties. No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right, and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

7.11    Terms of Agreement. This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Lender shall be outstanding, or Lender shall have any obligation to extend any financial accommodation hereunder, and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower or any Subsidiary under the Transaction Documents, nor shall any contemporaneous or subsequent agreement between Borrower and Lender be construed to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

7.12    Notices. Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record. Any such notice shall be deemed duly received and effective (a) if delivered in hand or by telecopier to, or received by, any officer or agent of Borrower or Lender, upon such delivery or receipt, or (b) if sent by overnight courier, on the next business day after being so sent, (c) if sent via electronic medium and reply or other proof of receipt is available, or (d) if mailed by registered or certified mail, return receipt requested, postage prepaid, and properly addressed to Borrower or Lender, two (2) business days after being so mailed. A party's proper address is that set forth for such party in this Agreement or such address as that party may from time to time hereafter designate by notice to the other party.

To Lender at:

875 Carretera 693
Suite 202
Dorado, PR 00646

To Borrower and Subsidiaries at:

P.O. Box 704
Watersmeet, MI 49969

With copy to counsel:

Rosette, LLP
25344 Red Arrow Highway, Suite B
Mattawan, MI 49071.

7.13   Reproductions.  This Agreement and all documents which have been or may be hereinafter furnished by one Party to the other Party may be reproduced by either Party by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding allowable pursuant to Section 8.5 herein (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

7.14   No Partnership.  Nothing contained in this Agreement or the other Transaction Documents shall be deemed to create an equity investment in Borrower or any Subsidiary on the part of Lender or a partnership between Lender and Borrower or any Subsidiary, it being the intent of the parties hereto that only the relationship of lender and borrower shall exist with respect to the Loan.  Borrower and each Subsidiary agree that they shall report this transaction for income tax purposes, and file all applicable and related tax returns, in a manner consistent with the form of this transaction as a loan.

7.15   Lender Is Not In Control; Lender-Creditor Relationship.

(a)     None of the covenants or other provisions contained in this Agreement or any of the other Transaction Documents shall, or shall be deemed to, give Lender the right or power to exercise control over the day to day affairs or management of Borrower or any Subsidiary, the power of Lender being limited to the right to exercise the remedies provided for in this Agreement and the other Transaction Documents.

(b)     The relationship between Lender, on the one hand, and Borrower and any Subsidiary, on the other hand, is solely that of creditor and debtor.  Lender shall not have (or be deemed to have) any fiduciary relationship or duty to any of Borrower or any Subsidiary, arising out of or in connection with, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrower, a Subsidiary, on the other hand, by virtue of, the Transaction Documents.

7.16   Certification.  The individual(s) signing this Agreement on behalf of each Party, by affixing a signature(s) hereon, hereby certify(ies) for the benefit of the receiving Party, that all information submitted to the receiving Party in connection with this Agreement is true and correct in all material respects on and as of the Effective Date.

7.17   Publicity.  Except as may be required by applicable law, none of the parties hereto shall issue a publicity release or announcement or otherwise make any public disclosure concerning this Agreement or the transactions contemplated hereby, without prior approval by the other parties hereto.  If any announcement is required by applicable law to be made by any party hereto, prior to making such announcement such party will deliver a draft of such announcement to the other parties and shall give the other parties an opportunity to comment thereon.  Notwithstanding the foregoing, Lender may disclose a general description of transactions arising under the Transaction Documents for advertising, marketing or other similar purposes upon notice to Borrower and Subsidiaries.

## 8.     TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1    Limited Waiver Of Sovereign Immunity.

(a)     Retention of Sovereign Immunity.  By executing this Agreement, neither Borrower nor any Subsidiary waives, limits or modifies its sovereign immunity, except as expressly provided in this Section 8.

(b)     Scope of Waiver.  Subject to the provisions of this Section 8, Borrower and each Subsidiary each hereby expressly and irrevocably grants to Lender, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Lender alleges a default or breach by Borrower or a Subsidiary of one or more of the specific obligations or duties expressly assumed by Borrower or a Subsidiary under the terms of this Agreement and the Transaction Documents.  These waivers expressly include Lender's or an affiliate's ability to pursue in litigation:

     (i)     specific performance or other specific action, or discontinuance of some action, by Borrower or Subsidiary to bring Borrower or Subsidiary into full compliance with its duties and obligations hereunder; or

     (ii)    money damages for noncompliance with the terms and provisions of this Agreement; or

     (iii)   Borrower and Subsidiaries do not consent to a waiver of their sovereign immunity from suit except for the limited purposes as set forth in this Section 8 and as follows: (A) the dispute shall be brought by and limited to Lender and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited  to the assets and revenues of Borrower and Subsidiaries and no other assets of the Tribe.

(c)     Express Waiver.  Borrower and each Subsidiary hereby expressly and irrevocably waives:

     (i)     its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

     (ii)    any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Lender does not consent to the jurisdiction of any Tribal Forum;

     (iii)   any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would

have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv)    its sovereign immunity as to an action by Lender in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Borrower or Subsidiary based solely upon an attempt by Borrower or Subsidiary to revoke its waiver of its sovereign immunity or other waivers granted under this Section 8 and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v)    its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Section 8, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi)    its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Borrower or Subsidiary in this Section 8).

8.2    Consent to Jurisdiction. Borrower and each Subsidiary consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Section 8. It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3    Enforcement Authorization of Governmental Authorities. Without in any way limiting the generality of the foregoing, Borrower and each Subsidiary expressly authorize any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Borrower's or Subsidiary's property, to give effect to any judgment or order entered, subject to this Section 8.

8.4    Governing Law. This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5    Dispute Resolution. In the event that either Party to this Agreement believes that the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a)    Discussions between the Parties. The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A Party asserting noncompliance or seeking

an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b)  Binding Arbitration. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "AAA"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "Arbitration Decision") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c)  Good Faith. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to the other Party of its reasonable expenses incurred in having to participate in the arbitration.

(d)  Enforcement of Arbitration Decision. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Section 8 solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial

proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e)     Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Section 8 to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6     Attorneys Fees. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7     Service of Process. Borrower and Lender hereby consent to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

8.8     **JURY WAIVER. BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE LAWS OF THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9     Irrevocable Waiver. Borrower and each Subsidiary covenants and agrees that each possess the requisite authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Section 8 and that each are irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period or indemnity period as defined in the Transaction Documents, or for that period of time required to resolve any disputes initiated within the times set forth previously,   whichever is longer. The Borrower and each Subsidiary each agrees not to revoke or limit, in whole or in part, the limited

waivers of sovereign immunity or other waivers contained in this Section 8. Borrower and each Subsidiary each hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.

[NO FURTHER TEXT ON THIS PAGE]

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the date first above written.

**SELLER:**

**Eventide Credit Acquisitions, LLC**

By: _____

Name: _Matt Martorello_____

Its: _President of Manager_____

**BORROWER:**

**Tribal Economic Development Holdings, LLC**

By: _____

Name: Michelle Hazen_____

Its: Co-Manager_____

**SUBSIDIARY:**

**Big Picture Loans, LLC**

By: _____

Name: Michelle Hazen_____

Its: Co-Manager and CEO_____

**SUBSIDIARY:**

**Ascension Technolgies, LLC**

By: _____

Name: Brian McFadden

Its: President

Signature Page

# EXHIBIT 3

# PARENTAL GUARANTEE AND SOVEREIGN IMMUNITY WAIVER

THIS PARENTAL GUARANTEE AND SOVEREIGN IMMUNITY WAIVER (this "Guarantee and Waiver"), is made effective as of October 7, 2015 (the "Effective Date"), by and among Eventide Credit Acquisitions, LLC, a Delaware limited liability company (the "Lender"), and the Tribe, TED and all Subsidiaries (all as defined as below). Each party to this Guarantee and Waiver may be referred to herein as a "Party" or, collectively, as the "Parties." Capitalized terms used herein are as defined in the Loan and Security Agreement, or if not defined therein, in the other applicable Transaction Document.

*Recitals*

**WHEREAS**, Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") is a federally recognized Native American Indian tribe with inherent sovereignty that predates the United States Constitution and whose sovereignty is recognized in the Indian Commerce Clause of the United States Constitution, subsequent United States Supreme Court cases and by the United States Congress.

**WHEREAS**, in furtherance of its objectives of economic self-sufficiency and political self-determination, the government of the Tribe has organized and operates several arms of the Tribe as businesses under its Tribal Constitution and Tribal law that offer financial goods and services from within the Indian Country of the Tribe in an effort to increase the standard of living for its Tribal members.

**WHEREAS**, Tribal Economic Development Holdings, LLC ("TED"), which is an instrumentality and economic development arm organized as a business entity under Tribal law of the Tribe as of the Effective Date has five wholly-owned subsidiaries: (1) Ascension Technologies, LLC, (2) Big Picture Loans, LLC, (3) Red Rock Tribal Lending, LLC, (4) Duck Creek Tribal Financial, LLC, and (5) LVD Tribal Acquisition Company, LLC (each individually a "Subsidiary" and collectively the "Subsidiaries"); however, as a condition precedent to Close of the Merger Agreement, Red Rock Tribal Lending, LLC, and Duck Creek Tribal Financial, LLC shall be wound up and dissolved.

**WHEREAS**, Article XIII, Section 1 of the Tribe's constitution allows the Tribal Council to waive the sovereign immunity of the Tribe and its entities in furtherance of tribal business enterprises, and the Tribal Council has determined that such a wavier furthers the business enterprises of the Tribe in this instance.

**WHEREAS**, the Lender agreed to loan to TED the Acquisition Amount with the use of proceeds to be used solely for the purchase of Bellicose Capital, LLC, an entity providing services to loan portfolios owned or to be developed by the Subsidiaries (the "Loan"), and the Lender wishes to gain assurances from all Tribal parties involved in the Collateral for that Loan that they will cooperate in preserving certain business environment parameters during the repayment period of such loan under the Transaction Documents.

**NOW, THEREFORE**, in consideration of the promises and the covenants hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The Tribe agrees that the total aggregate costs of regulation shall not exceed the total aggregate costs of regulation in 2014 and that such aggregate costs shall be allocated across each regulated entity in operation. Further, the Tribe acknowledges that any increase in taxes or fees, including those related to the regulation of Subsidiaries, over those assessed in 2014 by the Tribe or any tribal entity or body shall be paid from the cash flow directed to the Tribe in the Note and no deduction shall be made from the cash flows available to repay the Note. In the event that the cash flows directed to the Tribe in the Note are insufficient to cover such taxes or fees, the Tribe agrees to waive the remainder of such taxes and/or fees.

2.      The Subsidiaries shall maintain all applicable licenses and other authorizations required for each Subsidiary to operate its business as long as it remains operational. TED and the Tribe acknowledge that the Subsidiaries have a commitment to maintain business operations to repay the Note and agree that they will make no changes in any Subsidiary or TED corporate structures or documents that would materially adversely impact their operations or the Loan repayment under the Transaction Documents. The Tribe agrees to maintain regulatory stability and to make no substantive changes in Tribal law or regulations that would materially adversely impact Borrower's or a Subsidiary's performance under the Transaction Documents, unless such changes are caused by applicable requirements outside the Tribe's sovereign authority. The Tribe agrees that neither it nor any regulatory or other entity or division of the Tribe will attempt to seize control of any of the Collateral without due process as provided under the Tribal Consumer Financial Services Regulatory Code (the "Code") and that, in the event of any such seizure on behalf of the Tribe or other adverse action, the Tribe shall use all good faith efforts to ensure that all obligations to Lender are met and all Lender's rights may be fully exercised under the Transaction Documents. Further, any fines or other impositions assessed under Tribal law or regulation (including enforcement actions) shall be subordinate to the obligations of TED and the Subsidiaries under the Note. The Tribe, TED and the Subsidiaries agree that an arbitrator, pursuant to Section 10 hereof, may grant equitable relief voiding any actions that run counter to this provision.

3.      The Subsidiaries, TED and the Tribe agree not to create any additional entities engaged in the Business other than those in operation on the Effective Date hereof without the consent of the Lender. To ensure quality servicing of the loan portfolio included in the Collateral, neither TED nor any of its Subsidiaries will offer services to any other lender without a written agreement with Lender that establishes service priorities and cost allocations.

4.      The Tribe acknowledges that the Note affects TED and its Subsidiaries and agrees to make no changes in TED or the Subsidiaries organizational documents that might affect the ability of Lender to be repaid under the terms of the Loan Agreement or Note. The Tribe acknowledges and approves the use of deposit account control agreements or lockboxes as mechanisms to insure payment to Lender by TED and its Subsidiaries, and agrees to take no action that would affect the validity of any of those mechanisms.

5. The Subsidiaries and TED shall not dissolve, merge with or into, or consolidate with any entity or sell, transfer or convey any of the Collateral (other than bad debt), and none will take any actions that would cause any of the former to occur, except that Red Rock Tribal Lending, LLC, and Duck Creek Tribal Financial, LLC shall be wound up and dissolved before the closing of the Merger Agreement. The Tribe, Borrower or any Subsidiary shall not terminate or replace any manager, director or officer of Borrower or the respective Subsidiary or modify delegations of authority without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed. Should the Subsidiaries or TED take such actions during the pendency of the Note, the arbitrator of any dispute under this provision is authorized to declare such changes void, and the Tribe, TED and all Subsidiaries agree to allow the enforcement of such an injunctive decision pursuant to the Dispute Resolution provisions in Section 10 of this Guarantee and Waiver.

6. Unless authorized by Lender, the Subsidiaries and TED agree not to allow any liens or security interest other than the Senior Debt which would be considered senior over Lender. The arbitrator of any dispute under this provision is authorized to declare any such liens or security interests subordinate to the security interest created under Transaction Documents, and the Tribe, TED and all Subsidiaries agree to allow and cooperate with the enforcement of such a decision pursuant to the Dispute Resolution provisions in Section 10 of this Guarantee and Waiver.

7. In the Event of Default under any of the Transaction Documents by TED or any Subsidiary, the Tribe or any Tribal entity shall not participate in the online consumer lending industry related to the Business (except that TED or a Subsidiary may provide compliance consulting and bad debt collection services as well as services related to the operation of the Tribe's gaming business) for three (3) years; provided that (a) if an Event of Default occurs when at least ninety (90%) of the original principal amount of the Note has been paid, then the term of the foregoing prohibition shall be reduced from three (3) to one (1) year. In the event of a breach of this provision, Lender shall receive all profits from the Tribe's activities and all such activities shall immediately cease.

8. Borrower and each Subsidiary shall protect, defend (by counsel selected by Lender and reasonably acceptable to Borrower), indemnify and hold harmless Lender and Lender's officers, directors, partners, members, employees, attorneys, successors and permitted assigns and any successors to Lender's interest in the Loan, their officers, directors, partners, members, employees, attorneys, successors and assigns (collectively, the "Indemnitees") from and against all liabilities (including sums paid in settlement of claims), claims brought or threatened against Lender (as well as from reasonable attorneys' fees and expenses in connection therewith), losses, costs, obligations, demands, suits, liens, damages, fines (including any sums ordered to be paid or expended by Indemnitees by any governmental entity as a fine, penalty, restitution or damages) arising as a direct or indirect result of (a) the Tribe's, the Borrower's or any of the Subsidiary's Event of Default or (b) as a direct result of any investigative demand or enforcement proceeding initiated by any governmental entity into the Borrower's and/or any Subsidiary business. The indemnification provided by this Section 8 shall survive payment of the Obligations, any termination of this Guarantee and Waiver, and/or release or discharge executed by Lender, if earlier, in favor of Borrower for a period of three years.

9.     Confidentiality.  All oral and written information about each of the Tribe, TED and all Subsidiaries and the Lender, their respective businesses and customers, and this Guarantee and Waiver (collectively, "Records"), are valuable and proprietary assets.  Each of the Tribe, TED, Subsidiaries and the Lender (and each of their respective employees and agents) shall treat Records as strictly confidential and, except as expressly authorized hereunder, will not disclose Records to any person or use Records other than in accordance therewith.  Disclosure of Records that is compelled or requested by a tribunal, court, administrative body of competent jurisdiction, or other legal process shall not constitute a breach of this provision, provided the disclosing Party must promptly inform the other Party (a) of the existence, terms, and circumstances surrounding such request; (b) consult with the other Party on the advisability of taking available legal steps to resist or narrow such request; and (c) reasonably cooperate with the other Party to seek a protective order.  Each Party will use its best efforts to ensure that its employees and agents maintain such confidentiality.  This Section 9 will not apply to information, documents and material that are in or enter the public domain other than through a wrongful act or omission of a party.

10.     Tribal Waivers Of Sovereign Immunity, Disputes And Remedies.

a.     Limited Waiver Of Sovereign Immunity.

i.     Retention of Sovereign Immunity.  By executing this Guarantee and Waiver, none of the Tribe, Borrower or any Subsidiary waives, limits or modify its sovereign immunity, except as expressly provided in this Section 10.

ii.     Scope of Waiver.  Subject to the provisions of this Section 10, the Tribe, Borrower and each Subsidiary each hereby expressly and irrevocably grants to Lender, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Lender alleges a default or breach by the Tribe, Borrower or a Subsidiary of one or more of the specific obligations or duties expressly assumed by the Tribe, Borrower or a Subsidiary under this Guarantee and Waiver.  These waivers expressly include Lender's or an affiliate's ability to pursue in litigation:

1.     specific performance or other specific action, or discontinuance of some action, by the Tribe, Borrower or a Subsidiary to bring the Tribe, Borrower or Subsidiary into full compliance with its duties and obligations hereunder; or

2.     money damages for noncompliance with the terms and provisions of this Guarantee and Waiver; or

3.     the Tribe, Borrower and Subsidiaries do not consent to a waiver of their sovereign immunity from suit except for the limited purposes as set forth in this Section 10 and as follows: (i) the dispute shall be brought by and limited to Lender and no other party or entity; (ii) the dispute shall be limited to causes of action arising under this Guarantee and Waiver, as to the Tribe, and the Transaction Documents, as to Borrower and Subsidiaries pursuant to Section 10(e); (iii) enforce any Arbitration Decision (as defined herein) or court order compelling arbitration

pursuant to Section 10(e); and (iv) any such award or damages resulting from the dispute shall be a limited recourse obligation of Borrower and Subsidiaries and no other assets of the Tribe except as provided in this Guarantee and Waiver.

iii.    Express Waiver.    The Tribe, Borrower and each Subsidiary hereby expressly and irrevocably waives:

1.    its rights to have any dispute, controversy, suit, action or proceeding arising under this Guarantee and Waiver heard in any forum other than the ones set forth in Section 10.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

2.    any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Lender does not consent to the jurisdiction of any Tribal Forum;

3.    any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

4.    its sovereign immunity as to an action by Lender in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against the Tribe or Borrower based solely upon an attempt by the Tribe or Borrower to revoke its waiver of its sovereign immunity or other waivers granted under this Section 10 and solely to compel participation in arbitration proceedings pursuant to Section 10(e) and enforce an arbitration decision;

5.    its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Section 10, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

6.    its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Tribe or Borrower in this Section 10).

b.    Consent to Jurisdiction.    The Tribe, Borrower and each Subsidiary each consents to the jurisdiction of, and accepts to be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal

or state court having appellate jurisdiction thereover, for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Section 10.  It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

c.     <u>Enforcement Authorization of Governmental Authorities</u>.  Without in any way limiting the generality of the foregoing, the Tribe, Borrower and each Subsidiary each expressly authorizes any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court defined in Section 10(b), including, without limitation, to take such action as entering the Tribe's, Borrower's or a Subsidiary's property, to give effect to any judgment or order entered, subject to this Section 10 and in accordance with applicable law.

d.     <u>Governing Law</u>.  This Guarantee and Waiver, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

e.     <u>Dispute Resolution</u>.  In the event that either Party to this Guarantee and Waiver believes that the other Party has failed to comply with any requirement of this Guarantee and Waiver, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Guarantee and Waiver, the following procedures shall be invoked:

i.     <u>Discussions between the Parties</u>.  The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible.  A Party asserting noncompliance or seeking an interpretation of this Guarantee and Waiver first shall serve written notice on the other Party.  The notice shall identify the specific Guarantee and Waiver provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim.  Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute.  A failure to meet shall be considered a failure to resolve the dispute and shall invoke subsection (ii) below.

ii.     <u>Binding Arbitration</u>.  After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Guarantee and Waiver to arbitration with the American Arbitration Association (the "<u>AAA</u>").  If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party.  The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years' experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA.  If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing.  The expenses

of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "Arbitration Decision") in which the remedies available through arbitration are limited to enforcement of the provisions of this Guarantee and Waiver and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 10(e)(iv) below.

iii. <u>Good Faith</u>. The Party asserting breach or seeking an interpretation of this Guarantee and Waiver under this Section 10(e) shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Guarantee and Waiver is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 10(e)( iii), then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to the other Party of its reasonable expenses incurred in having to participate in the arbitration.

iv. <u>Enforcement of Arbitration Decision</u>. Notwithstanding any provision of law, either Party to the Guarantee and Waiver may bring an action against the other pursuant to the provisions of this Section 10 solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

v. <u>Fast-track Injunctive Relief</u>. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Section 10 to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 10(e).

f. <u>Attorneys Fees</u>. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Guarantee and Waiver. Anything in this Guarantee and Waiver to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Guarantee and Waiver and any additional agreement contemplated herein.

g.    <u>Service of Process</u>. Each Party hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown below and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

If to Borrower and/or Subsidiaries:

Attn: Co-Managers
N5385 US Highway 45
P.O. Box 704 Watersmeet, Michigan 49969

If to Tribe:

Attn: Tribal Chairman
N4698 US Highway 45
P.O. Box 249
Watersmeet, Michigan 49969

With a Copy to:
General Counsel Kenneth A.K. Akini
N4698 US Highway 45
P.O. Box 249
Watersmeet, Michigan 49969

If to Lender:

875 Carretera 693
Suite 202
Dorado, PR 00646

h.    **JURY WAIVER. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE LAWS OF THE STATE OF DELAWARE, WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS GUARANTEE AND WAIVER, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. THE TRIBE, TED AND ALL SUBSIDIARIES EACH CERTIFIES THAT NEITHER IT NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

i.  Irrevocable Waiver.  The Tribe, Borrower and Subsidiaries each covenants and agrees that its limited waiver of sovereign immunity and other waivers contained in this Section 10 are irrevocable for the longer of (a) three years after any of the Loan Agreement has terminated, (b) one year after the Obligations are no longer outstanding, and (c) during any non-compete period. Tribe, Borrower and Subsidiaries each agrees not to revoke or limit, in whole or in part, the limited waivers of sovereign immunity or other waivers contained in this Section 10.  The Tribe, Borrower and Subsidiaries each hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Guarantee and Waiver.

11.  Amendments and Waivers.  This Agreement may not be amended, or the obligations of the parties hereto modified, except in a writing executed by all of the parties.  No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right, and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

12.  Counterparts.  This Guarantee and Waiver may be executed in multiple counterparts.  Delivery by any party of an executed counterpart of a signature page to this Guarantee and Waiver by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

[signature pages follow]

Agreed to and accepted:

**LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS**

By: _____
Name: James Williams, Jr.
Title: Chairman

**TRIBAL ECONOMIC DEVELOPMENT HOLDINGS, LLC**

By: _____
Name: Michelle Hazen
Title: Co-Manager

**BIG PICTURE LOANS, LLC**

By: _____
Name: Michelle Hazen
Title: Co-Manager and CEO

**ASCENSION TECHNOLGIES, LLC**

By: _____
Name: Brian McFadden
Its: President

Acknowledged and accepted by:

**EVENTIDE CREDIT ACQUISITIONS, LLC, as Lender)**


By:_____
Name: Matt Martorello
Title:  President, Liont, LLC, Manager

# EXHIBIT 4

AGREEMENT AND PLAN OF MERGER

among

LVD TRIBAL ACQUISITION COMPANY, LLC

and

BELLICOSE CAPITAL, LLC

and

EVENTIDE CREDIT ACQUISITIONS, LLC

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), executed on September 14, 2015 but effective as of date of Close (the "Effective Date") is entered into among, LVD TRIBAL ACQUISITION COMPANY, LLC ("Acquiror") an entity wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), Bellicose Capital, LLC, a Delaware limited liability company ("Company"), and Eventide Credit Acquisitions, LLC, in its capacity as seller and member of the Company ("Seller").

## ARTICLE I
## RECITALS

1.1    The United States Congress has recognized and enacted legislation such as the Native American Business Development, Trade Promotion and Tourism Act (25 U.S.C. §§ 4301 et seq.) and other legislation which recognizes the federal policy and Congressional intent "to promote economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes" through offering services from Indian Country.

1.2    The Tribe is interested in expanding its e-commerce business interests in order to serve the much needed economic interests of the Tribe.

1.3    Historically, the Tribe has suffered from a lack of significant economic activity, however, with the advent of e-commerce activities occurring within the Tribe's jurisdiction and pursuant to Tribal law, including but not limited to the Tribal Consumer Financial Services Regulatory Code, the Tribe, through its wholly-owned corporate entities, has been able to engage in e-commerce in a meaningful way that enables Acquiror, or another successor Tribal entity, to achieve profits distributable to the Tribe that will be utilized for the benefit of the Tribe. Acquiror believes that the purchase of Company will help advance these efforts further.

1.4    Company has been engaged in servicing the loan portfolios of Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC and intends to service the loan portfolio of Big Picture Loans, LLC, all wholly owned and operated arms and instrumentalities of the Tribe, and the valuation of such services has been used among other components such as goodwill to base the sales price, and the Tribe wishes to acquire Company.

1.5   On the Effective Date, the parties intend that Company be merged with and into Acquiror, with Acquiror surviving that merger on the terms and subject to the conditions set forth herein (the "Merger").

1.6   At Close, the Company shall provide Acquiror, in accordance with Delaware corporate and limited liability company law ("DCL"), a written consent of its member approving this Agreement, the Merger and the transactions contemplated hereby in accordance with the DCL;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and subject to the terms and conditions set forth herein, Seller, Company, and Acquiror agree as follows:

## ARTICLE II
## MERGER

2.1   The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the DCL, at the time established in Section 2.2 on the Effective Date  provided that each of the conditions precedent have been satisfied, (a) the Company will merge with and into Acquiror, and (b) the separate corporate existence of Company will cease and Acquiror will continue its corporate existence under Tribal law as the surviving company (the "Surviving Company") in the Merger (collectively "Close").

2.2   Effective Time. Subject to the provisions of this Agreement, prior to Close, the Company and Acquiror shall cause a certificate of merger (the "Certificate of Merger") to be executed and filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DCL, to be filed at least seven (7) business days before closing, with the effective date of the Merger to be the Effective Time on the Effective Date, and shall make all other filings or recordings required under the DCL. The Merger shall become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by Company and Acquiror in writing and specified in the Certificate of Merger in accordance with the DCL (the effective time of the Merger being hereinafter referred to as the "Effective Time") or as required by DCL.

2.3   Effects of the Merger. The Merger shall have the effects set forth herein and in the applicable provisions of the DCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights, privileges, immunities, powers, franchises, licenses and authority of Company and Acquiror shall vest in the

Surviving Company with the exception that any tax credits or refunds from operations prior to January 1, 2016 shall remain the property and under the control of Seller, and all debts, liabilities, obligations, restrictions and duties of each of Company and Acquiror shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Company. Acquiror or a successor entity of Acquiror specifically agrees to honor and assume the obligations evidenced by those certain promissory notes owed by Bellicose listed on Exhibit A (an updated Exhibit A shall be provided immediately before Close). This Agreement does not modify or terminate any of those notes.

2.4    Certificate of Existence; Operating Agreement. At the Effective Time, (a) the certificate of incorporation of Acquiror as in effect immediately prior to the Effective Time shall be the certificate of organization of the Surviving Company until thereafter amended in accordance with the terms thereof or as provided by applicable law, and (b) the operating agreement of Acquiror as in effect immediately prior to the Effective Time shall be the operating agreement of the Surviving Company until thereafter amended in accordance with the terms thereof, the certificate of existence of the Surviving Company or as provided by applicable Tribal law.

2.5    Directors and Officers. The directors and officers of Acquiror, in each case, immediately prior to the Effective Time shall, from and after the Effective Time, be the directors and officers, respectively, of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of existence and operating agreement of the Surviving Company.

2.6    Effect of Merger. Provided the Merger has occurred, at the Effective Time, as a result of the Merger and without any action on the part of Acquiror, Company or any equity owner:

(a)    Cancellation of Company Equity. Units, interests and/or equity of the Company (collectively, "Equity") that are owned by Acquiror or Company shall automatically be cancelled and retired and shall cease to exist, and, except for the consideration set forth below, no further consideration shall be delivered in exchange therefor.

(b)    Conversion of Equity. All Equity of Company not cancelled pursuant to Section 2.6(a) that is issued and outstanding immediately prior to the Effective Time shall be cancelled and will cease to exist, and each holder of Equity of Company will cease to have any rights with respect thereto, except the right to receive the Merger Consideration (as hereinafter defined) in accordance with Section 2.7 hereof.

(c)  Continuation of Acquiror.  All issued and outstanding equity of Acquiror at the Effective Time shall remain unchanged and Acquiror shall be the Surviving Company.

(d)  Clarification on Company Assets.  To verify those certain intellectual property and general intangible assets of Company (collectively, "IP") acquired by Acquiror through the Merger, the list of IP owned by Company is attached as Exhibit B.  All Company information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to Acquiror and deleted or destroyed by the holder so that holder retains no copies of Company information.  Seller shall make a good faith effort to identify, transfer and/or destroy all Company information that may inadvertently be in its possession after the closing within two (2) month of the closing.  Acquiror shall make a good faith effort to identify, transfer and/or destroy all non-Company information that may inadvertently be in its possession after the closing within two (2) months of the closing, and Acquiror agrees to allow Seller limited access to remove any non-Company information for two (2) months from the Effective Date.  During those two (2) months Seller shall take all commercially reasonable steps to remove any non-Company information from Acquiror servers and locations, and after two (2) months, Acquiror may destroy any remaining information found.  All parties agree to hold such information strictly confidential.  Seller may retain such information as required to prepare required tax returns and any retention requirement of applicable taxing jurisdiction.

2.7  Consideration.  The amount of merger consideration to be paid to the Seller shall be an amount equal to three hundred million dollars $300,000,000 (the "Acquisition Amount").   Such consideration has been arranged by Acquiror's parent organization through a Secured Promissory Note and associated Loan and Security Agreement (collectively, the "Merger Consideration").

2.8  No Bad Acts.  As of the execution date of this Agreement, each party agrees that it shall not take any actions that are materially adverse to the rights of any other party, including, without limitation, any change in the organizational structure, ownership or assets, business, management, contracts or otherwise, except that the conditions precedent to Close set forth in Section 3.2 are specifically excluded and shall not be considered a "bad act." Specifically, Acquiror agrees that the provisions of the Parental Guarantee and Sovereign Immunity Waiver are hereby incorporated into this Agreement as of the execution date.

**ARTICLE III**
**CLOSING, DELIVERIES & ADJUSTMENTS**

3.1   The closing will take place on upon satisfaction of each of the conditions precedent set forth in Section 3.2, but in any event not earlier than January 6, 2016, but not later than February 15, 2016 (unless otherwise agreed to in writing by all parties), but effective on the Effective Date.

3.2   Conditions Precedent to closing. All of the following conditions precedent shall be met or waived in writing by each party prior to Close:

(a)   Company has provided Acquiror with the Certificate of Formation of the Company, certified as of a recent date and current under Delaware law by the Secretary of State of Delaware;

(b)   Company has provided Acquiror with certificates of the Secretary of State of Delaware as to the good standing of the Company as of a recent date under Delaware law of the Company;

(c)   The execution of all Transaction Documents and any associated agreements by all parties thereto;

(d)   The provision by Acquiror to Seller of a legal opinion satisfactory to Seller in similar substance as that provided to Senior Lenders regarding the legality of the Business and the enforceability of the Transaction Documents;

(e)   Acquiror has provided Seller evidence of the termination of operations and the dissolution of Duck Creek Tribal Financial, LLC in accordance with Tribal law and on terms satisfactory to and acceptable to Seller;

(f)   Acquiror has provided Seller with evidence of the merger of Red Rock Tribal Lending, LLC into Big Picture Loans, LLC or the assignment of all assets of Red Rock Tribal Lending, LLC to Big Picture, LLC and the dissolution of Red Rock Tribal Lending, LLC in accordance with Tribal law and on terms satisfactory to and  acceptable to Seller;

(g)   Any required approvals of any Senior Lenders;

(h)   Mutual approval of an operating budget for 2016;

(i) Lockbox and deposit account control agreements as described in Section 4.16 of the Loan and Security Agreement;

(j)  An executed Servicing Agreement between Ascension Technologies, LLC and Subsidiaries making consumer loans satisfactory to and on terms acceptable to Seller;

(k)  The Tribe shall provide a legal opinion that the Tribal Financial Services Regulatory Code ("Code") (1) allows for protections of the Collateral and perfection of the security interest under the Loan Agreement and other Transaction Documents acceptable to the Lender; and (2) clarifies that Lender shall not be a regulated entity under the Code

(l)  Undated assignments in blank or other appropriate transfer documents, each in form and substance satisfactory to Lender, to be held in escrow by Lender, for (1) domain names and (2) vendor agreements agreed to by the Parties shall be placed in escrow for the benefit and security of the Lender; and

(m)  Undated merger agreement, in form and substance satisfactory to Lender, to be held in escrow by Lender, in which Ascension Technologies, LLC would be merged into an entity of Lender's choice upon an event of default.

(n)  Company has provided to Acquiror Exhibits A and B, as defined herein, and information reasonably related thereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF COMPANY

4.1  Company represents and warrants as of immediately before the Effective Time to Acquiror as follows:

(a)  Organization and Good Standing. Company is an entity duly formed with limited liability under the applicable laws of Delaware, validly existing and in good standing under the applicable laws of Delaware and has full power, authority and the legal right to own its properties and conduct its business, and to execute, deliver and perform its obligations under this Agreement.

(b)  Organizational Documents. Company is in compliance with its organizational documents.

(c)  Due Authorization; Enforceability. Company has the full power and authority to execute and deliver this Agreement and to perform all obligations hereunder. The execution, delivery and performance of this Agreement by Company has been duly authorized by all necessary corporate actions on its part and does not and will not contravene any provision of its organizational documents. This Agreement has

been duly executed and delivered by Company and constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

(d) No Conflict. The execution, delivery and performance by Company of this Agreement and the transactions contemplated hereby does not violate, conflict with or result in a breach or default under the organizational documents of Company or any subsidiary or any other regulation applicable to Company or any subsidiary or any agreement or other document to which Company or any subsidiaryis a party or by which it or any of its property is bound.

(e) No Proceeding. To the knowledge of Seller, there is no litigation, administrative proceeding, enforcement action, or investigation before any court, tribunal or governmental body presently pending or threatened against Seller that has not been disclosed to Acquiror.

(f) No Outstanding Liabilities. There are no outstanding liabilities of the Company, including tax liability that exist other than those disclosed in Exhibit A.

(g) No Outstanding Guarantees. All guarantees related to the Company, or its members, have been released.

4.2 Capitalization. There are no: (a) outstanding securities convertible or exchangeable into equity of Company; (b) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Company to issue, transfer or sell any equity; or (c) voting trusts or other agreements, or understandings to which Company is a party or by which Company is bound with respect to the voting, transfer or other disposition of units, other than the Company's Operating Agreement.

4.3 No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate of formation of Company or Company's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Company pursuant to any note, bond,

mortgage, indenture, license, agreement, lease or other instrument or obligation to which Company is a party or by which Company or any of Company's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Company; or (c) violate any order or law applicable to the Company or its properties or assets.

**ARTICLE V**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SELLER**

Seller represents and warrants as of immediately before the Effective Time to Acquiror as follows:

5.1  Authority, Validity and Effect. Seller is a business entity duly formed, validly existing, and in good standing under the applicable laws of its respective jurisdiction. Seller has all requisite power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and such other agreements and documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate, limited liability company or other action on the part of Seller as the only member of Company and no other action is needed. This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the general enforceability exceptions in Section 4.1 above.

5.2  Capitalization. There are no: (a) outstanding securities convertible or exchangeable into units of the Company; (b) options, warrants, calls, subscriptions, or other rights, agreements, or commitments obligating Company to issue, transfer, or sell any units; or (c) voting trusts or other agreements, or understandings to which the Company is a party or by which Company is bound with respect to the voting, transfer, or other disposition of units, other than Company's Operating Agreement.

5.3  Promissory Notes Assumed.  The promissory notes owed by Company described in Exhibit A are true and correct descriptions thereof as of the date of the execution of this Agreement.

5.4  No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate

of formation of Seller or the Seller's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Seller pursuant to any note, bond, mortgage, indenture, license, agreement, lease or other instrument or obligation to which Seller is a party or by which Seller or any of Seller's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Seller; or (c) violate any order or law applicable to the Seller or its properties or assets.

5.5  Title. Seller (a) is the only record and beneficial owner of the equity being sold; (b) has full power, right, and authority, and any approval required by law to make and enter into this Agreement and to sell, assign, transfer, and deliver the units to Acquiror; and (c) has good and valid title to the units free and clear of all liens, other than liens arising under Company's Operating Agreement. Upon the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof, at the closing, Acquiror will acquire valid title to the units of Seller free and clear of all liens, other than liens created by Acquiror and pursuant to Company's Operating Agreement.

5.6 No Lawsuits.  Seller is unaware of any litigation or other governmental action of any type of pending against Seller, the Company, or any beneficial owner of the Company that has not been disclosed.

5.7. Access to IP.  At the closing, Seller will provide Acquiror with immediate secured access to all electronic data and IP of Company, and Aquiror will have the sole and exclusive right to access the IP of Company.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF ACQUIROR

Acquiror represents and warrants to the Seller on the date of execution of this Agreement and on the Effective Date as follows:

6.1  Organization and Standing. Acquiror is a limited liability company, duly organized, validly existing, and in good standing under Tribal law.

6.2  Authority, Validity and Effect. Acquiror has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby without obtaining any additional approvals (whether internal or third-party). The execution and

delivery of this Agreement and such other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Acquiror. This Agreement has been duly and validly executed and delivered by Acquiror and constitutes the legal, valid, and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms, except as limited by Article VIII herein. This Agreement, the Secured Promissory Note, the Loan and Security Agreement, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing, are collectively hereinafter referred to as the "Transaction Documents."

6.3   No Conflict; Required Consents. Neither the execution and delivery of this Agreement by Acquiror, nor the consummation by Acquiror of the transactions contemplated hereby, nor compliance by Acquiror with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the articles or certificate of existence or operating agreement or equivalent organizational documents of Acquiror; (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Acquiror pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which Acquiror is a party or by which Acquiror or any of Acquiror's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Acquiror; or (c) violate any order or law applicable to Acquiror or any of its properties or assets.

6.4   Independent Due Diligence. In connection with its investment decision, Acquiror and/or its representatives have inspected and conducted such reasonable independent review, investigation, and analysis of the Company.

## ARTICLE VII
## MISCELLANEOUS AND GENERAL

7.1   Successors and Assigns. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns consisting of TED and its Subsidiaries, but is not assignable by any party without the prior written consent of the other parties hereto.

7.2   Third Party Beneficiaries. Each party hereto intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

7.3    Further Assurances. The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement. Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

7.4    Notices. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and (a) sent by facsimile transmission; (b) electronic mail, (c) delivered in person, (d) mailed by first-class registered or certified mail, postage prepaid, or (e) sent by Federal Express or other overnight courier of national reputation. Each such notice or communication will be effective (i) if given by facsimile, when the successful sending of such facsimile is electronically confirmed, (ii) if given by electronic mail, when electronic evidence of receipt is received, or (iii) if given by any other means specified in the first sentence of this Section 7.4, upon delivery or refusal of delivery.

> To Seller at:
> 875 Carretera 693
> Suite 202
> Dorado, PR 00646
>
> To Acquiror at:
> P.O. Box 704
> Watersmeet, MI 49969
>
> With copy to counsel:
>
> Rosette, LLP
> 25344 Red Arrow Highway, Suite B
> Mattawan, MI 49071.

7.5    Complete Agreement. This Agreement and exhibits hereto and thereto and the other documents delivered by the parties in connection herewith contain the complete agreement between the parties hereto with respect to the transactions contemplated hereby and thereby and supersede all prior agreements and understandings between the parties hereto with respect thereto.

7.6    Captions. The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

7.7    Amendment. This Agreement may be amended or modified only by an instrument in writing duly executed by the parties.

7.8    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, subject to the limitations in Article VIII.

7.9    Survival. The releases, representations, warranties, covenants, and agreements of the Seller, the Company, and Acquiror contained in this Agreement (including the exhibits attached hereto) will survive the closing.

7.10    Release. The parties permanently release each other and each of their trustees, officers, directors, shareholders and members from, and irrevocably covenant to not commence any proceeding of any kind against any other party for, any and all claims, known and unknown, associated with past agreements entered into by the parties between the parties that occurred before closing except any claim associated with the provisions of the Transaction Documents.

7.11    Execution.  Document may be executed in multiple counterparts, all of which taken together shall constitute one and the same instrument. Delivery by any party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.12    Definitions.  All capitalized terms used but not defined herein will have the respective meanings set forth in the Loan and Security Agreement, or if not defined therein, in the applicable other Transaction Document.

## ARTICLE VIII
## TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1     Limited Waiver Of Sovereign Immunity.

(a)     Retention of Sovereign Immunity.  By executing this Agreement, Acquiror does not waive, limit or modify its sovereign immunity, except as expressly provided in this Article VIII.

(b)     Scope of Waiver.  Subject to the provisions of this Article VIII, Acquiror hereby expressly and irrevocably grants to Seller, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Seller alleges a default or breach by Acquiror of one or more of the specific obligations or duties expressly assumed by Acquiror under the terms of this Agreement and the Transaction Documents.  These waivers expressly include Seller's or an affiliate's ability to pursue in litigation:

(i)     specific performance or other specific action, or discontinuance of some action, by Acquiror to bring Acquiror into full compliance with its duties and obligations hereunder; or

(ii)     money damages for noncompliance with the terms and provisions of this Agreement; or

(iii)     Acquiror does not consent to a waiver of its sovereign immunity from suit except for the limited purposes as set forth in this Article VIII and as follows: (A) the dispute shall be brought by and limited to Seller and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited to the assets and revenues of Acquiror and no other assets of the Tribe.

(c)     Express Waiver.  Acquiror hereby expressly and irrevocably waives:

(i)     its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

(ii)     any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or

proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Seller does not consent to the jurisdiction of any Tribal Forum;

(iii) any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv) its sovereign immunity as to an action by Seller in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Acquiror based solely upon an attempt by Acquiror to revoke its waiver of its sovereign immunity or other waivers granted under this Article VIII and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v) its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Article VIII, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi) its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the Acquiror in this Article VIII).

8.2 <u>Consent to Jurisdiction</u>. Acquiror consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Article VIII. It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3 <u>Enforcement Authorization of Governmental Authorities</u>. Without in any way limiting the generality of the foregoing, Acquiror expressly authorizes any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Acquiror's property, to give effect to any judgment or order entered, subject to this Article VIII.

8.4 <u>Governing Law</u>. This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5 <u>Dispute Resolution</u>. In the event that either Party to this Agreement believes that

the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a) <u>Discussions between the Parties</u>. The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A Party asserting noncompliance or seeking an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b) <u>Binding Arbitration</u>. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "<u>AAA</u>"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years of experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "<u>Arbitration Decision</u>") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c) <u>Good Faith</u>. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to

the other Party of its reasonable expenses incurred in having to participate in the arbitration.(d) Enforcement of Arbitration Decision. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Article VIII solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties. In such judicial proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e) Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Article VIII to prevent actions by the other Party which could have a Material Adverse Effect if taken. Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6 Attorneys Fees. Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement. Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7 Service of Process. Acquiror and Seller hereby consent to any and all process which may be served in any such suit, action or proceeding, (a) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Seller and (b) by serving the same upon Acquiror in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Acquiror.

8.8 **JURY WAIVER. ACQUIROR AND SELLER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. ACQUIROR CERTIFIES THAT NEITHER SELLER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SELLER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9 Irrevocable Waiver. Acquiror covenants and agrees it possess the requisite

authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Article VIII and that it is irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period as defined in the Transaction Documents, or for any period required to enforce any rights under this Agreement when such enforcement action is initiated within one year of the termination of all the Transaction Documents, whichever is longer.  Acquiror agrees not to revoke or limit, in whole or in part, the limited waivers of sovereign immunity or other waivers contained in this Article VIII.  Acquiror hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.

# ARTICLE IX
## INDEMNIFICATION

9.1    Each party shall indemnify and hold harmless (the "Indemnifying Party") the other party, and its respective affiliates, members, managers, officers, directors, trustees, agents and employees (collectively "Indemnified Parties") from and against any claim, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs of suits) that arise out of or relate to any breach by the Indemnifying Party of its express representations, warranties, covenants or other responsibilities set forth in this Agreement, provided however, the Indemnifying Party shall not be liable to any Indemnified Party for the foregoing to the extent any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs) arise from any the Indemnified Party's gross negligence or willful misconduct, as determined pursuant to the dispute resolution procedures set forth in the Transaction Documents.

[signature pages to follow]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**ACQUIROR:**

**LVD TRIBAL ACQUISITION COMPANY, LLC**

By: _Michelle Hazen_

Name: Michelle Hazen

Title: Co-Manager

**COMPANY:**

**BELLICOSE CAPITAL, LLC**

By: _B. McFall_

Name: Brian McFadden

Title: President

**SELLER:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____

Name: Matt Martorello

Title: President, Liont, LLC, Manager

## EXHIBIT A

Notes Assumed

| Note Holder | Amount | Execution Date |
|---|---|---|
| Columbia Pipe & Supply Co. | 2,000,000.00 | 12/10/2012 |
| Timothy P. Arenberg | 700,000.00 | 12/10/2012 |
| Terrance J. Arenberg | 900,000.00 | 12/10/2012 |
| DTA Trinity Wealth Transfer Trust | 300,000.00 | 9/25/2013 |
| Columbia Pipe & Supply Co. | 4,000,000.00 | 11/21/2013 |
| Timothy P. Arenberg | 700,000.00 | 11/21/2013 |
| Terrance J. Arenberg | 750,000.00 | 11/21/2013 |
| DTA | 150,000.00 | 11/21/2013 |
| DMA | 150,000.00 | 11/21/2013 |
| Columbia Pipe & Supply Co. | 2,000,000.00 | 8/16/2014 |
| Timothy P. Arenberg | 400,000.00 | 12/10/2014 |
| Terrance J. Arenberg | 400,000.00 | 12/10/2014 |
| Jeremy Davis | 2,500,000.00 | 12/16/2014 |

**EXHIBIT B**

Intellectual Property
Assets of Company

Seller hereby transfers to Buyer the following Intellectual Property Assets of the Company at Close:

    (1)     All Company records in either paper or electronic format;

    (2)     All data contained on Company's servers or individual computer except as set forth in Section 2.6(d);

    (3)     All templates, training manuals, and other information created for the benefit of Company;

    (4)     All copyrighted or patented materials or processes created by Company or Company's employees;

    (5)     Any Company computer codes and computer models developed by or on behalf of Company or by Company employees;

    (6)     All rights to licenses or other use rights owned or controlled by Company with third-party vendors; and

    (7)     All trade secrets developed by or on behalf of Company or by Company employees.

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**RENEE GALLOWAY,** *et al.,*

        **Plaintiffs,**

**v.**                                **Civil Action No. 3:19-cv-00470-REP**

**JAMES WILLIAMS, JR.,** *et al.,*

        **Defendants.**

_____ /

## PLAINTIFFS' MOTION FOR
## PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, Marcella Singh as administrator of the estate of Felix Gillison, Jr., Renee Galloway, Dianne Turner, Earl Browne, Rose Marie Buchert, Regina Nolte, Kevin Minor, Teresa Titus, Lisa Martinez, Anthony Green, Sonji Grandy, Anastasia Sherman, Burry Pough, Linda Madison, Dominque de la Bay, Lucinda Gray, Andrea Scarborough, Jerry Avent, Lori Fitzgerald, Derek Geter, Keisha Hamm, Faith Thomas, Sharon Paavo, Latanya Tarleton, Christina Cumming, Lamesha Kondo, Andrea Mendez, Tammy Wangeline, Freeman Revels, Kimberly Pool, Tasha Pettiford, Richard L. Smith, Jr., Victoria Renee McKoy, Desiree Wright Lovins, Sandra Monsalve, Carrie Samantha Smith, Chris Kobin, Dana Duggan, and John Actis, for themselves and the Settlement Class Members, by Counsel, hereby moves the Court pursuant to Fed. R. Civ. P. 23 for preliminary approval of the class settlement involving claims and causes of action against only Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr., Michelle Hazen, Henry Smith, Andrea Russell, Alice Brunk, Tina Caron, Mitchell McGeshick, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin, Jeffery McGeshick, Roberta Ivey, June Saad, Columbia Pipe &

Supply Co., Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, DMA Trinity Wealth Transfer Trust, Amlaur Resources, LLC, Brian Jedwab, James Dowd, Simon Liang, and Brian McFadden (collectively "Settling Defendants"). Plaintiffs further move for certification of a class for the purposes of settlement of the claims against the Settling Defendants, appointment of Class Counsel and Class Representatives, and approval of form and manner of notice. Plaintiffs further request that the Court set a fairness hearing for final approval of the class action settlement. A Memorandum in Support will be filed contemporaneously with this Motion. A copy of the Settlement Agreement and all supporting Exhibits, including the proposed notice forms, are attached hereto, as well as a Proposed Order. The Settling Defendants do not oppose the filing of this Motion.

Respectfully submitted,

By: ___/s/ Leonard A. Bennett_____
Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

E. Michelle Drake, Admitted *Pro Hac Vice*
John G. Albanese, Admitted *Pro Hac Vice*
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net

Beth E. Terrell, Admitted *Pro Hac Vice*
Jennifer Rust Murray, Admitted *Pro Hac Vice*
Elizabeth A. Adams, Admitted *Pro Hac Vice*
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email:  jmurray@terrellmarshall.com
Email: eadams@terrellmarshall.com

Matthew Wessler, Admitted *Pro Hac Vice*
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792
Email: matt@guptawessler.com

*Attorneys for Plaintiffs and Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

David N. Anthony, VSB #31696
Email: david.anthony@troutmansanders.com
Timothy J. St. George, VSB #77349
Email: tim.stgeorge@troutmansanders.com
William H. Hurd, VSB #16769
Email: william.hurd@troutman.com
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118

*Attorneys for Defendants*

Hugh M. Fain, III,  VSB #26494
Email: hfain@spottsfain.com
M. F. Connell Mullins, Jr., VSB #47213
Email: cmullins@spottsfain.com
John M. Erbach, VSB #76695
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2069
Facsimile: (804) 697-2169

Richard L. Scheff, *Admitted Pro Hac Vice*
Email: rlscheff@ armstrongteasdale.com
Jonathan P. Boughrum, *Admitted Pro Hac Vice*
Email: jboughrum@ armstrongteasdale.com
Michael Christopher Witsch, *Admitted Pro Hac Vice*
Email: mwitsch@armstrongteasdale.com
ARMSTRONG TEASDALE
1500 Market Street
12th Floor, East Tower
Philadelphia. Pennsylvania 19102
Telephone: (215) 246-3479
Facsimile: (215) 569-8228

4

Tod Daniel Stephens, *Admitted Pro Hac Vice*
Email: tstephens@armstrongteasdale.com
Paul Louis Brusati, *Admitted Pro Hac Vice*
Email: pbrusati@armstrongteasdale.com
ARMSTRONG TEASDALE
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile: (314) 621-5065

Michelle Lynn Alamo, *Admitted Pro Hac Vice*
Email: malamo@armstrongteasdale.com
Alec Paul Harris, *Admitted Pro Hac Vice*
Email: aharris@armstrongteasdale.com
ARMSTRONG TEASDALE
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
Facsimile: (720) 200-0679

Charles Palella, *Admitted Pro Hac Vice*
Email: cpalella@armstrongteasdale.com
ARMSTRONG TEASDALE
919 Third Avenue, 37th Floor
New York, New York 10022
Telephone: (212) 209-4400
Facsimile: (212) 409-8385

*Attorneys for Defendant Matt Martorello*

Craig T. Merritt, VSB #20281
Email: cmerritt@cblaw.com
James E. Moore, VSB # 4526
Email: jmoore@cblaw.com
Shannan M. Fitzgerald, VSB #90712
Email: sfitzgerald@cblaw.com
Email: kmueller@cblaw.com
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Telephone: (804) 697-4100
Facsimile: (804) 697-6112

Justin Alexander Gray, *Admitted Pro Hac Vice*
Email: jgray@rosettelaw.com
Anna Marek Bruty, *Admitted Pro Hac Vice*
Email: abruty@rosettelaw.com

ROSETTE, LLP
44 Grandville Avenue SW, Suite 300
Grand Rapids, Michigan 49503
Telephone: (616) 655-1601
Facsimile: (517) 913-6443

Cindy Dawn Hanson, *Admitted Pro Hac Vice*
Email: cindy@troutman.com
TROUTMAN SANDERS LLP
600 Peachtree Street N.E., Suite 3000
Atlanta, Georgia 30308
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

Alan D. Wingfield. VSB #27489
Email: alan.wingfield@troutman.com
H. Scott Kelly, VSB #80546
Email: scott.kelly@troutman.com
TROUTMAN SANDERS LLP
Post Office Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1350
Facsimile: (804) 698-5172

*Attorneys for Defendants Big Picture Loans, LLC and Ascension Technologies, LLC*

DATED this 26th day of November, 2019.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

*Attorneys for Plaintiffs and Proposed Classes*

## CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE

This Class Action Settlement Agreement and Release ("Settlement Agreement") is made and entered into by and between: (1) Plaintiffs in the Actions listed below ("Plaintiffs"), and (2) (i) Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") (collectively, the "Big Picture Defendants"), wholly-owned and operated entities of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally-recognized Indian tribe, (ii) James Williams, Jr., Michelle Hazen, Henry Smith, Alice Brunk, Andrea Russell, Tina Caron, Mitchell McGeshick, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin, Jeffery McGeshick, Roberta Ivey, and June Saad (collectively, the "Individual Tribal Defendants"), (iii) Columbia Pipe & Supply Co., Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust (collectively, the "Columbia Defendants"), (iv) Amlaur Resources, LLC and Brian Jedwab (collectively the "Amlaur Defendants"), (v) James Dowd ("Dowd"), (vi) Simon Liang ("Liang"), and (vii) Brian McFadden ("McFadden") (collectively, the Big Picture Defendants, the Tribe, the Individual Tribal Defendants, the Columbia Defendants, the Amlaur Defendants, Dowd, Liang and McFadden shall be referred to as the "Settling Defendants"; collectively, Plaintiffs and the Settling Defendants shall be referred to as the "Parties").

This Settlement Agreement is intended to fully, finally, and forever resolve the Released Claims (*see* Section XII) of the Settlement Class (*see* Section 2.28), some of which are set forth in certain pending and dismissed civil actions, including but not limited to: *Lula Williams, et al. v. Big Picture Loans, LLC, et al.*, No. 3:17-cv-00461 (E.D. Va.) ("*Williams*"); *Renee Galloway, et al. v. Big Picture Loans, LLC, et al.*, No. 3:18-cv-00406 (E.D. Va.) ("*Galloway I*"); *Renee Galloway, et al. v. Matt Martorello, et al.*, No. 3:19-cv-00314 (E.D. Va.) ("*Galloway II*"); *Renee*

*Galloway, et al. v. James Williams, Jr., et al.*, No. 3:19-cv-00470 (E.D. Va.) ("*Galloway III*");
*Dana Duggan v. Big Picture Loans, LLC, et al.*, No. 1:18-cv-12277 (D. Mass.) ("*Duggan*");
*Richard Lee Smith, Jr. v. Big Picture Loans, LLC, et al.*, No. 3:18-cv-01651 (D. Or.) ("*Smith*");
*Christine Cumming, et al. v. Big Picture Loans, LLC, et al.*, No. 5:18-cv-03476 (N.D. Ca.); *Chris Kobin v. Big Picture Loans, LLC, et al.*, 2:19-cv-02842 (C.D. Ca.); and *Victoria Renee McKoy, et al., v. Big Picture Loans, LLC, et al.*, 1:18-cv-03217 (N.D. Ga.) (collectively, the "Actions").

## I.     RECITALS

1.1     Beginning in June 2017, Plaintiffs filed putative class action Complaints in the United States District Courts for the Eastern District of Virginia, Central District of California, Northern District of California, Northern District of Georgia, District of Massachusetts, and District of Oregon, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the usury laws of various states, among other claims, arising from loans made to consumers by Big Picture or Red Rock Tribal Lending, LLC ("Red Rock").

1.2     The Actions collectively involved substantial discovery and motion practice, including multiple motions to dismiss; the production and review of hundreds of thousands of pages of documents; depositions and expert reports; an appeal to the Fourth Circuit Court of Appeals; and pre-trial briefing and preparation, which – following significant arms-length negotiations and multiple all-day mediations conducted by Nancy F. Lesser of PAX ADR Dispute Resolution & Mediation Services and the Honorable David J. Novak – culminated in a Settlement (*see* Section 2.24).   During those mediation sessions, the fact that Troutman Sanders, LLP represented multiple Defendants, including certain Settling Defendants and certain Non-Settling Defendants, was fully disclosed to the Parties, the mediator, and the Honorable David J. Novak. Troutman Sanders, LLP did not participate in discussions where any proposed settlement term potentially adversely impacting any of the Non-Settling Defendants was being considered.

1.3     Based on Class Counsel's investigation and the Parties' negotiations, which included Class Counsel's extensive review of voluminous documents and data obtained in discovery in related litigation and multiple depositions, and taking into account the sharply-contested issues involved, the risks, uncertainty, and cost of further prosecution of this litigation, and the substantial benefits to be received by Settlement Class Members pursuant to this Settlement Agreement, Class Counsel have concluded that a settlement with the Settling Defendants on the terms set forth herein is fair, reasonable, adequate and in the best interests of the Settlement Class Members.

1.4     The Tribe, the Big Picture Defendants, the Tribal Officials, the Individual Tribal Defendants, Dowd, McFadden, and Liang assert that they are all entitled to tribal sovereign immunity.  Further, the Tribe, the Big Picture Defendants, the Tribal Officials, the Individual Tribal Defendants, Dowd, McFadden, and Liang deny that any court in the Actions has subject matter jurisdiction or personal jurisdiction over any of them. By entering into this Settlement Agreement, Plaintiffs and Class Counsel have not conceded nor agreed to these defenses.

1.5     The Columbia Defendants and the Amlaur Defendants deny that the Court in *Galloway II* has subject matter jurisdiction or personal jurisdiction over any of them. By entering into this Settlement Agreement, Plaintiffs and Class Counsel have not conceded nor agreed to these defenses.

1.6     The Settling Defendants deny all material allegations in the Complaints, deny any jurisdiction in this Court save for purposes of enforcing this Settlement Agreement, deny any fault, wrongdoing, or liability whatsoever arising out of or related to their business practices, and affirmatively state that their practices have been lawful and proper.  The Settling Defendants deny that the resolution of the merits of the Actions is suitable for class treatment, and further deny

3

liability to Plaintiffs or to others similarly situated, including all members of the Settlement Class. It is specifically agreed that the execution of this Settlement Agreement is not, and shall not be construed as, an admission of wrongdoing or liability by any Defendant, an admission that any Defendant violated any provision of any federal or state law, or an admission that any Defendant concedes that class treatment of the Actions is appropriate for any purpose other than certification of a settlement class as set forth herein. By entering into this Settlement Agreement, Plaintiffs and Class Counsel have not conceded nor agreed to the preceding assertions, disputes, and defenses.

1.7    Based on the investigation and negotiations described above, Plaintiffs and Class Counsel have concluded that it would be in the best interests of the Settlement Class to enter into this Settlement Agreement in order to avoid the uncertainties of litigation and to assure benefits to the Settlement Class and that the settlement contemplated hereby is fair, reasonable, and adequate, and in the best interests of all members of the Settlement Class.

1.8    The Parties understand, acknowledge and agree that the execution of this Settlement Agreement constitutes the settlement and compromise of disputed claims. This Settlement Agreement is inadmissible as evidence against any Party except to enforce the terms of the Settlement Agreement and is not an admission of fact or law, or as a concession of any wrongdoing, obligation, or liability on the part of any Party or the Tribe. The Parties desire and intend to affect a full, complete, and final settlement and resolution of all existing disputes and claims as set forth herein. The Parties agree that nothing in this Settlement Agreement shall constitute a waiver by the Tribe, the Big Picture Defendants, the Tribal Officials, the Individual Tribal Defendants, Dowd, McFadden, and/or Liang of sovereign immunity, except as specifically and expressly provided herein, namely and only to the extent, of enforcement of this Settlement Agreement.

1.9     The Settlement contemplated by this Settlement Agreement is subject to preliminary approval and final approval by the Court, as set forth herein.  This Settlement Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims, upon and subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, it is hereby STIPULATED AND AGREED, subject to this Court's approval, that each and every claim that has been alleged, or could have been alleged based on the facts alleged in the Actions, whether brought by or on behalf of Plaintiffs, the Settlement Class (as defined in Paragraph 2.32 below), or portions of the Settlement Class, shall be fully and finally settled and compromised and dismissed with prejudice, and shall be fully discharged and released, upon and subject to the following terms and conditions.

The recitals stated above are true and accurate and are hereby made a part of the Settlement Agreement.

## II.     DEFINITIONS

2.1     As used in this Settlement Agreement, the terms defined below shall have the meanings assigned to them when capitalized in the same fashion as in this Section II.  All other terms shall have the meaning accorded to those terms in the operative complaint in the Actions.

2.2     "Attorneys' Fees" means the attorneys' fees and expenses applied for by Class Counsel relating to this Settlement Agreement and approved by the Court.

2.3     "Claim" means any and all actions, causes of action, proceedings, adjustments, executions, offsets, contracts, judgments, obligations, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, variances, covenants, trespasses, damages, demands (whether written or oral), agreements, promises, liabilities, controversies, costs, expenses, attorneys' fees and losses whatsoever, whether in law, in admiralty or in equity, whether by affirmative claim,

counterclaim, or setoff, and whether based on any federal law, state law, foreign law or common law right of action or otherwise, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued, existing now or that may later exist in the future, relating to and/or arising out of loans made by and/or in the name of Big Picture, Castle Payday Loans, and/or Red Rock that are the subject of the Actions.

2.4    "Claim Amount" means a *pro rata* distribution to those members of the Settlement Class who make a claim and have paid more than 2.5 times the amount of principal on their respective loan.  This Claim Amount will be the same regardless of the number of loans.

2.5    "Claims Process" means the process by which a member of the Settlement Class must complete a Claim Form certifying his or her membership in the Settlement Class and decision electing to obtain a distribution from the Settlement Fund, as set forth in Section VIII.

2.6    "Class Counsel" means Consumer Litigation Associates, P.C.; Kelly Guzzo PLC; Terrell Marshall Law Group PLLC; Berger & Montague PC; Virginia Poverty Law Center; Gupta Wessler PLLC; Tycko & Zavareei LLP; Caddell & Chapman; and their respective attorneys, as listed on the operative complaints in the Actions.

2.7    "Class Notice" means the notice (in form substantially similar to that attached hereto as **Exhibit A** and approved by the Court) that will be emailed to Settlement Class Members pursuant to the Notice Plan approved by the Court.

2.8    "Consumer" means a natural person residing in the United States of America or its territories who is a member of the Settlement Class.

2.9    "Court" means the United States District Court for the Eastern District of Virginia.

2.10   "Settling Defendants' Counsel" means Rosette, LLP; Troutman Sanders LLP; Dorsey & Whitney LLP; Hinshaw and Culbertson LLP; Ruyak Cherian LLP; and Bellew LLC, as set forth in the respective signature blocks below.

2.11   "Effective Date" is the date on which this Court's entry of the Final Approval Order and this Court's order regarding attorneys' fees have all become final because the following has occurred: (i) the expiration of three (3) business days after the time to file a motion to alter or amend the Final Approval Order under Federal Rule of Civil Procedure 59(e) has passed without any such motion having been filed; (ii) the expiration of three (3) business days after the time in which to appeal the Final Approval Order has passed without any appeal having been filed (which date shall be deemed to be thirty-three (33) days following the entry of the Final Approval Order, unless the date to take such an appeal shall have been extended by Court order or otherwise, or unless the thirty-third (33rd) day falls on a weekend or a Court holiday, in which case the date for purposes of this Settlement shall be deemed to be the next business day after such thirty-third (33rd) day); and (iii) if such motion to alter or amend is filed, or if an appeal is taken, three business days after a determination of any such motion or appeal that permits the consummation of the Settlement.  For purposes of this definition, the term "appeal" includes all writ proceedings.

2.12   "Final Approval" means the approval of the Settlement Agreement by the Court at or after the Final Approval Hearing, and entry on the Court's docket of the Final Approval Order.

2.13   "Final Approval Hearing" or "Final Fairness Hearing" means the hearing at which the Court will consider and finally decide whether to approve this Settlement, enter a judgment, and make such other rulings as are contemplated by this Settlement.  The Final Approval Hearing shall be scheduled in accordance with the Notice Plan approved by the Court and following the granting of Plaintiffs' motion for Preliminary Approval of the Settlement.

2.14   "Final Approval Order" means a final order and judgment entered by the Court giving Final Approval of the Settlement Agreement, dismissing with prejudice Plaintiffs' claims (which shall not include Plaintiffs' Claims against the Non-Settling Defendants), and entering a judgment in a form agreed to by the Parties according to the terms set forth in this Settlement Agreement and as approved by the Court.

2.15   "Named Plaintiffs" means Lula Williams; Gloria Turnage; George Hengle; Dowin Coffy; Marcella Singh; Renee Galloway; Dianne Turner; Earl Browne; Rose Marie Buchert; Regina Nolte; Kevin Minor; Teresa Titus; Lisa Martinez; Anthony Green; Sonji Grandy; Anastasia Sherman; Burry Pough; Linda Madison; Dominque de la Bay; Lucinda Gray; Andrea Scarborough; Jerry Avent; Lori Fitzgerald; Derek Geter; Keisha Hamm; Faith Thomas; Sharon Paavo; Latanya Tarleton; Christina Cumming; Lamesha Kondo; Andrea Mendez; Tammy Wangeline; Freeman Revels; Kimberly Pool; Tasha Pettiford; Richard L. Smith, Jr.; Victoria R. McKoy; Desiree W. Lovins; Sandra Monsalve; Carrie S. Smith; Chris Kobin; and Dana Duggan.

2.16   "Non-Settling Defendant" means any defendant in any of the Actions that is not one of the Released Parties and/or Settling Defendants in this Settlement Agreement.  The Non-Settling Defendants include at this time, but are not limited to, Matt Martorello, Justin Martorello, Rebecca Martorello, Jeremy Davis, Eventide Credit Acquisitions, Bluetech Irrevocable Trust, Kairos Holdings, LLC, Liont, LLC, Breakwater Holdings, LLC, and Gallant Capital, LLC.

2.17   "Notice Plan" means the plan for disseminating notice to Settlement Class Members that is approved by the Court, as described in Sections 6.6 through 6.8.

2.18   "Objection Deadline" shall be the final date set by the Court for Settlement Class Members to return notice of their objection to this Settlement, which shall be thirty (30) days prior to the Final Approval Hearing.

2.19    "Payment Notices" means the notices sent at the time of payment to Settlement Class Members who submit Valid Claims pursuant to Section VIII.

2.20    "Preliminary Approval" means the preliminary approval of the Settlement Agreement by the Court, conditional certification of the Settlement Class, and approval of the Notice Plan by the Court, including the method and content of notice to the Settlement Class Members.

2.21    "Released Claims" means those Claims released as set forth in Section 12.3 below.

2.22    "Released Parties" shall include the Tribe and its current and former Tribal Officials; the Individual Tribal Defendants; Big Picture; Ascension; Red Rock; Duck Creek Tribal Financial, LLC ("Duck Creek"); Tribal Economic Development Holdings, LLC ("TED"); Columbia Pipe & Supply Co. ("Columbia Pipe"); DTA Wealth Transfer Trust ("DTA Wealth"); Deborah M. Arenberg Living Trust ("DMA Living"); Amlaur Resources, LLC ("Amlaur") and each of their current and former directors, officers, principals, trustees, shareholders, partners, contractors, agents, attorneys (including, Rosette Holdings, LLC, Rosette, LLP, Robert A. Rosette, and Karrie S. Wichtman).  The Released Parties also specifically include:  (1) Simon Liang; (2) Brian McFadden; (3) James Dowd; (4) Terrance Arenberg; (5) Timothy Arenberg; (6) Brian Jedwab; (7) Alice Brunk; (8) Tina Caron; (9) Michelle Hazen; (10) Roberta Ivey; (11) Gertrude McGeshick;  (12) Jeffery  McGeshick;  (13) Mitchell  McGeshick;  (14) Susan  McGeshick; (15) Giiwegiizhigookway Martin; (16) Andrea Russell; (17) June Saad; (18) all members (past and present) of the LVD Tribal Council, each in their individual and official capacity; (19) Henry Smith; and (20) James Williams, Jr.  The "Released Parties" shall not include Matt Martorello, Justin Martorello, Rebecca Martorello, Jeremy Davis, Eventide Credit Acquisitions, LLC,

Bluetech Irrevocable Trust, Kairos Holdings, LLC, Liont, LLC, or any other entities owned, directly or indirectly, by Matt Martorello, Justin Martorello or Rebecca Martorello.

2.23    "RICO" means the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*., and any subsequent amendments thereto.

2.24    "Service Awards" means the payments to Named Plaintiffs for their service as class representatives of the Settlement Class as set forth in Section 10.11, subject to approval by the Court.

2.25    "Settlement" means the agreement between the Named Plaintiffs as proposed representatives of the Settlement Class, and Settling Defendants, to settle and compromise, fully, finally, and forever, the Named Plaintiffs' and the Settlement Class Members' Claims in the Actions, as memorialized in this Settlement Agreement and the accompanying documents attached hereto.

2.26    "Settlement Administrator" means the class settlement administration company mutually agreeable to all Parties and approved by the Court, which has been hired by the Parties to provide the Class Notice and to carry out the other specified, administrative tasks set forth in this Settlement Agreement.

2.27    "Settlement Agreement" means this Class Action Settlement Agreement and Release.

2.28    "Settlement Class" or "Settlement Class Member" means all consumers residing within the United States who executed loan agreements with Red Rock, Castle Payday Loans, or Big Picture (including loans assigned to Big Picture) from June 22, 2013 to the date of the Preliminary Approval Order; provided, however, that "Settlement Class" and "Settlement Class Member" shall exclude: (i) all consumers who would otherwise qualify for membership in the

"Settlement Class" for which the consumer previously has released all claims as to the Settling Defendants; (ii) Settling Defendants' officers, directors, and employees; (iii) Settling Defendants' attorneys; (iv) Plaintiffs' attorneys; and (v) any judge who has presided over either mediation or disposition of this case and the members of his or her immediate family.

2.29    "Settlement Fund" means the amount paid pursuant to Sections 10.1 and 10.2 herein.  The Settlement Fund shall be inclusive of any and all Service Awards, Attorneys' Fees, costs, expenses, notice to the Settlement Class Members, and settlement administration costs.

2.30    "Settlement Website" means the internet website established by the Settlement Administrator for purposes of facilitating notice to, and communicating with, the Settlement Class and for receipt of online claims.

2.31    "Tribal Officials" means the Individual Tribal Defendants and/or any past or present members of the Lac Vieux Desert Band of Lake Superior Chippewa Indians Tribal Council and/or any employees of the Tribe or any arms of the Tribe.

2.32    "Valid Claim" means a claim filed pursuant to Section VIII by a Settlement Class Member who (1) repaid his or her loan in full, and also (2) paid more than 2.5 times the original principle amount of the loan in payments over the life of the loan.

## III.    NO ADMISSION OF LIABILITY OR TO THE ELEMENTS OF CLASS CERTIFICATION FOR PURPOSES OF MERITS RESOLUTION.

3.1    Settling Defendants' Denial of Wrongdoing or Liability.  Settling Defendants have asserted and continue to assert many defenses in these Actions and have expressly denied and continue to deny any fault, wrongdoing, or liability whatsoever arising out of the conduct alleged in the Actions.  Settling Defendants expressly deny any fault, wrongdoing, or liability whatsoever, as well as the validity of each of the claims and prayers for relief asserted in the Actions.  The Parties expressly acknowledge and agree that neither the fact of, nor any provision contained in,

this Settlement Agreement nor any of the implementing documents or actions taken under them, shall constitute or be construed as an admission of the validity of any claim, any status, or any fact alleged in the Actions or any fault, wrongdoing, violation of law, or liability of any kind on the part of Settling Defendants and/or the Released Parties, or any admission by Settling Defendants and/or the Released Parties of any claim or allegation made in any action or proceeding against Settling Defendants. Settling Defendants have denied and continue to deny each and all of the claims and allegations in the Actions. Neither this Settlement Agreement nor any document referred to herein, nor any action taken to carry out this Settlement Agreement and/or the Settlement, or Settling Defendants' willingness to enter into this Settlement Agreement, nor any or all negotiations, communications, and discussions associated with the Settlement are, or may be construed as, or may be used in any proceeding as, an admission by or against any or all Settling Defendants of any fault, wrongdoing or liability whatsoever, or any infirmity of any defenses asserted by any or all Settling Defendants.

3.2     No Waiver of Tribal Sovereign Immunity. The Big Picture Defendants, the Tribe, the Individual Tribal Defendants, the Tribal Officials, Dowd, McFadden, and Liang expressly assert that they are all entitled to tribal sovereign immunity. Neither this Settlement Agreement nor any document referred to herein, nor any action taken to carry out this Settlement Agreement and/or the Settlement, or Defendants' willingness to enter into this Settlement Agreement, nor any or all negotiations, communications, and discussions associated with the Settlement are, or may be construed as, or may be used in any proceeding as, an admission by or against the Big Picture Defendants, the Tribe, the Individual Tribal Defendants, the Tribal Officials, Dowd, McFadden, and/or Liang of any waiver of sovereign immunity.

3.3     No Admission of Applicability or Inapplicability of State Law or State Regulation. The Big Picture Defendants, the Tribe, the Individual Tribal Defendants, and the Tribal Officials expressly deny that they – or any of their loans or lending activity – are subject to the laws and/or regulations of any state.   Plaintiffs expressly assert that they – and any of their loans or lending activity – are subject to the laws and/or regulations of their respective states.   Neither this Settlement Agreement nor any document referred to herein, nor any action taken to carry out this Settlement Agreement and/or the Settlement, or the Parties' willingness to enter into this Settlement Agreement, nor any or all negotiations, communications, and discussions associated with the Settlement are, or may be construed as, or may be used in any proceeding as, an admission by or against any Party as to the application of state law and/or state regulation to the Settling Defendants, their loans, or their activities.

3.4     No Admission by Settling Defendants of Elements of Class Certification for Merits Resolution.  Settling Defendants deny that a class should be certified other than for purposes of this Settlement and reserve their rights to contest any class certification motion should this Settlement Agreement not be approved by the Court.  Settling Defendants contend for settlement purposes only that the Actions could be certified as a class action under Federal Rule of Civil Procedure 23, including Rule 23(b)(2) and/or 23(b)(3).   Nothing in this Settlement Agreement shall be construed as an admission by any Defendant that the Actions or any similar case is amenable to class certification for trial purposes.   Furthermore, nothing in this Settlement Agreement shall prevent Settling Defendants from opposing class certification or seeking de-certification of the conditionally certified Settlement Class if Final Approval of this Settlement is not obtained, or not upheld on appeal, including, without limitation, any review by the United States Supreme Court.

3.5     None of the foregoing disclaimers in this Section should be construed as an admission or stipulation by Plaintiffs and Class Counsel regarding the Released Parties' defenses, including the disputed issues of sovereign immunity, the application of state law, and/or the legality of the subject lending practices.

3.6     Admissibility of this Settlement Agreement and Release.  The Parties agree that this Settlement Agreement, its terms and provisions, and any facts surrounding its entry by the Parties shall not be used in any court of law, including the Actions, for any purpose other than those permitted under Section 14.1 below.

## IV.     CERTIFICATION OF THE SETTLEMENT CLASS

4.1     Certification of Settlement Class.  Plaintiffs shall seek, and Settling Defendants shall not oppose, the certification for settlement purposes only of the Settlement Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  If the Settlement Agreement is not finally approved by the Court for any reason whatsoever, the certification of the Settlement Class will be void, and no doctrine of waiver, estoppel, or preclusion will be asserted in any litigated certification proceedings in this Action.  No agreements made by or entered in connection with the Settlement Agreement may be admitted as evidence or used in any way by Plaintiffs, Settling Defendants, any person in the Settlement Class, or any other person to establish any of the elements of liability or class certification other than as expressly provided herein in any litigated certification proceedings, whether in the Actions or any other judicial proceeding.

4.2     Appointment of Class Counsel and Class Representatives. For Settlement purposes only, Plaintiffs shall also seek, and Settling Defendants shall not oppose, appointment of Class Counsel, and appointment of the Named Plaintiffs as class representatives, to represent the Settlement Class.

## V.     PRELIMINARY APPROVAL

5.1     Amended Complaint and Single Case for Settlement.   Upon execution of this Settlement Agreement and prior to the filing of the Motion for Preliminary Approval of this Settlement Agreement, Plaintiffs in *Galloway III* shall seek leave to amend their complaint to add the Plaintiffs and the Settling Defendants from the other Actions, after which *Williams*, *Galloway I*, *Galloway II*, *Duggan*, and *Smith* shall be voluntarily dismissed as to the Settling Defendants only.   The amended complaint in *Galloway III* shall represent a consolidation of the allegations against the Settling Defendants and will name all of the Settling Defendants.   The Parties agree to consent to Plaintiffs' request to amend their complaint in *Galloway III* solely for the purposes of effectuating this Settlement.   The Settling Defendants do not by such consent agree that the allegations that may be contained in such amended complaint are true, correct, or accurate.   In the event this Settlement is not finally approved, Plaintiffs shall file whatever motions and pleadings are necessary to ensure that the Parties are postured in the respective Actions as they were prior to the aforementioned amendment as if such amendment intended for settlement purposes had never occurred.

5.2     Order of Preliminary Approval.   Plaintiffs shall move the Court for entry of the Preliminary Approval Order subsequent to the amendment described in Section 5.1. Pursuant to the motion for preliminary approval, Plaintiffs will request that:

5.2.1    the Court certify the Settlement Class for settlement purposes only, appoint the Named Plaintiffs as the class representatives of the Settlement Class for settlement purposes only, and appoint Class Counsel as counsel for the Settlement Class for settlement purposes only;

5.2.2    the Court preliminarily approve the Settlement Agreement as fair, adequate, and reasonable, and within the reasonable range of possible Final Approval;

        5.2.3   the Court approve the form(s) of Class Notice and find that the Notice Plan satisfies due process and Rule 23 of the Federal Rules of Civil Procedure;

        5.2.4   the Court set the date and time for the Final Fairness Hearing, which may be continued by the Court from time to time without the necessity of further notice; and,

        5.2.5   the Court set the Objection Deadline.

    5.3    Stay.  Other than actions taken for purposes of effectuating the Settlement and those items covered in Sections 6.2 of this Settlement Agreement and subject to Court approval, the Parties agree to jointly move the respective Courts for stays of the Actions – including all pending motions and discovery directed to the Parties – and any related appeals after preliminary approval and pending Final Approval of this Settlement Agreement with respect to Settling Defendants only.  The stay will not apply to the prosecution of claims against the Non-Settling Defendants.

## VI.    ADMINISTRATION AND NOTIFICATION PROCESS

    6.1    Appointment of Settlement Administrator.  Class Counsel will cause to be hired the Settlement Administrator, subject to reasonable objection by the Settling Defendants and approval by the Court.  The Settlement Administrator shall be responsible for carrying out the specified tasks set forth in this Settlement Agreement, including, but not limited to, creating a post office box for receipt of objections and maintaining records of all its activities, including the dates of Class Notices, mailed checks, returned mail, and any other communications and attempted communications with the Settlement Class Members.

    6.2    Provision of Data and Information for Settlement Purposes as to Settling Defendants.  Within thirty (30) days after entry of the Preliminary Approval Order and only as part of this Settlement, the Big Picture Defendants agree to provide a list of names, postal addresses, and email addresses, all if known, for Settlement Class Members to the Settlement Administrator approved by the Court for the purposes of effectuating this Settlement.  The Big Picture Defendants

will cooperate with the Settlement Administrator to the extent that additional personally-identifiable information is necessary to locate a Settlement Class Member. The Big Picture Defendants shall also provide Loan-Level information regarding each Settlement Class Member's loan sufficient to demonstrate the original principal balance of the loan, the interest rate, and the amount and timing of any payments the Settlement Class Member made on the Loan, as well as any other loan-level information reasonably requested by Class Counsel for purposes of effectuating the Settlement and for no other purpose. Class Counsel shall have five (5) business days to review and approve the class data and/or class list, or to notify the Big Picture Defendants of any objections to its completeness. In the event this Settlement is not finally approved, within five (5) business days of such an occurrence, Class Counsel shall destroy all copies of such data that remain in their possession, custody, or control, and shall certify to each Settling Defendant that they have done so.

6.3     Class Certification as to a Non-Settling Defendant. If a class action is certified against a non-Settling Defendant in one or more of the Actions, the Big Picture Defendants will provide (or provide authorization for third parties to provide) data sufficient to identify class members, to determine the terms of class members' loans, to determine payments made by class members on their loans, to determine which loans have been charged off, to determine all outstanding amounts owed under the terms of class members' loan agreements, and any other data or information about class members and their loans which is reasonably requested by Class Counsel and under this provision, such data may only be used for the purpose of creation of a class list or distribution of funds to class members, or to effectuate a subsequent settlement with such Non-Settling Defendant. Subject to the provisions in Section 6.4 below, upon Twenty-One (21) calendar days' notice, in response to a reasonable request from Plaintiffs, the Big Picture

Defendants shall also provide evidence necessary to establish the availability of this data to identify class membership in a contested class certification motion.

6.4     Other Uses   Plaintiffs have represented that they may need additional data, documents, and information to establish liability or for other important purposes in the Actions other than class certification, including by example only and without limitation,  information from: TransDotCom, LLC, Data X, LLC, and Microbilt (as it relates to the Actions); emails and communications by Non-Settling Defendants to which the Tribe or Tribal Officials  were not a party; and loan-level information regarding each Settlement Class Member's loan sufficient to demonstrate the original principal balance of the loan, the interest rate, and the amount and timing of any payments the Settlement Class Member made on the loan.  The Settling Defendants have neither agreed nor refused to provide this information and documents to the Plaintiffs as a term of the Settlement.  If such request is made to the Big Picture Defendants by the Plaintiffs, Plaintiffs will discuss their request(s) with Robert Rosette and both sides agree to negotiate and attempt to resolve any disagreement in good faith.  Any remaining disputes will be resolved in accordance with Section 6.5.

6.5     If the Parties are not able to reach an agreement on Plaintiffs' request(s), the Honorable. David J. Novak will conduct binding mediation of the disputed issues.

6.6     Notice Process Generally.  Subject to approval by the Court, Class Notice shall be provided to all persons in the Settlement Class in accordance with the Notice Plan approved by the Court.  The form of the Class Notice is attached hereto as **Exhibit A** for all Settlement Class Members.  Class Notice will be sent in accordance with Fed. R. Civ. P. 23(c) in the manner approved by the Court through email notice to verified email addresses to each Settlement Class

Member identified on the Class List. Class Notice shall be emailed no later than thirty (30) days after the class list is reviewed by Class Counsel.

6.7    Settlement Website. The Settlement Administrator shall establish an Internet domain and website containing information about the Settlement. The Settlement Website will be accessible by no later than the date of the electronic mailing of the Class Notices. The Settlement Website will post the Settlement Agreement, the Class Notice, Claim Form, the Preliminary Approval Order, the proposed Final Judgment, and, if not included in the Preliminary Approval Order, any court order setting a date and time for the Final Fairness Hearing, and all other documents and information requested by Plaintiffs, subject to reasonable objection by another Party, and any other information required by the Court. Any information appearing on the Settlement Website in addition to the above-listed documents shall be subject to joint approval of the Parties. The Settlement Website also will offer a Spanish-language translation option. The Settlement Website also will detail a process through the website and direct e-mail notice by which a Settlement Class Member can review an estimated claim amount before submitting either a mailed or electronic claim as well as a process to determine, after the claim deadline has passed, an approximate amount of recovery and may elect to withdraw his or her claim. A Settlement Class Member may elect to withdraw his or her claim only by U.S. Mail. The Settlement Website shall be disestablished by the Settlement Administrator within ninety (90) days following the mailing of the last payment to a Settlement Class Member.

6.8    Telephone Assistance Program. The Settlement Administrator will establish a toll-free telephone number, which will be staffed by the Settlement Administrator, to answer questions from Settlement Class Members. The toll-free number will provide access to live support, a voice

response unit ("VRU") or a combination of live support and VRU. It shall also offer a Spanish-language alternative number and VRU.

6.9    Expenses of Notice and Administration. All Class Notice, Payment Notices, and other class administration costs shall be invoiced by the Settlement Administrator and paid promptly from the Settlement Fund, as set forth in Sections 6.10 and 6.11 below. Any disputes relating to this Subsection shall be brought to the Honorable David J. Novak for binding resolution.

6.10    Expenses Paid Through the Settlement Fund. The total expenses associated with Class Notice, Payment Notices, and any other class administration costs (including any consulting costs), shall not increase the amount paid by any of the Settling Defendants as part of the Settlement under any circumstance. Any and all payments shall come from the Settlement Fund before the calculation of net settlement payments to Settlement Class Members. The Settlement Administrator shall invoice and charge as to each subsequent distribution against the payments to be made in that distribution.

6.11    In the event that the Big Picture Defendants advance payments for purposes of effectuating the Notice Plan and administration of the Settlement as provided in Sections 6.6 through 6.8 (as provided in Section 10.1), the Big Picture Defendants will provide an accounting of the payments to Class Counsel. Any disagreement or objection as to the advance payments will be raised with Honorable David J. Novak for binding resolution.

6.12    Notice under Class Action Fairness Act of 2005 ("CAFA Notice"). Settling Defendants will send the CAFA Notice in accordance with 28 U.S.C. § 1715(a)-(b), not later than ten (10) days after this Settlement Agreement is filed with the Court.

6.13    Notice to Court. No later than fourteen (14) days prior to the Final Fairness Hearing, the Settlement Administrator shall file with the Court and serve on counsel for all Parties a

declaration stating that the Class Notice required by the Settlement Agreement has been completed, as well as implementation of the Settlement Website, toll-free telephone support, and copies of all objections received.

6.14    Confidentiality.  The Settlement Administrator (and any person retained by the Settlement Administrator) shall sign a confidentiality agreement in a form agreed to by all counsel for the Parties.  The confidentiality agreement will provide that the Settlement Administrator (and any person retained by the Settlement Administrator) shall treat as confidential the names, addresses, and all other information concerning Settlement Class Members.  The confidentiality agreement will further provide that the Settlement Administrator (and any person retained by the Settlement Administrator) shall use such information only for the purposes of fulfilling the Settlement Administrator's duties and responsibilities as provided for under this Settlement Agreement.

## VII.    PROCEDURES FOR OBJECTIONS

7.1    Objections from Settlement Class Members.  Any Settlement Class Member may appear at the Final Fairness Hearing to argue that the proposed Settlement should not be approved and/or to oppose the application of Class Counsel for an award of Attorneys' Fees and costs and the Service Awards to the Named Plaintiffs.  However, no individual within the Settlement Class shall be heard, and no objection may be considered, unless the individual files the objection with the Court no later than thirty (30) days before the Final Fairness Hearing and serves the objection so that it is received by representative Class Counsel, representative Settling Defendants' Counsel (who shall forward a copy of each objection received to the other Settling Defendants' Counsel), and the Settlement Administrator no later than thirty (30) days before the Final Fairness Hearing; provided, however, objections to the Class Counsel's Attorneys' Fees or the requested Service Awards may be supplemented up to seven (7) days after the filing of a motion for such fees or

awards to address additional information or materials in the motion.  Copies of all objection papers

must be sent to the following addresses:

| **Class Counsel Representative** | **Big Picture Defendants' Counsel Representative** |
|---|---|
| Leonard A. Bennett<br>Consumer Litigation Associates, PC<br>763 J Clyde Morris Blvd., Suite 1A<br>Newport News, VA  23601<br>Telephone: (757) 930-6330<br>Facsimile: (757) 960-3662<br>Email: lenbennett@clalegal.com | Karrie S. Wichtman<br>Lac Vieux Desert Band of Lake Superior<br>Chippewa Indians<br>N4698 US 45, P.O. Box 249<br>Watersmeet, Michigan 49969<br>Telephone: (906) 358-4577, extension 4127<br>Email: karrie.wichtman@lvdtribal.com |
| **Big Picture Defendants' Counsel Representative** | **Settlement Administrator** |
| Robert A. Rosette<br>Rosette, LLP<br>565 W. Chandler Boulevard<br>Suite 212<br>Chandler, Arizona 85225<br>Telephone: (480) 889-8990<br>Facsimile: (480) 899-8997<br>Email: rosette@rosettelaw.com | Settlement Administrator to be approved by the Court. |

7.2     All objections must include: (1) the objector's name, address, telephone number,

and the last four digits of the Settlement Class Member's Social Security number; (2) a sentence

stating that to the best of his or her knowledge he or she is a member of the Settlement Class; and

(3) the factual basis and legal grounds for the objection to the Settlement; and (4) the name, firm

name, phone number, email address, and mailing address of counsel representing the objector, if

any.  The written objection must state whether the Settlement Class Member and/or his or her

lawyer(s) intend to appear at the Final Fairness Hearing.  Any lawyer who intends to appear at the

Final Fairness Hearing must also enter a written Notice of Appearance of Counsel with the Clerk

of the Court no later than thirty (30) days before the Final Fairness Hearing and shall include the

full style and case number of each previous class action case in which that counsel has represented an objector. To the extent necessary or desired, the Parties may respond to any properly-filed objections no later than fourteen (14) days before the Final Fairness Hearing.

7.3    A Settlement Class Member who objects to the Settlement may withdraw that objection. Any Settlement Class Member that does not make an objection in the time and manner set forth herein shall be deemed to have waived any objection and be forever foreclosed from making any objection to the fairness or adequacy of any aspect of the Settlement.

## VIII.    SETTLEMENT CLAIMS PROCESS

8.1    In order to receive a payment from the Settlement Fund, a Settlement Class Member must submit a Claim Form, no later than sixty (60) days from the date of mailing the Class Notices, by either: (1) submitting a Claim Form on the Settlement Website; or (2) returning to the Settlement Administrator, via U.S. mail, the completed Claim Form attached to the Class Notice.

8.2    Submission of claims pursuant to this Section shall be permitted commencing on the first day on which Class Notice is disseminated.

8.3    To be eligible for any payment from the Settlement Fund, a Settlement Class Member must submit a Valid Claim by completing a Claim Form, which shall be provided within the Class Notice to all Settlement Class Members and also made available for download or submission on the Settlement Website or by request from the Settlement Administrator. The Claim Form shall be streamlined, requiring only the Settlement Class Member's name, current postal address, date of birth, and the last four digits of the Settlement Class Member's Social Security number. The Claim Form shall also solicit and recommend Settlement Class Members submit an updated email address and current telephone number of the Class Member. However, an email address and phone number shall not be required. The Claim Form and the Settlement Website shall provide complete instructions for completion of this claims process. Each Class Member

may submit only one Claim Form regardless of the number of loans the Class Member had with the Big Picture Defendants and that Claim Form will apply to all loans the Class Member had with the Big Picture Defendants.

8.4     Claim Forms submitted by U.S. mail shall contain the same information as contained in the electronic form (plus the individual's signature) and shall be mailed to a separate, dedicated post office box established by the Settlement Administrator, as provided herein.

8.5     Deceased Claimants.  Claims may be filed by deceased Settlement Class Members through authorized representatives of their estates if appropriate documentation is provided.  Any claim paid to a deceased consumer shall be made payable to the estate of the deceased.

8.6     Determining the Validity of Claims.    Claim Forms, whether submitted electronically via the Settlement Website or by U.S. mail, that do not meet the requirements as set forth in this Settlement Agreement shall be rejected.  The Settlement Administrator shall have the authority to determine whether a claim is a Valid Claim.   The Settlement Administrator's determination in this regard shall be final and non-appealable unless Settling Defendants' Counsel or Class Counsel disagree, in which case the determination shall be made by the Honorable David J. Novak.  The Settlement Administrator shall promptly notify such individual that his or her claim has been denied and why it has been denied.  Settlement Class Members shall have an opportunity to cure deficient claims.

8.7     The Settlement Administrator shall notify, in a prompt fashion, any Settlement Class Member whose Claim Form has been rejected, setting forth the reasons therefore.  The Settlement Administrator shall timely provide copies of all rejection notices to Class Counsel and to Settling Defendants' Counsel.  Such claimant shall have an additional twenty-one (21) days

after the date this notice is mailed to correct and resubmit the defective claim, but any subsequent determination by the Class Administrator on any resubmitted notice shall be final.

8.8     No Liability for Determinations Relating to Validity of Claims.  No person shall have any claim against Settling Defendants, Plaintiffs, the Settlement Class, Class Counsel, Settling Defendants' Counsel, or the Settlement Administrator based on any claim determinations made in accordance with this Settlement Agreement.

## IX.     FINAL FAIRNESS HEARING AND FINAL APPROVAL

9.1     Final Fairness Hearing.  The Parties will jointly request that the Court hold the Final Fairness Hearing to consider approval of the Settlement of the Actions in accordance with the time period specified in the Notice Plan approved by the Court.  On or before a date at least fourteen (14) days prior to the Final Fairness Hearing, Class Counsel shall file a motion for entry of the Final Approval Order.  The Parties agree that, upon entry, the Final Approval Order constitutes a final judgment dismissing the Actions with prejudice as to Settling Defendants and all of the Released Parties.

9.2     Final Approval.  Unless stated otherwise herein, all relief contemplated by this Settlement Agreement is expressly contingent upon the Settlement Agreement receiving the Court's Final Approval.

## X.     SETTLEMENT FUND

10.1     Creation of and Deposit into Settlement Fund.  Class Counsel, in conjunction with the Settlement Administrator, shall establish an escrow account or equivalent account at Towne Bank (the "Financial Institution"), which shall be considered a common fund created as a result of the settlement of the Actions.  The Settlement Administrator shall direct the Financial Institution to make distributions from the Settlement Fund only in accordance with this Settlement Agreement.  No funds shall be distributed or paid by the Financial Institution without written

confirmation from both Class Counsel and Settling Defendants' Counsel.  Class Counsel shall promptly notify the other Parties of the date of the establishment of the account.  Subject to credits for amounts that were previously paid by the Big Picture Defendants for purposes of effectuating the Notice Plan and administration of the Settlement as provided in Sections 6.6 through 6.8, the Big Picture Defendants shall make deposits totaling $8,700,000.00 to the Settlement Fund on the following schedule:   (1) $2,900,000 within Ninety (90) days after the Effective Date; (2) an additional $2,900,000.00 within One (1) years after the Effective Date; and (3) an additional $2,900,000.00 within Two (2) years after the Effective Date.   The failure of the Big Picture Defendants to perform as to this term will constitute a material breach.  The Settlement Fund may not be commingled with any other funds and may be held in cash, cash equivalents, certificates of deposit, or instruments insured by an arm of or backed by the full faith and credit of the United States Government.  Interest earned, if any, on the Settlement Fund shall be for the benefit of the Settlement Class Members who submit Valid Claims in the event this Settlement Agreement is not terminated by the Settling Defendants and the Effective Date otherwise occurs.

10.2    Dowd, Liang, and McFadden each presently own discrete membership interests in Eventide Credit Acquisitions, LLC ("Eventide"), which is entitled to receive payments from the Loan Agreement and Promissory Note dated September 14, 2015 between Eventide and TED (the "Eventide Note").  As separate and distinct consideration for the respective releases granted to each of them under this Settlement, each of Dowd, Liang, and McFadden shall transfer to the Settlement Fund their respective Eventide membership interests, including their respective interests in future Eventide distributions, if any, received under the Eventide Note (separately and collectively, Dowd's, Liang's, and McFadden's "Eventide Interests") subject to the Parties' understanding that such transfer must be structured in such a way as to: (a) avoid any tax liability

to Dowd, Liang, and McFadden; (b) comply with the terms of the Eventide Note; (c) comply with the terms of the Eventide Operating Agreement; and (d) if necessary because it is not possible to satisfy requirements (a), (b) and (c), through the direct transfer of their Eventide Interests, effectuate the transfer or assignment to the Settlement Fund of their respective future Eventide distributions, if any. The transfer of the Eventide Interests shall be made in a manner to avoid Dowd, Liang, or McFadden incurring any tax liabilities; however, in the event that is not possible, such transfer shall be made, less whatever amounts are necessary to satisfy any tax liabilities incurred by Dowd, Liang, or McFadden as the result of receiving such distributions before payment to the Settlement Fund. The Parties and Settlement Administrator shall provide their reasonable cooperation to accomplish the transfer of the Eventide Interests contemplated under this Section 10.2. Any disputes relating to this Section 10.2 shall be brought to the Honorable David J. Novak for resolution.

10.3     Settlement Fund Distributions. The Settlement Fund will be used to make distributions to the Settlement Class Members who submit a Valid Claim from the Settlement Fund under the process set forth below. Class Counsel will: (1) request an award of Attorneys' Fees in an amount not to exceed Thirty-three percent (33%) of the Settlement Fund; and (2) seek the disbursement of the remaining balance of the costs of the Notice Plan and administration out of the Settlement Fund. The remainder of the Settlement Fund shall be used to pay Settlement Class Members who submit a Valid Claim on a *pro rata* basis, as set forth below. Distribution checks will be void after ninety (90) days. To the extent that Attorney's Fees are awarded by the Court in an amount that is less than what is sought by Class Counsel at the time of Final Approval, the difference shall be credited to the Settlement Fund.

10.4    Costs of Notice and Administration Expenses Deduction. Prior to Final Approval, costs of notice and any other expenses incurred in the administration of the Settlement shall be paid by the Big Picture Defendants within ten (10) business days of receiving advance, written notice from the Settlement Administrator for amounts to be invoiced by the Settlement Administrator to the Big Picture Defendants for costs and any other expenses incurred in the administration of the Settlement. This amount shall be credited against the initial payment of $2,900,000.00 scheduled to be paid within Ninety (90) days of the Effective Date. The Big Picture Defendants, therefore, will fund the Settlement Fund in two stages: first to pay the costs of notice and any other expenses incurred in the administration of the Settlement in accordance with Section 6.6-6.10; and second to pay the remainder of the Settlement Fund in accordance with Section 10.1. Under no circumstance shall the total amount paid by the Big Picture Defendants into the Settlement Fund exceed $8,700,000.00. Under no circumstances shall the total amount paid by Dowd, Liang, and McFadden into the Settlement Fund exceed the Eventide Interests (addressed in Section 10.2).

10.5    Settlement Fund Tax Status. The Parties agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1. The Settlement Administrator shall timely make such elections as necessary or advisable to carry out the provisions of this Subsection, including the "relation back election" (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Settlement Administrator to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur. For the purpose of Treasury Regulation § 1.468B of the Internal Revenue Code of 1986, as amended,

and the regulations promulgated thereunder, the "administrator" shall be the Settlement Administrator. The Settlement Administrator shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including, without limitation, the returns described in Treas. Reg. § 1.468B-2(k)). Such returns shall be consistent with this Subsection and in all events shall reflect that all federal or state income taxes ("Taxes") (including any estimated Taxes, interest or penalties) on the income earned by the Settlement Fund, if any, shall be paid out of the Settlement Fund.

10.6    Tax Liabilities. All (a) taxes (including any estimated Taxes, interest or penalties) arising with respect to any income earned by the Settlement Fund, including any Taxes or tax detriments that may be imposed upon the Released Parties with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes, and (b) expenses and costs incurred in connection with the operation and implementation of this Subsection (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns herein ("Tax Expenses"), shall be paid out of the Settlement Fund. In no event shall the Released Parties have any responsibility for or liability with respect to the Taxes or the Tax Expenses. The Settlement Administrator shall indemnify and hold the Released Parties harmless for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification). Further, Taxes and Tax Expenses shall be timely paid by the Settlement Administrator out of the Settlement Fund without prior order from the Court, and the Settlement Administrator shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as

well as any amounts that may be required to be withheld under Treas. Reg. § 1.468B-2(l)); the Released Parties are not responsible therefore nor shall they have any liability with respect thereto. The Parties hereto agree to cooperate with the Settlement Administrator, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Section. The Settlement Administrator has discretion to submit whatever tax form(s) it deems appropriate to any Settlement Class Member. The Settling Defendants do not make any representation or warranty as to the appropriate tax treatment of any provision of this Settlement Agreement.

10.7    Attorneys' Fees. No later than fourteen (14) days before the Final Approval Hearing, Class Counsel shall file an application or applications to the Court for reimbursement of Attorneys' Fees and costs from the overall Settlement Fund, not to exceed Thirty-three percent (33%) of the Settlement Fund. The application or applications shall be noticed to be heard at the Final Fairness Hearing. Settling Defendants will not oppose such a request so long as it does not exceed that amount.

10.8    Settlement Not Conditioned on Attorneys' Fees Approval. The application or applications for Attorneys' Fees, and any and all matters related thereto, shall not be considered part of the Settlement Agreement, and shall be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement. Plaintiffs and Class Counsel agree that this Settlement Agreement is not conditional on the Court's approval of Attorneys' Fees in the requested amount or in any amount whatsoever. The Court's ruling on the application or applications for such fees shall not operate to terminate or cancel the Settlement.

10.9    All Attorneys' Fees Come Out of Settlement Fund.  Settling Defendants shall have no responsibility for, nor any liability with respect to, the payment of Attorneys' Fees to Class Counsel.  The sole source of any payment of Attorneys' Fees shall be the Settlement Fund.

10.10   Payment of Attorneys' Fees.  Attorneys' Fees in the amount approved by the Court will be paid through distribution from the Settlement Fund by the Settlement Administrator from the third and final $2,900,000 payment made by the Settling Defendants and may be paid ten (10) days after receipt of the final payment in the Settlement Fund under Section 10.1.

10.11   Service Awards to the Named Plaintiff.  On or before fourteen (14) days before the Final Fairness Hearing, Class Counsel shall file an application to the Court for a Service Award, not to exceed five-thousand dollars ($5,000.00), depending upon each Plaintiff's degree of contribution and service, to be paid to each of the Named Plaintiffs serving as class representatives in support of the Settlement out of the Settlement Fund.  Settling Defendants will not oppose such a request.  To the extent the Court approves a Service Award in an amount less than $5,000.00 to a Named Plaintiff, the difference will remain in the Settlement Fund.  Any Service Award payment shall be funded through the Settlement Fund.

10.12   Settlement Class Member Payments.  All Settlement Class Members who submit Valid Claims are entitled to payment pursuant to the processes for submitting Claim Forms and determining Valid Claims as set forth in Section VIII.  The amount of each check to be issued is subject to deduction for Attorneys' Fees and costs approved by the Court and costs of administration by the Settlement Administrator.  To calculate the amount of each payment, the Settlement Administrator shall divide the amount left in the Settlement Fund after all other payments and costs required by this Settlement Agreement have been deducted.

10.13   Settlement Checks.  All settlement checks shall be issued thirty (30) days after receipt of the second deposit into the Settlement Fund under Section 10.1.  All settlement checks shall state: "This payment is tendered to you as a class member in *Renee Galloway, et al. v. James Williams, Jr., et al.,* Case No. 3:19-cv-00470-REP (E.D. Va.) in consideration for your release of the Released Parties as set forth in the Class Action Settlement Agreement and Release."

10.14   Use and Disbursement of Settlement Fund.  The Settlement Fund shall be used only in the manner and for the purposes provided for in this Settlement Agreement.  No portion of the Settlement Fund shall be disbursed except as expressly provided for herein.

10.15   Disbursement of Funds for Notice and Administrative Expenses. Upon Preliminary Approval, the Settlement Administrator shall disburse funds for the costs of notice and related administrative expenses incurred with respect to effectuating the Notice Plan approved by the Court.

10.16   Deduction of Reasonable and Necessary Expenses. The Settlement Administrator shall distribute payments from the Settlement Fund pursuant to the processes set forth in this Section X.  The Settlement Administrator may deduct from the Settlement Fund any and all reasonable and necessary expenses for the administration of such payments (*e.g.*, costs associated with generating and mailing checks), as well as all reasonable expenses for the determinations as to Valid Claims.

10.17   General Distribution Plan.  The Settlement Administrator shall send payments via U.S. mail or by commercially reasonable electronic means out of the Settlement Fund to the Settlement Class Members who submit Valid Claims.  Each such Settlement Class Member will receive only one payment, regardless of the number of counts in any of the operative complaints in the Actions that may have applied to that Settlement Class Member.  The Payment Notices

accompanying the payment check shall notify the recipients that the checks must be cashed within sixty (60) days from the date on the Payment Notice and that the enclosed check shall not be valid after that date.

10.18   Distribution after Sixty (60) Days.  Sixty (60) days after the date on the Payment Notice, if the check has not been deposited or cashed, the amount of the check shall remain in the Settlement Fund.

10.19   Residual Amounts in Settlement Fund.  Any residual amounts in the Settlement Fund (including after payments to Settlement Class Members, Attorneys' Fees, Service Awards, and amounts necessary to effectuate the Notice Plan and for administration of the Settlement) shall be paid to The PEW Charitable Trusts.

10.20   Capped Fund.  All of the following must be paid from the $8,700,000 and Eventide Interests, if any, paid into the Settlement Fund by Settling Defendants: (i) notice and administration/consulting costs; (ii) payments to the Settlement Class Members who submit Valid Claims; (iii) payments of Service Awards to the Named Plaintiffs; (iv) and payments to Class Counsel for Attorneys' Fees.  The Parties and their respective counsel agree that under no circumstances will Settling Defendants and/or Released Parties pay or cause to be paid more than their respective contributions aggregating to the sum of $8,700,000, plus the assigned Eventide Interests, if any, pursuant to this Settlement.

10.21   No Vested Interest.  The Parties Agree, and the Court shall order, that no Settlement Class Member has a vested interest in any amount to be paid to him or her under the Settlement Agreement unless and until he or she has cashed a settlement check under the parameters and timeframe set forth herein.

## XI.   SETTLEMENT CLASS INJUNCTIVE RELIEF

11.1     Subject to the terms and conditions of this Settlement Agreement, the Parties have agreed that Plaintiffs will move for an uncontested motion for the Court to enter an injunction attached as **Exhibit B** to this Settlement Agreement that will consist of the following issues only.

11.2     Cap on Collections.  With respect to Settlement Class Members residing within the United States or its territories who executed loan agreements with Big Picture and/or Red Rock (including loans assigned to Big Picture or Red Rock) from June 22, 2013, to the date of the Preliminary Approval Order and have not fully paid off his or her loan under the agreed terms, but not including Charged-Off Loans (defined below), the Big Picture Defendants agree to collect no more than 2.5 times the original principal amount of the loan in payments over the life of the loan (*e.g.*, if the original principal amount of the loan was $500.00 then the Big Picture Defendants agree to cap collection at $1,250.00, including payments credited to either interest or principal reduction).

11.3     Cease Collection and Cancellation of Charged-Off Loans.  With respect to loan agreements executed (i) by Settlement Class Members residing within the United States or its territories, (ii) with Big Picture and/or Red Rock (including loans assigned to Big Picture) and (iii) from June 22, 2013 to the date of the Preliminary Approval Order, Big Picture will charge off such loans after being at least 210 days in default ("Charged-Off Loans").  The Big Picture Defendants agree to cease any collection activities and cancel all such loans as a contested liability to the extent not already done for Charged-Off Loans.  The Big Picture Defendants will not assign, sell, or transfer any interest in Charged-Off Loans and/or future loan proceeds from Charged-Off Loans. Any consumers with Charged-Off Loans on the Effective Date will be notified of the elimination of their defaulted loan balances through a letter, approved by all Parties and sent by the Settlement Administrator.  Such letter will be sent by email if such address is reasonably verifiable and shall

not imply or express any admission of wrongdoing by any of the Released Parties. Any payments made on Charged-Off Loans to the Big Picture Defendants after the date of the Preliminary Approval Order will either be (i) rejected by Big Picture Defendants or (ii) held in escrow by the Big Picture Defendants and within thirty (30) days of the Effective Date shall be returned to the respective consumer or paid to the Settlement Administrator to be returned to the respective Settlement Class Member.

## XII.    RELEASE OF CLAIMS

12.1    Release for Valid Claims.  Upon the Effective Date, the Named Plaintiffs, for themselves and as representatives of the Settlement Class, each Settlement Class Member who submits a Valid Claim, and/or their respective spouses, heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors and assigns and all those acting or purporting to act on their behalf acknowledge full satisfaction of, and shall be conclusively deemed to have fully, finally and forever settled, released and discharged the Released Parties of and from the Released Claims.  Nothing in this Settlement Agreement, however, shall be deemed a release of the Parties' respective rights and obligations under this Settlement Agreement.  Also, nothing in this Settlement Agreement shall be deemed a release of Plaintiffs' and Settlement Class Members' respective Claims against the Non-Settling Defendants.

12.2    Scope of Release for Settlement Class Members Who Submit Valid Claims.  In exchange for the relief described in this Settlement Agreement and the injunctive relief set forth in Section XI, the Settlement Class Members who submit Valid Claims and/or anyone acting or purporting to act on their behalf agree to release the Released Parties from any and all Released Claims.  It is the intent of the Parties that this release covers every possible Claim that could have been brought in the Actions against the Released Parties, regardless of any other requirement

imposed by federal or state law, including all damages claims and claims for any and other remedies.

12.3    Released Claims.  "Released Claims" means any and all claims, causes of action, suits, obligations, debts, demands, agreements, promises, liabilities, damages, losses, controversies, costs, expenses and attorneys' fees of any nature whatsoever, whether based on any federal law, state law, common law, territorial law, foreign law, tribal law, contract, rule, regulation, any regulatory promulgation (including, but not limited to, any opinion or declaratory ruling), common law or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory, as of the date of the Final Fairness Approval Order and Judgment, that relate to and/or arise out of loans made by and/or in the name of Big Picture, Castle Payday Loans, and/or Red Rock. Notwithstanding the Release defined and stated herein, this Settlement Agreement shall not release any claim alleged against any party in *Williams, et al, v. Microbilt Corporation, et al*, Civ. No. 3:19cv85 (E.D. Va.).

12.4    Scope of Release for Settlement Class Members Who Do Not Receive a Payment ("Non-Payment Released Claims").  All Settlement Class Members who do not receive a payment from the Settlement Fund will waive their rights to bring a class action, collective action, and/or mass action (but not an individual action) against any and all of the Released Parties related to not only claims asserted in the Actions, but also claims that could have been asserted in the Actions.

12.5    General Release to Fullest Extent Possible. The Parties agree that the release is limited to those Released Claims encompassed by the provisions of Section 12.3.  Notwithstanding that understanding, Plaintiffs, for themselves and for each Settlement Class Member, acknowledge that they are aware that they may hereafter discover facts in addition to or different from those that

they or Class Counsel now knows or believes to be true with respect to the subject matter of these releases, but it is their intention to, and they do hereby, upon the Effective Date of this Settlement Agreement, fully, finally and forever settle and release any and all Released Claims and Non-Payment Released Claims, without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs, for themselves and for each Settlement Class Member, further waives any and all rights and benefits afforded by California Civil Code Section 1542, which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." Plaintiffs and Class Counsel understand and acknowledge the significance of this waiver and/or of any other applicable federal or state law relating to limitations on releases.

12.6    Binding Nature of Settlement. Subject to the requirements of due process, this Settlement Agreement shall bind all Settlement Class Members and all of the Released Claims shall be dismissed with prejudice and released as against the Released Parties, even if the Settlement Class Member claims or can later show that he or she did not receive actual notice of the Settlement prior to the hearing on final approval of the Settlement.

12.7    This Release as set forth in this Section may be raised as a complete defense and bar to any action or demand brought in contravention of this Settlement Agreement.

12.8    Upon entry of the Final Fairness Approval Order and Judgment, the Parties shall take all actions necessary to cause entry of Final Judgment, including the severance of Claims

against the Non-Settling Defendants, and the Parties agree to dismiss the Actions and any related appeals with prejudice as to Settling Defendants.

12.9    It is expressly understood and acknowledged by the Parties that the provisions of this release and covenant not to sue as set forth in this Section together constitute essential and material terms of the Settlement Agreement to be included in the Final Approval Order.

## XIII.   TERMINATION AND SUSPENSION

13.1    Settling Defendants' Rights to Terminate Agreement.    Settling Defendants' willingness to settle the Actions on a class-action basis and to agree to the certification of conditional Settlement Class is dependent upon achieving finality in the Actions, and the desire to avoid the expense of these and other Actions.   Consequently, Settling Defendants shall have the unilateral right in their sole discretion to individually terminate this Settlement Agreement, declare it null and void, and have no further obligations under this Settlement Agreement to the Plaintiffs, Settlement Class Members, or Class Counsel if any of the following conditions subsequently occurs: (1) the Court fails or declines to grant Preliminary Approval pursuant to the terms of the Preliminary Approval Order; (2) the Court modifies the terms of the Settlement Agreement; or (3) the Effective Date does not occur for any reason, including the entry of an order by any court that would require either material modification or termination of the Settlement Agreement or the Final Approval Order.

13.2    Plaintiffs' Rights to Terminate Agreement.  Plaintiffs shall have the unilateral right in their sole discretion to individually terminate this Settlement Agreement, declare it null and void, and have no further obligations under this Settlement Agreement to the Settling Defendants if any of the following conditions subsequently occurs: (1) the Court fails or declines to grant Preliminary Approval pursuant to the terms of the Preliminary Approval Order; (2) the Court modifies the terms of the Settlement Agreement; or (3) the Effective Date does not occur for any

reason, including the entry of an order by any court that would require either material modification or termination of the Settlement Agreement or the Final Approval Order.

13.3 **Disapproval of Fee Request.** Notwithstanding anything else contained herein, the failure of any Court to approve the Attorneys' Fees or Service Awards in the requested amounts, or any amounts whatsoever, shall not be grounds for the Named Plaintiffs or Class Counsel to terminate this Settlement Agreement.

13.4 **Effect of Termination on This or Future Actions.** If this Settlement Agreement is rejected by the Court or terminated for any reason: (1) the class-certification portions of the Settlement Agreement shall have no further force and effect and shall not be offered in evidence or used in the Actions or in any other proceeding; (2) counsel for the Parties shall seek to have any Court orders, filings, or other entries in the Court's file that result from this Settlement Agreement set aside, withdrawn, and stricken from the record; (3) the Settlement Agreement and all negotiations, proceedings, and documents prepared, and statements made in connection with either of them, shall be without prejudice to any Party and shall not be deemed or construed to be an admission or confession by any Party of any fact, matter, liability, or proposition of law; and (4) the Parties shall stand in the same procedural position as if the Settlement Agreement had not been negotiated, made, or filed with the Court, and no doctrine of waiver, estoppel, or preclusion will be asserted in any litigated certification proceedings in the Actions against any Party, including without limitation, the amended complaint filed in *Galloway III* and any consolidation of the Actions pursuant to Section 5.1 shall be null and void as it was filed only to effectuate this Settlement.

## XIV. PUBLIC STATEMENTS

14.1 **Public Statements.** Settling Defendants and Plaintiffs shall not issue any press releases or make any affirmative statements to any media regarding this Settlement. Class Counsel

shall not use the name of or identity of any Settling Defendant, other than the Big Picture Defendants, on any of Class Counsel's websites or promotional materials.

## XV. MISCELLANEOUS PROVISIONS

15.1 No Invocation of Sovereign Immunity as a Defense to the Final Settlement Agreement: The Tribe, the Individual Tribal Defendants, the Big Picture Defendants, Dowd, Liang, and McFadden will not invoke sovereign immunity as a defense to the enforcement of the Settlement Agreement. None of the Individual Tribal Defendants, the Big Picture Defendants, Dowd, Liang, or McFadden consent to a waiver of their sovereign immunity from suit except for the limited purposes of the enforcement of this Settlement Agreement and as follows: (a) any dispute shall be brought by and limited to Plaintiffs, Settlement Class Members and no other party or entity; (b) the dispute shall be limited to those arising under this Settlement Agreement and the enforcement of any agreement, order, judgment or ruling resulting therefrom; and (c) the dispute shall be brought in the United States District Court for the Eastern District of Virginia. Nothing contained herein shall be construed as a waiver of the sovereign immunity of the Tribe, the Individual Tribal Defendants, the Big Picture Defendants, Dowd, Liang, and/or McFadden in any other context, proceeding or litigation. Except as expressly set forth herein, nothing contained in this Settlement Agreement shall be construed as a waiver of any rights or privileges belonging to the Tribe, the Individual Tribal Defendants, the Tribal Officials, the Big Picture Defendants, Dowd, Liang, and McFadden, and each of their current, past and future affiliates, subsidiaries, parents, insurers, and all of the respective directors, officers, Tribal Council members, general and limited partners, shareholders, managers, representatives, employees, members, agents, attorneys, accountants successors, assigns, and representatives, including sovereign immunity from judicial process, all of which are otherwise reserved.

15.2    Choice of Law.  This Agreement and the rights of the parties under this Settlement Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia including all matters of construction, validity, performance, and enforcement and without giving effect to the principles of conflict of laws.  By agreeing to this, none of the Defendants is agreeing to the application of Virginia law in any other context.  Neither this Settlement Agreement nor any document referred to herein, nor any action taken to carry out this Settlement Agreement and/or the Settlement, or Defendants' willingness to enter into this Settlement Agreement, nor any or all negotiations, communications, and discussions associated with the Settlement are, or may be construed as, or may be used in any proceeding as, an admission by or against the Big Picture Defendants, the Tribe, the Individual Tribal Defendants, the Tribal Officials, Dowd, McFadden, and/or  Liang of any waiver of sovereign immunity.

15.3    Discovery to Settling Defendants.  In addition to the stay sought in Section 5.3 and the dismissals pursuant to Section 5.1, as to Settling Defendants named in the Actions, all discovery as to the Settling Defendants is stayed while the Settlement Agreement goes through the approval process.  If the Settlement is not finally approved by the Court for any reason, the stay shall be terminated, and any discovery implicated by this Section 15.3 shall not be deemed due for response until at least forty-five (45) days from such termination.

15.4    Use of Discovery Materials in Related Actions.  Settling Defendants agree that documents produced, and depositions provided in *Williams* or *Galloway I* shall be produced in *Galloway II* or any other related case subject to the protective order entered or to be entered in *Galloway II*.

15.5    Destruction and Non-Use of Discovery Materials.  Class Counsel agrees to destroy all materials produced by the Settling Defendants, Released Parties, and all third parties upon entry

of the Final Approval Order or upon resolution of the Actions, or any related actions brought against a party that is not a Released Party, whichever is later; subject to good faith discussion between counsel of the Parties as necessary. Class Counsel agree to be bound by the requirements of the protective orders entered in the Actions, even following their disposal of the materials. Any disputes will be arbitrated by the Honorable David J. Novak.

15.6    Bellicose Capital, LLC ("Bellicose") Privilege. The Big Picture Defendants agree to withdraw their assertion of attorney-client privilege for communications that occurred at Bellicose or Sourcepoint VI, LLC prior to the acquisition on January 26, 2016. The Big Picture Defendants will produce such communications if they are within the Big Picture Defendants' possession unless another Party or entity, other than a Released Party, has timely served a separate privilege objection that has not been overruled by the respective court. The Big Picture Defendants agree to withdraw their objections to discovery for such communications, including but not limited to third-party subpoenas to Jennifer Galloway and Conner & Winters, LLP.

15.7    Admissibility of Settlement Agreement. This Settlement Agreement shall not be offered or be admissible in evidence in any action or proceeding except: (1) the hearings necessary to obtain and implement Court approval of this Settlement; or (2) any hearing to enforce the terms of this Settlement Agreement or any related order by the Court.

15.8    Successors and Assigns. The terms of this Settlement Agreement shall apply to and bind the Parties as well as their heirs, successors, and assigns.

15.9    Communications Relating to Settlement Agreement. Unless specified otherwise herein, all notices or other formal communications under this Settlement Agreement and/or the Settlement shall be in writing and sent by electronic mail, fax or hand delivery, or overnight mail postage prepaid to:

If to Class Counsel:

>Leonard A. Bennett
>CONSUMER LITIGATION ASSOCIATES, P.C.
>763 J. Clyde Morris Blvd., Ste. 1-A
>Newport News, VA 23601
>Telephone: (757) 930-3660
>Facsimile: (757) 930-3662
>Email: lenbennett@clalegal.com

If to counsel for the Big Picture Defendants, the Tribe, the Individual Tribal Defendants,
Liang and McFadden:

>Robert A. Rosette
>Justin A. Gray
>Rosette, LLP
>44 Grandville Avenue SW
>Suite 300
>Grand Rapids, Michigan 49503
>Telephone: (616) 655-1601
>Facsimile: (517) 916-6443
>Email: rosette@rosettelaw.com
>Email: jgray@rosettelaw.com

If to counsel for the Columbia Defendants:

>Thomas Lester
>Devin Noble
>HINSHAW & CULBERTSON LLP
>100 Park Avenue
>PO Box 1389
>Rockford, IL 61105
>Telephone: 815-490-4946
>Facsimile: 815-490-4901
>Email: tlester@hinshawlaw.com
>Email: dnoble@hinshawlaw.com

If to counsel for Defendant James Dowd:

>Michael Stinson
>Vernle C. Durocher, Jr.
>DORSEY & WHITNEY LLP
>50 S Sixth St., Suite 1500
>Minneapolis, MN 55402
>Telephone: 612-492-6624
>Facsimile: 612-340-2868
>Email: stinson.mike@dorsey.com

Email: Durocher.skip@dorsey.com

If to counsel for Defendants Amlaur Resources and Brian Jebwab:

Rebecca Ruby Anzidei
Amadou Kilkenny Diaw
Martin Cunniff
Ruyak Cherian LLP
1700 K Street NW
Suite 810
Washington, DC 20006
Telephone: (202) 897-1914
Facsimile: (202) 478-1715
Email: rebeccaa@ruyakcherian.com
Email: amadoukd@ruyakcherian.com
Email: martinc@ruyakcherian.com

Sean J. Bellew
Bellew LLC
2961 Centerville Road
Suite 302
Wilmington, DE 19808
Telephone: (302) 353-4951
Email: sjbellew@bellewllc.com

The notice recipients and addresses designated above may be changed by written notice. Upon the request of any of the Parties, the Parties agree to promptly provide each other with copies of objections received in relation to this Settlement Agreement.

Any Party may, by written notice to all the other Parties, change its designated recipient(s) or notice address provided above.

15.10 If any Party to this Agreement believes that another Party is in default of its obligations under this Agreement, the Party believe there is a default must advise all Parties in writing ("Notice of Default"), as listed in Section 15.9, prior to filing suit or seeking other relief to enforce the terms of this Agreement. Upon receipt of the Notice of Default, the defaulting Party shall have thirty (30) days to cure the default. If the default is not cured at the end of the 30-day

period, the non-defaulting Party may file suit or seek other relief to enforce the terms of this Agreement.

15.11  Non-Solicitation/Representation.  Class Counsel represents and warrants that they will not solicit or suggest, directly or indirectly, personally or through other actions, other lawyers, law firms, nonprofit entities, or governmental or regulatory authorities the filing of new actions against Settling Defendants or any of the Released Parties relating to the offering, transacting, servicing, selling, or collection of the Big Picture Defendants' or Red Rock's loans consummated prior to the date of Preliminary Approval to any consumer located in the United States.

15.12  Destruction and Non-Use of Discovery Materials:  Class Counsel agree to destroy all materials produced by Settling Defendants, any Released Party, and/or any third parties and designated upon that production as confidential upon entry of the Final Order or upon final resolution of the Actions, or any related actions brought against a party that is not a Released Party, whichever is later; subject to good faith discussion between counsel for the Parties as necessary. Class Counsel agree to be bound by the requirements of the protective orders entered in the Actions, even following their disposal of the materials.  Any disputes will be arbitrated by the Honorable David J. Novak.

15.13  Big Picture Defendants' Communications with Consumers in the Ordinary Course of Business.  Big Picture Defendants reserve the right to continue communicating with its customers and Consumers, including Settlement Class Members, in the ordinary course of business.  Big Picture Defendants shall not advise consumers of anything contrary to the terms of this Settlement.

15.14  Efforts to Support Settlement.  The Parties and their counsel agree to cooperate fully in seeking Court approval for this Settlement Agreement and to use their best efforts to effect

the consummation of the Settlement and to protect the Settlement Agreement by applying for appropriate orders enjoining others from initiating or prosecuting any action arising out of or related to facts or claims alleged in the Actions, if so required.

15.15   Competency of the Parties.  The Parties, and each of them, acknowledge, warrant, represent, and agree that in executing and delivering this Settlement Agreement, they do so freely, knowingly, and voluntarily, that they had an opportunity to and did discuss its terms and their implications with legal counsel of their choice, that they are fully aware of the contents and effect of this Settlement, and that such execution and delivery is not the result of any fraud, duress, mistake, or undue influence whatsoever.

15.16   Procedures for Disputes Between Parties Relating to the Settlement Agreement. Unless specifically indicated as a dispute to be brought to the Honorable David J. Novak in the first instance, the Parties agree to submit any dispute arising under this Settlement Agreement first to mediation with Nancy F. Lesser of PAX ADR Dispute Resolution & Mediation Services, a private mediator previously used by the Parties on three occasions for the Actions, and, if deemed necessary and agreed by the Parties, the Honorable David J. Novak, before filing any motion or action with the Court, allowing a reasonable time for the mediation of the dispute.

15.17   Entire and Voluntary Agreement.  The Parties intend the Settlement Agreement to be a final and complete resolution of the Actions.  The Parties agree that the terms of the Settlement Agreement were negotiated at arm's length and in good faith and were reached voluntarily after consultation with competent legal counsel.  There shall there be no presumption for or against any Party that drafted all or any portion of this Settlement Agreement.  This Settlement Agreement contains the entire agreement and understanding concerning the subject matter between the Parties and supersedes all prior negotiations and proposals, whether written or oral.  No other party or any

46

agent or attorney of any other party has made any promise, representation or warranty whatsoever not contained in this Settlement Agreement and the other documents referred to in this Settlement Agreement to induce them to execute the same. The Parties represent that they have not executed this instrument or the other documents in reliance on any promise, representation, or warranty not contained in this Settlement Agreement and the other documents referred to in this Settlement Agreement. Any modification must be in writing signed by the Parties and their respective counsel and, to the extent necessary, approved by the Court.

15.18   Headings for Convenience Only. The headings in this Settlement Agreement are for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

15.19   Settlement Agreement Controls. All of the Exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. To the extent that there is any conflict between the terms of this Settlement Agreement and the Exhibits attached hereto, this Settlement Agreement shall control.

15.20   Time Periods. The time periods and dates described herein are subject to Court approval and may be modified upon order of the Court or written stipulation of the Parties.

15.21   Amendments. The Settlement Agreement may be amended or modified only by a written instrument signed by Class Counsel and Settling Defendants' Counsel, or their respective successors-in-interest.

15.22   Receipt of Advice of Counsel. Each Party acknowledges, agrees, and specifically warrants that he, she, or it has fully read this Settlement Agreement, received independent legal advice with respect to the advisability of entering into this Settlement Agreement and fully

understands the effect of this Settlement Agreement, the Released Parties, and the Released Claims.

15.23  Authorization of Counsel.  Class Counsel, on behalf of the Settlement Class, are expressly authorized by Plaintiffs to take all appropriate action required or permitted to be taken by the Settlement Class pursuant to the Settlement Agreement to effectuate its terms, and also are expressly authorized to enter into any modifications or amendments to the Settlement Agreement on behalf of the Settlement Class that they deem necessary or appropriate.  Each attorney executing the Settlement Agreement on behalf of any Party hereto hereby warrants that such attorney has the full authority to do so.

15.24  Confidentiality.  All agreements made and Orders entered during the course of the Actions relating to the confidentiality of information shall survive this Settlement Agreement.

15.25  Court's Jurisdiction.  The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Settlement Agreement and all orders entered in connection therewith.  The Parties and their attorneys submit to the jurisdiction of the Court regarding these matters.

15.26  Construction.  Each of the Parties has cooperated in the mutual drafting and preparation of this Settlement Agreement.  Hence, in any construction to be made of this Settlement Agreement, the same shall not be construed against any of the Parties.  Before declaring any provision of this Settlement Agreement invalid, a court should first attempt to construe the provision as valid to the fullest extent possible consistent with applicable precedent so as to find all provisions of this Settlement Agreement valid and enforceable.

15.27  No Claims Arising from this Settlement Agreement.  No person shall have any claim against any Settling Defendants, Released Party, Settling Defendants' Counsel, Named

Plaintiff or Class Counsel based on distribution of benefits made substantially in accordance with this Settlement Agreement or any Settlement Agreement-related order(s) of the Court.

15.28   Waiver.   The waiver by one party of any provision or breach of this Settlement Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

15.29   Counterparts and Date of Agreement.   This Settlement Agreement may be executed in one or more counterparts and by facsimile.  All executed counterparts and each of them shall be deemed to be one and the same instrument.   Counsel for the Parties shall exchange among themselves signed counterparts, and a complete set of executed counterparts shall be filed with the Court.   The Settlement Agreement shall become effective upon its execution by all of the undersigned.

IN WITNESS THEREOF, the Parties hereto have caused this Settlement Agreement to be executed by their duly authorized representatives.

**LULA WILLIAMS; GLORIA TURNAGE;
GEORGE HENGLE; DOWIN COFFY;
MARCELLA SINGH; RENEE GALLOWAY;
DIANNE TURNER; EARL BROWNE; ROSE
MARIE BUCHERT; REGINA NOLTE; KEVIN
MINOR; TERESA TITUS; LISA MARTINEZ;
ANTHONY GREEN; SONJI GRANDY;
ANASTASIA SHERMAN; BURRY POUGH;
LINDA MADISON; DOMINQUE DE LA BAY;
LUCINDA GRAY; ANDREA
SCARBOROUGH; JERRY AVENT; LORI
FITZGERALD; DEREK GETER; KEISHA
HAMM; FAITH THOMAS; SHARON PAAVO;
LATANYA TARLETON**

Date:_____    _____

Consumer Litigation Associates, P.C.
Kelly Guzzo PLC
Terrell Marshall Law Group PLLC
Berger & Montague PC
Virginia Poverty Law Center
Gupta Wessler PLLC

**CHRISTINA CUMMING; LAMESHA KONDO; ANDREA MENDEZ; TAMMY WANGELINE; FREEMAN REVELS; KIMBERLY POOL; TASHA PETTIFORD**

Date:_____                 _____
                                       Tycko & Zavareei LLP

**RICHARD L. SMITH, JR.; VICTORIA R.
MCKOY; DESIREE W. LOVINS; SANDRA
MONSALVE; CARRIE S. SMITH; CHRIS
KOBIN; DANA DUGGAN**

Date:_____          _____

                               Caddell & Chapman

**BIG PICTURE LOANS, LLC; ASCENSION TECHNOLOGIES, LLC; JAMES WILLIAMS, JR.; MICHELLE HAZEN; GERTRUDE MCGESHICK; SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN; JAMES DOWD; SIMON LIANG; BRIAN MCFADDEN; KARRIE WICHTMAN; HENRY SMITH; ALICE BRUNK; ANDREA RUSSELL; TINA CARON; MITCHELL MCGESHICK; JEFFERY MCGESHICK; ROBERTA IVEY; JUNE SAAD**

Date:_____      _____

                          Rosette, LLP

**COLUMBIA PIPE & SUPPLY CO.; TIMOTHY ARENBERG; TERRANCE ARENBERG; DTA TRINITY WEALTH TRANSFER TRUST; DEBORAH M. ARENBERG LIVING TRUST**

Date:_____                    _____

                                         Hinshaw and Culbertson LLP

**JAMES DOWD**

Date:_____          _____

                              Dorsey & Whitney LLP

**AMLAUR RESOURCES, LLC; BRIAN JEBWAB**

Date:_____

_____
Ruyak Cherian LLP

Date:_____

_____
Bellew LLC

Return Address Box 123
Return City, ST 12345-6789



E1234 0000001 P01 T00001 ************5-DIGIT 12345

John Q. Sample
123 Any Street
Any Town, ST 12345-6789

# EXHIBIT A

# CLASS NOTICE

# If You Obtained a Big Picture or Castle Payday Loan
# You Could Get Loan Forgiveness and/or
# a Cash Payment from a Settlement.

*A federal court ordered this notice. This is not a solicitation from a lawyer.*

- Read this Notice. It states your rights and provides you with information regarding a proposed nationwide class action settlement ("Settlement") in lawsuits brought against a number of companies and persons alleged to be involved with the making of online loans in the name of Big Picture Loans and Red Rock Tribal Lending d/b/a/ Castle Payday Loans. All of these settling parties, listed below, are known here as the Settling Defendants.

- The lawsuit claimed that the Big Picture and Castle Payday loans violated state usury laws and the Racketeer Influenced and Corrupt Organizations Act. There was no finding of liability in this case, and the Settling Defendants vigorously denied all allegations in the lawsuits.

- As part of the proposed Settlement, individuals who executed Big Picture and/or Castle Payday loan agreements from June 22, 2013, to the date of the Preliminary Approval Order may be eligible to receive certain benefits, as detailed below, including cash refunds.

- This Notice is a summary of information about the Settlement and explains your legal rights and options because you may be a member of the class of borrowers who would be affected if the Settlement is finally approved by the Court. The complete terms of the proposed Settlement are available at the Settlement website, WEBSITE ("Settlement Website"). You may also obtain further information about the Settlement at the following telephone number: NUMBER.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | You will remain a member of the Settlement Class. You may receive certain benefits without doing anything, including a reduction in the amount of interest you can be charged on your loan.<br><br>However, if you do nothing, you will not receive a cash payment. You can still bring any claim you may have against a Defendant, but only on an individual basis. |
| **MAKE A CLAIM FOR A CASH PAYMENT** | You can make a claim for a cash amount by submitting the attached claim form ("Claim Form") by mail or at [WEBSITE]. You will receive a cash payment if you repaid your loan, and paid more than 2.5 times the original principal amount of the loan in payments over the life of the loan. You can go to www.[_____].com/claim to see whether you would receive a cash payment. |
| **OBJECT TO THE SETTLEMENT** | If you do not exclude yourself, you may write to the Courts about why you don't like the Settlement or why the Courts should not approve it. |

## 1. WHY IS THERE A NOTICE?

This Notice relates to a proposed nationwide Settlement that will be considered by a United States District Court in Richmond, Virginia (the "Court"). Before the Settlement becomes effective, it must be finally approved by the Court. The claims of the Settlement Class Members (as defined below) are being settled in the Court in the following class action matter: *Renee Galloway, et al. v. James Williams, Jr., et al.*, Case No. 3:19-cv-00470-REP (E.D. Va.) (the "Lawsuit").

The Settlement also resolves other cases in Virginia, California, Oregon, Georgia and Massachusetts.

You have been identified as a Settlement Class Member. The Court authorized this Notice because you have a right to know about a proposed Settlement of the lawsuit and about all of your options before the Court decides whether to give "final approval" to the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

## 2. WHAT ARE THESE LAWSUITS ABOUT?

The claims involved in the Settlement arise out of loans made in the name of two companies that are owned by a Native American Indian Tribe: Big Picture Loans and Red Rock Tribal Lending d/b/a/ Castle Payday Loans ("Tribal Companies"). There were others that are alleged to have invested or assisted in the operations of these businesses. Several of these companies and individuals are also included in the Settlement (collectively known as the "Settling Defendants"). Each of the Settling Defendants is listed below in Section 7.

The plaintiffs in these cases claim that the Settling Defendants violated federal and various state laws by: (a) making and collecting loans with annual interest rates in excess of the amount allowed by state law, (b) lending to consumers when these entities were required to have a license from a state to lend to consumers, and they did not have that license, (c) servicing or collection activities, or (d) their involvement in and support of other parties' conduct.

The plaintiffs in the lawsuit claim that the Tribal Companies' loans violated state usury laws that govern the amount of interest lenders can charge and federal laws the prevent the collection of illegal debts.

The Settling Defendants do not agree that state law is applicable to the loans made by the Tribal Companies. They have vigorously denied all claims and allegations of wrongdoing. The Tribal Companies have maintained at all times that they are arms of the Tribe and share in the Tribe's sovereign immunity. Notwithstanding the denials of liability and alleged unlawful conduct, the Settling Defendants have decided it is in their best interest to settle the Lawsuit to avoid the burden, expense, risk, and uncertainty of continuing in litigation.

Important case documents, including the Settlement Agreement, may be accessed at the Settlement Website, www.WEBSITE.com.

## 3. WHY IS THIS A CLASS ACTION?

In a class action or proceeding, one or more people, called class representatives, bring an action on behalf of people who have similar claims. All of the people who have claims similar to the class representatives are a class or class members, except for those who exclude themselves from the class. Here, the Plaintiffs have filed a claim on behalf of the Settlement Class.

## 4. HOW DO I KNOW IF I AM INCLUDED IN THE SETTLEMENT?

You are affected by the Settlement (and thus a "Settlement Class Member") if you obtained a Big Picture or Castle Payday loan(s) from June 22, 2013 to the date of the Preliminary Approval Order (the "Settlement Class").

The Settling Defendants' business records have identified you as a member of the Settlement Class, and you will be a Settlement Class Member unless you exclude yourself.

## 5. WHAT DOES THE SETTLEMENT PROVIDE AND HOW MUCH WILL MY PAYMENT BE?

The Settling Defendants have agreed to create a fund in the amount of $8.7 million ("Settlement Fund"), and they have also agreed to certain other forms of non-monetary relief for the Settlement Class. The Settling Defendants have agreed to provide the following benefits and others more fully described in the Settlement Agreement:

a) **Consumer Refund.** A Settlement Fund will provide payments to some Settlement Class Members who submit claims to the administrator of the Settlement ("Settlement Administrator"). Only borrowers who repaid the loan and also paid more than 2.5 times the original principal amount of the loan in payments over the life of the loan

will receive a refund payment. YOU MUST SUBMIT A VALID CLAIM FORM TO RECEIVE A REFUND PAYMENT. The amount of your check will depend on the amount of interest that you paid on your loan(s) and how many total valid claims are made by other Settlement Class Members. The Settlement Administrator will mail the check to the address you provide on the Claim Form, and so it is your obligation to update your address with the Settlement Administrator if you move.

b) **Reduced Interest on Pending Loans.** For those Settlement Class Members whose loan(s) have not been fully paid off or are not more than 210 days delinquent or past due, the Settling Defendants agree to collect no more than 2.5 times the original principal amount of the loan in payments over the life of the loan. For example, if the original principal amount of the loan was $500.00, then the Settling Defendants have agreed to cap collection at $1,250.00 over the life of the loan, including payments credited to either interest or principal reduction.

c) **Loan Forgiveness.** For those Settlement Class Members whose loan(s) are currently, or become, more than 210 days in default ("Charged-Off Loans"), the Settling Defendants agree to cease any collection activities and cancel all such loans as a contested liability to the extent not already done. The Settling Defendants will not assign, sell, or transfer any interest in Charged-Off Loans and/or future loan proceeds from Charged-Off Loans.

## 6. WHAT DO I HAVE TO DO TO RECEIVE MY PAYMENT?

**To receive a refund payment from the Settlement Fund, you must complete the Claim Form attached to this Notice or at [WEBSITE].** The Claim Form requires your name, current postal address, date of birth, and the last four digits of the Settlement Class Member's Social Security number. The Claim Form and the Settlement Website provide complete instructions for completion of this claims process. You may submit only one Claim Form regardless of the number of loans you had.

The Claim Form is also made available for download on the Settlement Website or by request from the Settlement Administrator.

If you are entitled to a payment, the Settlement Administrator will mail you a check upon receipt of a Valid Claim approximately 395 days after the Court grants final approval of the Settlement and any appeals are resolved.

The Settlement Administrator will mail the check to the address you provide on the Claim Form, and so it is your obligation to update your address with the Settlement Administrator if you move. You can contact the Settlement Administrator at the telephone number or address below if your address has changed.

TO SEE IF YOU QUALIFY FOR A CASH REFUND PAYMENT, click here or call NUMBER.

## 7. WHAT AM I GIVING UP IN THE SETTLEMENT?

As a member of the Settlement Class, you are providing a "Release" of certain claims against the "Released Parties" in the Settlement, who are the Settling Defendants. If you do nothing or otherwise do not receive a cash refund payment, you do not release any of your rights or claims, but you can only bring those on an individual basis. Under the Settlement, you lose your right to bring these claims in a different class action.

If you do submit a claim and do receive a cash refund payment, you will release all your claims against the Settling Parties and Released Parties. You will not be allowed to bring those claims either as an individual case or as a different class action.

The Released Parties and Settling Defendants include: the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") and the current and former members of the Lac Vieux Desert Band of Lake Superior Chippewa Indians Tribal Council and/or any employees of the Tribe or any arms of the Tribe; Big Picture Loans, LLC; Ascension Technologies, LLC; James Williams, Jr., Michelle Hazen, Henry Smith, Alice Brunk, Andrea Russell, Tina Caron, Mitchell McGeshick, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin, Jeffery McGeshick, Roberta Ivey, and June Saad; Columbia Pipe & Supply Co., Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust; Amlaur Resources, LLC and Brian Jedwab; James Dowd; Simon Liang; Brian McFadden; Duck Creek Tribal Financial, LLC; Tribal Economic Development Holdings, LLC; and each of their current and former directors, officers, principals, trustees, shareholders, partners, contractors, agents, attorneys (including, Rosette Holdings, LLC, Rosette, LLP, Robert A. Rosette, and Karrie S. Wichtman).

Under the Settlement, the Named Plaintiffs and Settlement Class Members who submit Valid Claims will be deemed to have released and waived all past, present, and future claims against the Released Parties relating to and/or arising out of loans made by and/or in the name of Big Picture and/or Red Rock/Castle Payday that are the subject of the Lawsuit. Specifically, Section 12.1 of the Settlement Agreement states:

> 12.1 Release for Valid Claims. Upon the Effective Date, the Named Plaintiffs, for themselves and as representatives of the Settlement Class, each Settlement Class Member who submits a Valid Claim, and/or their respective spouses, heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors and assigns and all those acting or purporting to act on their behalf acknowledge full satisfaction of, and shall be conclusively deemed to have fully, finally and forever settled, released and discharged the Released Parties of and from the Released Claims. Nothing in this Settlement Agreement, however, shall be deemed a release of the Parties' respective rights and obligations under this Settlement Agreement. Also, nothing in this Settlement Agreement shall be deemed a release of Plaintiffs' and Settlement Class Members' respective Claims against the Non-Settling Defendants.

Settlement Class Members who do not submit a Valid Claim will be deemed to have provided a more limited release of only class, collective, and mass actions against the Released Parties. Specifically, Section 12.4 of the Settlement Agreement states:

> 12.4 Scope of Release for Settlement Class Members Who Do Not Receive a Payment ("Non-Payment Released Claims"). All Settlement Class Members who do not receive a payment from the Settlement Fund will waive their rights to bring a class action, collective action, and/or mass action (but not an individual action) against any and all of the Released Parties related to not only claims asserted in the Actions, but also claims that could have been asserted in the Actions.

The Plaintiffs have brought claims against other Non-Settling Defendants and their companies who they allege were behind the lending operation. Specifically, claims against Matt Martorello, Justin Martorello, Rebecca Martorello, Jeremy Davis, Eventide Credit Acquisitions, LLC, Bluetech Irrevocable Trust, Kairos Holdings, LLC, Liont, LLC, or any other entities owned, directly or indirectly, by Matt Martorello, Justin Martorello, or Rebecca Martorello will continue to be litigated by the Plaintiffs. If a class is certified, you may also be part of that class and will receive separate notice of this and any rights or benefits you may have due to those lawsuits.

## 8. CAN I OPT OUT OF THE SETTLEMENT?

No. Settlement Class Members are not permitted to exclude themselves or otherwise "opt out" of the Settlement because of the nature of the Settlement, which is brought under Fed. R. Civ. P. 23(b)(2). However, unless you request and receive a cash refund payment, you do not give up your rights (if any) to bring an individual claim in your own lawsuit. That individual lawsuit would not be part of this case, and you would need to obtain your own lawyer(s) to bring it.

## 9. HOW DO I TELL THE COURT THAT I OBJECT TO AND DO NOT LIKE THE SETTLEMENT?

If you are a Settlement Class Member, then you can object to the Settlement if you think the Settlement is not fair, reasonable, or adequate, and that the Court should not approve the Settlement. You have the right to appear personally and be heard by the judge. The Court will consider your views carefully.

To preserve your objection, you must send a letter stating your views to each of the parties listed below:

| Class Counsel Representative | Big Picture Defendants' Counsel Representative |
|---|---|
| Leonard A. Bennett<br>Consumer Litigation Associates, PC<br>763 J Clyde Morris Blvd., Suite 1A<br>Newport News, VA 23601<br>Telephone: (757) 930-6330<br>Facsimile: (757) 960-3662<br>Email: lenbennett@clalegal.com | Karrie S. Wichtman<br>Lac Vieux Desert Band of Lake Superior Chippewa Indians<br>N4698 US 45, P.O. Box 249<br>Watersmeet, Michigan 49969<br>Telephone: (906) 358-4577, extension 4127<br>Email: karrie.wichtman@lvdtribal.com |

| **Big Picture Defendants' Counsel Representative** | **Settlement Administrator** |
|---|---|
| Robert A. Rosette<br>Rosette, LLP<br>565 W. Chandler Boulevard<br>Suite 212<br>Chandler, Arizona 85225<br>Telephone: (480) 889-8990<br>Facsimile: (480) 899-8997<br>Email: rosette@rosettelaw.com | Settlement Administrator to be approved by the Court |

You should include the following case name and docket number on the front of the envelope and letter you file with the Court: "*Renee Galloway, et al. v. James Williams, Jr., et al.*, Case No. 3:19-cv-00470-REP (E.D. Va.)".

All objections **must** include the following information:

- Your name, address, telephone number, and the last four digits of your Social Security number;

- A sentence confirming that you are a Settlement Class Member;

- Your factual basis and legal grounds for the objection to the Settlement; and

- The name, firm name, phone number, email address, and mailing address of counsel representing you, if any.

**Objections must be filed with the Court and served on the above parties so that they are postmarked no later than DATE. Any lawyer who intends to appear at the Final Fairness Hearing must also enter a written Notice of Appearance of Counsel with the Clerk of the Court no later than thirty (30) days before the Final Fairness Hearing and shall include the full style and case number of each previous class action case in which that counsel has represented an objector.**

## 10. WHEN AND WHERE WILL THE COURTS DECIDE WHETHER TO APPROVE THE SETTLEMENT?

The Court will hold a hearing to decide whether to approve the Settlement on DATE at TIME in the courtroom of Judge Robert E. Payne of the United States District Court for the Eastern District of Virginia, Spottswood W. Robinson III and Robert R. Merhige, Jr. Federal Courthouse, 701 E. Broad St., Richmond, VA 23219. At this hearing, the Court will determine whether the Settlement is fair, reasonable, and adequate.

If there are objections, the Court will consider them at that time. The hearing may be moved to a different date or time without additional notice. Please check WEBSITE or call PHONE NUMBER to be kept up-to-date on the date, time, and location of the hearing.

## 11. DO I HAVE TO COME TO THE HEARING?

No.  But you are welcome to come at your own expense. As long as you mailed your written objection on time, the Court will consider it. You may also retain a separate lawyer to appear on your behalf at your own expense.

## 12. DO I HAVE A LAWYER IN THE CASE?

Yes.  The Court has appointed these law firms in these cases as "Class Counsel" to represent you and all other members of the Settlement Class: Consumer Litigation Associates, P.C., Kelly Guzzo PLC, Terrell Marshall Law Group PLLC, Berger & Montague PC, Caddell & Chapman, Gupta Wessler PLLC and Tycko & Zavareei LLP.

These lawyers will not separately charge you for their work on the case.  If you want to be represented by your own lawyer, you may hire one at your own expense.

5

## 13. HOW WILL THE LAWYERS BE PAID?

As part of the proposed Settlement, Class Counsel are seeking an award of up to 33% of the Settlement Fund for their attorneys' fees and costs. The amount awarded by the Court will reduce the distributions to Settlement Class Members.

Class Counsel also will ask the Court to approve a service award of up to $5,000 to each of the 43 individual Plaintiffs in this matter, depending upon each Plaintiff's degree of contribution and service. The Plaintiffs were subject to extensive discovery and made substantial contributions in the prosecution of these lawsuits for the benefit of the Class. The Court will ultimately decide how much Class Counsel and the individual Plaintiffs will be paid.

The Settlement contains a number of detailed provisions for the allocation of the Settlement Fund, including the distribution of leftover amounts. The details for Settlement Fund distribution are set forth in the settlement documents available at the Settlement Website, www.WEBSITE.com.

## 14. HOW DO I GET MORE INFORMATION?

This Notice summarizes the proposed Settlement. You can get a copy of the Settlement Agreement and other relevant case-related documents at the Settlement Website, www.WEBSITE.com., by calling the Settlement Administrator at PHONE NUMBER, or by contacting Class Counsel at the addresses above or by email to email@email.com.

**PLEASE DO NOT ADDRESS ANY QUESTIONS ABOUT THE SETTLEMENT OR THE LITIGATION TO THE CLERK OF THE COURT, THE JUDGE, THE SETTLING DEFENDANTS OR THE SETTLING DEFENDANTS' COUNSEL.**
**THEY ARE NOT PERMITTED TO ANSWER YOUR QUESTIONS.**

# EXHIBIT B

# PROPOSED ORDER

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**RENEE GALLOWAY,** *et al.*,

      **Plaintiffs,**

**v.**                                       **Civil Action No. 3:19-cv-00470-REP**

**JAMES WILLIAMS, JR.,** *et al.,*

      **Defendants.**

## <u>ORDER</u>

WHEREAS all named Plaintiffs, by counsel, have alleged that Defendants, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") (collectively, the "Big Picture Defendants" and with Plaintiffs, "the Parties"), violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the usury laws of various states, among other claims, arising from loans made to consumers by Big Picture or Red Rock Tribal Lending, LLC ("Red Rock"); and

WHEREAS, the Big Picture Defendants, while denying that they have violated any legal requirement, have agreed to adopt certain changes to their businesses as a condition of the class Settlement of the above-captioned matter.

THEREFORE, pursuant to the agreement and consent of the Parties, and upon its own consideration and disposition, the Court hereby FINDS and ORDERS as follows:

1.      With respect to Settlement Class Members residing within the United States or its territories who executed loan agreements with Big Picture and/or Red Rock (including loans assigned to Big Picture or Red Rock) from June 22, 2013, to the date of the Preliminary Approval Order and have not fully paid off his or her loan under the agreed terms, but not

including Charged-Off Loans (defined below), the Big Picture Defendants shall collect no more than 2.5 times the original principal amount of the loan in payments over the life of the loan.

2.      With respect to loan agreements executed (i) by Settlement Class Members residing within the United States or its territories, (ii) with Big Picture and/or Red Rock (including loans assigned to Big Picture) and (iii) from June 22, 2013 to the date of the Preliminary Approval Order, Big Picture shall charge off such loans after being at least 210 days in default ("Charged-Off Loans").  The Big Picture Defendants shall cease any collection activities and cancel all such loans as a contested liability to the extent not already done for Charged-Off Loans.  The Big Picture Defendants shall not assign, sell, or transfer any interest in Charged-Off Loans and/or future loan proceeds from Charged-Off Loans.  Any consumers with Charged-Off Loans on the Effective Date shall be notified of the elimination of their defaulted loan balances through a letter, approved by all Parties and sent by the Settlement Administrator. Such letter will be sent by email if such address is reasonably verifiable and shall not imply or express any admission of wrongdoing by any of the Released Parties.  Any payments made on Charged-Off Loans to the Big Picture Defendants after the date of the Preliminary Approval Order shall either be (i) rejected by Big Picture Defendants or (ii) held in escrow by the Big Picture Defendants and within thirty (30) days of the Effective Date shall be returned to the respective consumer or paid to the Settlement Administrator to be returned to the respective Settlement Class Member.

3.      All capitalized terms in this Order shall have the same meaning ascribed to them in the Class Action Settlement Agreement and Release.

IT IS SO ORDERED.

Dated: _____     _____

                                        Senior United States District Judge

# EXHIBIT C

# PROPOSED PRELIMINARY APPROVAL ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**RENEE GALLOWAY,** *et al.,*

        **Plaintiffs,**

**v.**                                                     **Civil Action No. 3:19-cv-00470-REP**

**JAMES WILLIAMS, JR.,** *et al.,*

        **Defendants.**

_____ /

## PRELIMINARY APPROVAL ORDER

WHEREAS, all named Plaintiffs (listed and defined below) and certain Defendants, namely: (1) Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") (collectively, the "Big Picture Defendants"), represented to be wholly-owned and operated entities of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally-recognized Indian tribe, (2) James Williams, Jr., Michelle Hazen, Henry Smith, Alice Brunk, Andrea Russell, Tina Caron, Mitchell McGeshick, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin, Jeffery McGeshick, Roberta Ivey, and June Saad (collectively, the "Individual Tribal Defendants"), (3) Columbia Pipe & Supply Co., Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust (collectively, the "Columbia Defendants"), (4) Amlaur Resources, LLC and Brian Jedwab (collectively the "Amlaur Defendants"), (5) James Dowd ("Dowd"), (6) Simon Liang ("Liang"), and (7) Brian McFadden ("McFadden") (collectively, the Big Picture Defendants, the Tribe, the Individual Tribal Defendants, the Columbia Defendants, the Amlaur Defendants, Dowd, Liang and McFadden shall be referred to as the "Settling Defendants"; collectively, the Named Plaintiffs and the Settling Defendants shall be referred to as the "Parties"), through their respective

counsel, have agreed, subject to Court approval following notice to the Settlement Class Members and a hearing, to settle the above-captioned lawsuit (the "Lawsuit") upon the terms and conditions set forth in the Class Action Settlement and Release (the "Settlement Agreement").

The Settlement Agreement that has been filed with the Court (ECF No. ___) and the definitions set forth in the Settlement Agreement are incorporated herein by reference.

Based upon the Settlement Agreement and all the files, records, and proceedings herein, it appears to the Court that, upon preliminary examination, the proposed Settlement is fair, reasonable, and adequate. Accordingly, the Court grants preliminary approval of the Settlement. A Final Approval Hearing will be held on _____, ____, 20__ at __:__ A.M./P.M., after notice to the proposed Settlement Class Members, in order to determine whether a Final Approval Order should be entered in the Lawsuit.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. **Consolidated Amended Complaint:** Plaintiffs' Motion for Leave to File the Consolidated Amended Complaint is granted, subject to the conditions within the Settlement Agreement.

2. **Settlement Class:** Pursuant to Fed. R. Civ. P. 23(b)(2), the matter is hereby preliminarily certified, for Settlement purposes only, as a class action on behalf of the following class of individuals (the "Settlement Class Members" or "Settlement Class"):

> All consumers residing within the United States or its territories who executed loan agreements with Red Rock Tribal Lending, LLC or Big Picture Loans, LLC (including loans assigned to Big Picture Loans, LLC) from June 22, 2013 to the date of the Preliminary Approval Order; provided, however, that "Settlement Class" and "Settlement Class Member" shall exclude: (i) all consumers who would otherwise qualify for membership in the "Settlement Class" for which the consumer previously has released all claims as to the Settling Defendants; (ii) the Settling Defendants' officers, directors, and employees; (iii) the Settling Defendants' attorneys; (iv) the Named Plaintiffs' attorneys; and (v) any judge who has presided over either mediation or disposition of this case and the members of his or her immediate family.

3.     **Class Representative Appointment:** Pursuant to Fed. R. Civ. P. 23, the Court preliminary certifies Lula Williams; Gloria Turnage; George Hengle; Dowin Coffy; Marcella Singh, as administrator of the Estate of Felix Gillison, Jr.; Renee Galloway; Dianne Turner; Earl Browne; Rose Marie Buchert; Regina Nolte; Kevin Minor; Teresa Titus; Lisa Martinez; Anthony Green; Sonji Grandy; Anastasia Sherman; Burry Pough; Linda Madison; Dominque de la Bay; Lucinda Gray; Andrea Scarborough; Jerry Avent; Lori Fitzgerald; Derek Geter; Keisha Hamm; Faith Thomas; Sharon Paavo; Latanya Tarleton; Christina Cumming; Lamesha Kondo; Andrea Mendez; Tammy Wangeline; Freeman Revels; Kimberly Pool; Tasha Pettiford; Richard L. Smith, Jr.; Victoria Renee McKoy; Desiree Wright Lovins; Sandra Monsalve; Carrie Samantha Smith; Chris Kobin; Dana Duggan; and John Actis (collectively, "Named Plaintiffs") as the Class Representative(s) for the Settlement Class. The Court finds and determines that the Named Plaintiffs will fairly and adequately represent the interests of the Settlement Class in enforcing the rights of the Settlement Class in the Litigation.

4.     **Class Counsel Appointment:** The following attorneys are preliminarily appointed as Class Counsel under Fed. R. Civ. P 23(g)(1):

   a.   Leonard A. Bennett, Elizabeth W. Hanes, and Craig C. Marchiando of Consumer Litigation Associates, P.C.;

   b.   Kristi C. Kelly, Andrew J. Guzzo, and Casey S. Nash of Kelly Guzzo PLC;

   c.   Beth E. Terrell, Elizabeth A. Adams, and Jennifer R. Murray of Terrell Marshall Law Group PLLC;

   d.   E. Michelle Drake and John G. Albanese of Berger & Montague PC;

   e.   Matthew W. Wessler of Gupta Wessler PLLC;

   f.   Anna C. Haac and Hassan Zavareei of Tycko & Zavareei LLP; and

g. Michael A. Caddell, Cynthia B. Chapman, John B. Scofield, Jr., and Amy E. Tabor of Caddell & Chapman.

For purposes of these Settlement approval proceedings, the Court finds that these law firms are competent and capable of exercising their responsibilities as Class Counsel and have fairly and adequately represented the interests of the Settlement Class for Settlement purposes.

5. **Preliminary Certification of the Class:** For Settlement purposes only, the Court preliminarily finds that this matter and the Settlement Class satisfy the applicable prerequisites for class action treatment under Fed. R. Civ. P. 23(b)(2). The Court preliminarily finds that, for Settlement purposes and conditioned upon the entry of this Order and the Final Approval Order, and the occurrence of the Effective Date, that the prerequisites for a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure have been satisfied. The Court finds, in the specific context of this Settlement, that the following requirements are met: (a) the number of Settlement Class Members is so numerous that joinder is impracticable; (b) there are questions of law and fact common to the Settlement Class Members; (c) the Named Plaintiffs' claims are typical of the claims of the Settlement Class Members; (d) the Named Plaintiffs have fairly and adequately represented the interests of the Settlement Class and will continue to do so, and the Named Plaintiffs have retained experienced counsel to represent them; (e) the questions of law and fact common to the Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; and, (f) a class action provides a fair and efficient method for settling the controversy under the criteria set forth in Rule 23 and is superior to alternative means of resolving the claims and disputes at issue in this Lawsuit. The Court also concludes that, because this case is being settled rather than litigated, the Court need not consider manageability issues that might be presented by the trial of a class action involving the issues in this case.

6.      The Court finds that the Settlement falls within the range of reasonableness because it provides for meaningful remediation relative to the merits of the Named Plaintiffs' claims and the Settling Defendants' defenses in that Settlement Class Members will obtain substantial injunctive relief.  The Settlement also has key indicia of fairness in that significant discovery and litigation have been undertaken by the Parties in the Lawsuit and other related cases and settlement negotiations occurred at arm's length.

7.      **Class Action Administration:** [_____] is approved as the Settlement Administrator. The Settlement Administrator shall oversee the administration of the Settlement and the notification to Settlement Class Members as directed in the Settlement Agreement.  The Notice Plan and class administration expenses shall be paid in accordance with the Settlement Agreement.

8.      **Class Notice:** The Court approves the form and content of the Class Notice submitted to the Court on November 26, 2019 (ECF No. ____).  The proposed form and method for notifying the Settlement Class Members of the Settlement and its terms and conditions meet the requirements of Fed. R. Civ. P. 23(c)(2)(B) and due process.  The proposed Class Notice constitutes the best notice that is practicable under the circumstances and constitutes due and sufficient notice to all persons and entities entitled to notice.  The Court finds that the proposed notice concisely and clearly states, in plain, easily understood language, the nature of the Lawsuit; the definition of the class certified; the class claim, issues, and defenses; that a Settlement Class Member may enter an appearance through counsel if the member so desires; and the binding effect of a class judgment on Settlement Class Members.  The Notice Plan is designed for notice to reach a significant number of Settlement Class Members and is otherwise proper under Fed. R. Civ. P. 23(e)(l).

Based on the foregoing, the Court hereby approves the Notice Plan developed by the Parties and directs that the Notice Plan be implemented according to the Settlement Agreement.

9. **Objections:** Any individual within the Settlement Class may appear at the Final Approval Hearing to argue that the proposed Settlement should not be approved and/or to oppose the application of Class Counsel for an award of Attorneys' Fees and costs and the Service Awards to the Named Plaintiffs; provided, however, that no individual within the Settlement Class shall be heard, and no objection may be considered, unless the individual files the objection with the Court no later than thirty (30) days before the Final Approval Hearing and mails the objection to Class Counsel, Settling Defendants' Counsel, and the Settlement Administrator postmarked no later than thirty (30) days before the Final Approval Hearing; provided, however, objections to the Class Counsel's Attorneys' Fees or the requested Service Awards may be supplemented up to seven (7) days after the filing of a motion for such fees or awards to address additional information or materials in the motion. All objections must include: (1) the objector's name, address, telephone number, and the last four digits of the Settlement Class Member's Social Security Number; (2) a sentence stating that to the best of his or her knowledge he or she is a member of the Settlement Class; (3) the factual basis and legal grounds for the objection to the Settlement; and (4) the name, firm name, phone number, email address, and mailing address of counsel representing the objector, if any.

The written objection must indicate whether the Settlement Class Member and/or his or her lawyer(s) intend to appear at the Final Approval Hearing. Any lawyer who intends to appear at the Final Approval Hearing must also enter a written Notice of Appearance of Counsel with the Clerk of the Court no later than thirty (30) days before the Final Approval Hearing and shall include the full style and case number of each previous class action case in which that counsel has represented an objector. Settlement Class Members who do not timely make their objections in this manner

will be deemed to have waived all objections and shall not be heard or have the right to appeal approval of the Settlement.

10.  **Final Approval:** The Court shall conduct a Final Fairness Hearing on _____, 2020 at the Spottswood W. Robinson III and Robert R. Merhige, Jr. Federal Courthouse, 701 East Broad Street, Richmond, VA 23219, commencing at ___:___ A.M./P.M., to review and rule upon the following issues:

> a.  Whether the proposed Settlement is fundamentally fair, reasonable, adequate, and in the best interests of the Settlement Class Members and should be approved by the Court, including in light of any valid objections filed by Settlement Class Members;
>
> b.  Whether the Final Approval Order should be entered, dismissing the Lawsuit with prejudice against the Settling Defendants, releasing the Released Claims against the Released Parties, and releasing the Non-Payment Released Claims against Settlement Class Members who do not receive a payment from the Settlement Fund, as defined in the Settlement Agreement and Class Notice;
>
> c.  Whether Class Counsel's requested Attorneys' Fees and costs and the Service Awards to the Class Representatives should be approved; and
>
> d.  To discuss and review other issues as the Court deems relevant to the Settlement.

11.  Settlement Class Members need not appear at the Final Approval Hearing or take any other action to indicate their approval of the proposed class action Settlement. Settlement Class Members wishing to be heard regarding their objection are, however, required to indicate in their written objection whether or not they intend to appear at the Final Approval Hearing. The Final Approval Hearing may be postponed, adjourned, transferred, or continued without further notice to the Settlement Class Members.

12. An application for Attorneys' Fees and reimbursement of costs and expenses by Class Counsel shall be made in accordance with Section 10.7 of the Settlement Agreement and shall be filed with the Court no later than fourteen (14) days before the Final Fairness Hearing. Further submissions by the Parties, including memoranda in support of the proposed Settlement and responses to any objections, shall be filed with the Court no later than fourteen (14) days prior to the Final Approval Hearing. The Court will permit the supplementation of any filings by objectors as to Attorneys' Fees and costs at any date up to seven (7) days after the filing of a motion for such fees to address additional information or materials in the motion. The Parties may respond to this supplementation before the Final Fairness Hearing.

13. All proceedings against the Settling Defendants are stayed pending Final Approval of the Settlement, except as may be necessary to implement the Settlement or comply with the terms of the Settlement Agreement.

14. Any deadlines set in this Preliminary Approval Order may be extended by order of the Court, for good cause shown, without further notice to the Settlement Class, except that notice of any such extensions shall be posted to the Settlement Website. Members of the Settlement Class should check the Settlement Website regularly for updates, changes, and/or further details regarding extensions of these deadlines.

15. The Parties are directed to carry out their obligations under the Settlement Agreement and are hereby authorized to use all reasonable procedures in connection with approval and administration of the Settlement that are not materially inconsistent with this Order or the Settlement Agreement, including making, without further approval of the Court, minor changes to the Settlement Agreement or to the form or content of the Class Notice that the Parties jointly agree are reasonable or necessary, and which do not limit the rights of Settlement Class Members under the Settlement Agreement.

16.     Pending final determination of whether the Settlement should be approved, the Named Plaintiffs, all Settlement Class Members, and any person or entity allegedly acting on behalf of Settlement Class Members, either directly, representatively or in any other capacity, are preliminarily enjoined from commencing or prosecuting against: (1) the Released Parties any action or proceeding in any court or tribunal asserting any of the Released Claims and/or Non-Payment Released Claims.  This injunction is necessary to protect and effectuate the Settlement, this Order, and this Court's flexibility and authority to effectuate the Settlement and to enter Judgment when appropriate, and is ordered in aid of this Court's jurisdiction and to protect its judgments pursuant to 28 U.S.C. § 1651(a).

17.     If the Settlement Agreement and/or this Order are voided per Section XIII of the Settlement Agreement:

a.     The Settlement Agreement shall have no further force and effect and shall not be offered in evidence or used in the Litigation or in any other proceeding;

b.     Counsel for the Parties shall seek to have any Court orders, filings, or other entries in the Court's file that result from the Settlement Agreement set aside, withdrawn, and stricken from the record;

c.     The Settlement Agreement and all negotiations, proceedings, and documents prepared, and statements made in connection with either of them, shall be without prejudice to any Party and shall not be deemed or construed to be an admission or confession by any Party of any fact, matter, or proposition of law; and

d.     The Parties shall stand in the same procedural position as if the Settlement Agreement had not been negotiated, made, or filed with the Court, and no doctrine of waiver, estoppel, or preclusion will be asserted in any litigated certification proceedings in the Actions against any Party, including without limitation, the

amended complaint filed the Lawsuit and any consolidation of the Actions pursuant to Section 5.1 of the Settlement Agreement shall be null and void as it was filed only to effectuate this Settlement.

18.     The Court retains continuing and exclusive jurisdiction over the Lawsuit only to consider all further matters arising out of or connected with the Settlement, including the administration and enforcement of the Settlement Agreement.

IT IS SO ORDERED.

Dated: _____          _____

Senior United States District Judge

# EXHIBIT 6

# TRIBAL ECONOMIC DEVELOPMENT HOLDINGS, LLC

E23970 Pow Wow Trail
P.O. Box 692
Watersmeet, Michigan 49969

---

May 6, 2019

Eventide Credit Acquisitions, LLC
Attn: Matt Martorello
875 Carretera 693
Suite 202
Dorado, PR 00646

Re: $5,000,000 Advance Note Payment

Mr. Martorello:

Tribal Economic Development Holdings, LLC ("TED") and its wholly owned subsidiary companies Big Picture Loans, LLC ("BPL") and Ascension Technologies, LLC (collectively, "Borrower") and Eventide Credit Acquisitions, LLC ("ECA") are parties to the following: Agreement and Plan of Merger, Parental Guarantee and Sovereign Immunity Waiver, Loan and Security Agreement dated October 7, 2015and that certain Secured Promissory Note ("Note"), as amended, dated January 26, 2016.  The Co-Managers of TED have authorized a advanced Note payments to ECA in the amount of FIVE MILLION DOLLARS ($5,000,000.00) ("Advanced Payment").  The Advanced Payment will be made as follows: ONE MILLION FIVE HUNDRED DOLLARS ($1,500,000.00) immediately and ONE MILLION DOLLARS ($1,000,000.00) on or before May 31, 2019.  If, by July 31, 2019 ECA has not received Note payments pursuant to Section 1.2 of the Note in an amount equal to or greater than TWO MILLION AND FIVE HUNDRED DOLLARS ($2,500,000.00), TED will make an additional Advanced Payment of TWO MILLION AND FIVE HUNDRED DOLLARS ($2,500,000.00) at that time.

The parties agree that TED will continue to make Note payments pursuant to Section 1.2 of the Note, if any, until July 31, 2019.  After July 31, 2019, any Advanced Payment will be setoff by future Note payments pursuant to Section 1.2 of the Note.  For the avoidance of doubt, after July 31, 2019 no further payments will be considered due under Section 1.2 of the Note until a,l Advanced Payments have been fully setoff.

If the foregoing properly reflects your understanding of our agreement, please execute a copy of this letter and return the same to TED's Co-Managers via email to: Michelle Hazen at shellyh@bigpictureloans.com and James Williams, Jr. at jim.williams@lvdtribal.com.

Sincerely,

Michelle Hazen, Co-Manager

James Williams, Jr., Co-Manager

Acknowledged and agreed to this ___ 6th day of May, 2019:

Matt Martorello, President of Manager
Eventide Credit Acquisitions, LLC